UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

OKEELANTA CORPORATION,   Case No. 9:21-cv-81505-DMM

    Plaintiff,

v.

UNITED STATES ARMY CORPS OF
ENGINEERS,

    Defendant.
_____/

## AMENDED COMPLAINT OF OKEELANTA CORPORATION

Plaintiff Okeelanta Corporation ("Okeelanta") sues the United States Army Corps of Engineers ("Corps").

### INTRODUCTION

1.    This lawsuit challenges an action by the Corps to modify the Central and Southern Florida Project for Flood Control and Other Purposes ("C&SF Project" or "Project"), without adequately considering or protecting public water supply. The C&SF Project is the regional water management project that provides for the water-related needs of South Florida. In the Water Resources Development Act of 2000 ("WRDA 2000"), Congress directed the Corps to modify the C&SF Project to achieve environmental objectives consistent with the Comprehensive Everglades Restoration Plan ("Comprehensive Plan" or "CERP") and to ensure that environmental modifications to the Project will not eliminate or transfer water supply for existing users before replacement sources of water supply are made available. The Corps is now modifying the Project without ensuring the protection of water supply for existing users.

2. Specifically, the Corps has approved the construction and operation of a reservoir in the Everglades Agricultural Area (the "EAA Reservoir") so that excess water from Lake Okeechobee can be sent south to the Everglades to achieve environmental objectives in both the lake and in the Everglades. The Corps also issued a permit for a Stormwater Treatment Area for the reservoir ("Reservoir STA") to remove phosphorus from lake water so that it can be sent south to the Everglades. The construction of the EAA Reservoir is a positive step forward toward achieving the environmental goals of the Comprehensive Plan, and Okeelanta supports that project.

3. However, the Corps failed to properly analyze and ensure that the EAA Reservoir and Reservoir STA will be operated to avoid the elimination or transfer of water supply before replacement water sources become available. In particular, the Corps has ignored the plain language of WRDA 2000 and its own regulations that require the protection of water supply that existed when WRDA 2000 was passed, and instead has assumed that it need only protect a lesser amount of water supply provided by the Corps' current management of Lake Okeechobee. The Corps also failed to analyze how the Reservoir STA might affect water supply if it is operated before construction of the EAA Reservoir, which is likely to occur for years. The Corps' failure will directly harm Okeelanta and other legal water users by increasing the risk to their existing water supply during droughts.

4. Okeelanta brings this lawsuit under the Administrative Procedure Act to challenge this action and to compel the Corps to comply with its statutory obligations under WRDA 2000 and the National Environmental Policy Act ("NEPA").

128353482.1

## PARTIES

5.     Plaintiff Okeelanta is in the business of growing sugarcane and rice. Okeelanta owns, leases and farms properties south of Lake Okeechobee in Palm Beach County, Florida, and was an existing legal water user when Congress passed WRDA 2000.

6.     Okeelanta relies on the C&SF Project for water supply during periods of low rainfall, such as during the annual dry season and during droughts. In particular, Okeelanta uses water originating in Lake Okeechobee and drawn from EAA canals, which will be the sources of water the Corps will send to the EAA Reservoir. Use of water to irrigate Okeelanta's farm fields is authorized by consumptive use permits issued by the South Florida Water Management District ("SFWMD"), which allow for the use of water to the extent that it is available. Okeelanta needs a secure and predictable source of water supply in order to manage its planting schedules and crop rotations. When water is not available, then Okeelanta is unable to pump irrigation water onto its fields, which can cause the loss of or damage to crops because plants need water to grow.

7.     Okeelanta relies on the Corps' compliance with the procedural requirements of WRDA 2000 and NEPA, because those statutes require the Corps to evaluate and disclose the water supply effects of modifications to the C&SF Project, and also to ensure that project modifications will not eliminate or transfer the water supply of existing legal users. Okeelanta suffers injury when the Corps fails to comply with those procedural requirements.

8.     Defendant U.S. Army Corps of Engineers is a federal agency. The Corps is responsible for planning, constructing, operating and modifying the C&SF Project. The Corps' Jacksonville District manages projects associated with Lake Okeechobee and Everglades watersheds on behalf of the Corps.

128353482.1

## JURISDICTION AND VENUE

9. This Court has jurisdiction over the subject matter of the Amended Complaint pursuant to 28 U.S.C. §§ 1331 and 2201, and 5 U.S.C. §§ 701-706.

10. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims occurred in Palm Beach County, the Corps maintains an office in Palm Beach County, and Okeelanta's substantial farming operations affected by the challenged decisions occur in Palm Beach County, which lies within this judicial district.

11. This action is brought pursuant to the Administrative Procedure Act, which provides a right of judicial review to any person adversely affected by an agency action. 5 U.S.C. § 702. The Administrative Procedure Act provides that "[t]he reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## REGULATORY FRAMEWORK

### A. The C&SF Project and the Comprehensive Everglades Restoration Plan.

12. The C&SF Project is a regional water management project extending from Orlando to Florida City that is composed of canals, levees, storage areas, and water control structures. The Corps can only construct, operate and modify the C&SF Project pursuant to authorization from Congress.

13. Congress originally authorized the C&SF Project in the Flood Control Act of 1948 for the purposes of providing flood control; water supply for municipal, industrial and agricultural uses; prevention of saltwater intrusion of coastal wellfields; and water supply for Everglades National Park.

14. For its first 50 years, the C&SF Project achieved the original authorized project purposes to provide flood protection and water supply. However, operation of the Project also had adverse effects on the natural environment. Those unintended effects included ecological impacts in Lake Okeechobee, and water quality and environmental concerns in the St. Lucie and Caloosahatchee Estuaries. In 1992 and 1996, Congress directed the Corps to review the C&SF Project and make recommendations for how the Project might be modified to give the Corps authority to address those environmental concerns.

15. In 1999, the Corps submitted to Congress a revised plan for the C&SF Project known as the Comprehensive Everglades Restoration Plan. The Comprehensive Plan was designed to enhance the performance of existing Project purposes, especially water supply, while achieving additional environmental objectives. The environmental objectives of the Comprehensive Plan include increasing water deliveries to the Water Conservation Areas; lowering water levels in Lake Okeechobee to improve wildlife habitat in the lake; reducing environmentally-damaging regulatory (flood control) releases of water from the lake to the St. Lucie and Caloosahatchee Estuaries; and reducing harmful algae blooms in the lake and estuaries.

16. The Comprehensive Plan was designed to avoid impacting the original Project purposes of water supply and flood protection during plan implementation, and to increase water supply performance when constructed. The Comprehensive Plan was designed to avoid tradeoffs between water supply and environmental objectives by increasing the total amount of freshwater made available by the C&SF Project for all users, so there is more water to distribute, and by developing new locations to store fresh water outside of Lake Okeechobee (such as reservoirs).

17. In WRDA 2000, Congress approved the Comprehensive Plan as the "framework for modifications and operational changes to the Central and Southern Florida Project that are

128353482.1

needed to restore, preserve and protect the South Florida ecosystem while providing for other water-related needs of the region, including water supply and flood protection." WRDA 2000, Pub. L. No. 106-541, § 601(b)(1)(A), 104 Stat. 2680 (Dec. 11, 2000). WRDA 2000 directed the Corps to implement the Comprehensive Plan, and to integrate it with ongoing federal and state projects. *Id.* § 601(b)(1)(A)-(B).

18.  WRDA 2000 modified the Comprehensive Plan to incorporate a Savings Clause to protect existing water users. The Savings Clause provides that "[u]ntil a new source of water supply of comparable quantity and quality as that available on the date of enactment of this Act [December 11, 2000] is available to replace the water to be lost as a result of implementation of the Plan, the Secretary and non-Federal sponsor shall not eliminate or transfer existing legal sources of water, including those for … an agricultural or urban water supply." WRDA 2000, § 601(h)(5)(A)(1).

19.  In 2003, the Corps issued Programmatic Regulations that interpret and implement the requirements of WRDA 2000. Final Rule, Programmatic Regulations for Comprehensive Everglades Restoration Plan, 68 Fed. Reg. 64200 (Nov. 12, 2003) (promulgating regulations at 33 CFR Part 385).

20.  The Programmatic Regulations require the Corps "to develop operating manuals to ensure that the goals and purposes of [the Comprehensive Plan] are achieved." 33 CFR § 385.28(a)(1). The operating manuals include a "system-wide manual that provides a system-wide operating plan for operation of the projects of the [CERP] and other features of the C&SF Project," and project operating manuals that "provide the details necessary for integrating the operation of the individual projects with the system operation." 33 CFR § 385.28(a)(2). The Programmatic Regulations require that all "operating manuals shall … be consistent with the savings clause

provisions in the Project Implementation Report and Project Cooperation Agreement and the provisions of … § 385.36….” 33 CFR § 385.28(a)(6). The Programmatic Regulations require the Army Corps and SFWMD to develop the System Operating Manual no later than December 31, 2005. 33 CFR § 385.28(b)(1).

21. The Programmatic Regulations provide that the Corps must determine compliance with the Savings Clause by comparing the availability of water under its proposals with the availability of water under the pre-CERP baseline. 33 CFR § 385.36(a). The pre-CERP baseline is defined as "the hydrological conditions … on the date of enactment of WRDA 2000," which was December 11, 2000. 33 CFR § 385.3. The Programmatic Regulations require the Army Corps and SFWMD to develop the Pre-CERP baseline for approval by the Secretary of the Army not later than June 14, 2004. 33 CFR § 385.35(a).

22. Project Implementation Reports are documents prepared by the Corps and South Florida Water Management District ("SFWMD") that describe a project in detail and demonstrate compliance with requirements of WRDA 2000. WRDA 2000, § 601(h)(4)(A).

23. A Project Cooperation Agreement is a legal agreement between the Corps and SFWMD that describes the parties' responsibilities for construction, operation, maintenance, repair, rehabilitation, and replacement of a project. 33 CFR § 385.3. The Corps has since renamed them "Project Partnership Agreements."

**B.  NEPA.**

24. The governing charter of all federal environmental laws is the National Environmental Policy Act ("NEPA"). 42 U.S.C. § 4332(2). NEPA requires all federal agencies to analyze the reasonably foreseeable environmental impacts of their proposed actions before making final decisions. The purpose of NEPA is to ensure that both the agency and the public are

fully informed and take a hard look at the environmental consequences of proposals before the agency acts.

25. NEPA regulations require federal agencies to prepare environmental impact statements for major federal actions that will significantly affect the quality of the human environment. An environmental impact statement must fully and accurately disclose the likely environmental impacts of the proposed action.

**CHALLENGED ACTION:**
**OPERATION OF THE EAA RESERVOIR PROJECT (EAA RESERVOIR AND RESERVOIR STA)**

26. The proposed action prompting this lawsuit is the EAA Reservoir project, which the Corps is proceeding to develop in conjunction with the SFWMD.

**A. EAA Reservoir Project Description, Purpose, and Applicability of WRDA 2000.**

27. One of the features of CERP is the EAA Reservoir south of Lake Okeechobee that would be used to store water from the lake prior to delivery to the Water Conservation Areas or EAA water users. The purposes of the reservoir are to improve the timing of environmental water deliveries to the Water Conservation Areas, to reduce Lake Okeechobee regulatory releases to the St. Lucie and Caloosahatchee Estuaries, to meet EAA irrigation and Everglades water demands, and to increase flood protection in the EAA. If operated as originally planned, the EAA Reservoir will both provide environmental benefits and improve agricultural water supply.

28. The EAA Reservoir project also includes the Reservoir STA. The purpose of the Reservoir STA is to remove phosphorous from lake water and meet all water quality standards for water entering into the Everglades. This is necessary because elevated phosphorous concentrations in Lake Okeechobee limit the ability to deliver water to the Water Conservation Areas.

29. The EAA Reservoir project is a component of CERP and is subject to WRDA 2000. WRDA 2000, Pub. L. No. 106-541, § 601(b)(2)(c)(ii), 104 Stat. 2680 (Dec. 11, 2000) (authorizing

EAA Reservoir project); American Water Infrastructure Act of 2018, Pub. L. No. 115-270, § 1308(a), 132 Stat. 3765, 3819 (Oct. 23, 2018) (authorizing Corps to carry out project "in accordance with section 601 of the Water Resources Development Act of 2000"). The EAA Reservoir project therefore must comply with the WRDA 2000 Savings Clause.

### B. EAA Reservoir Project Procedural History.

30. The EAA Reservoir is one feature of the Central Everglades Planning Project, which consists of a number of individual CERP projects. On August 31, 2015, the Corps issued a Record of Decision regarding the Project Implementation Report for the Central Everglades Planning Project. Congress authorized the Central Everglades Planning Project in 2016. Pub. L. No. 114-322, § 1401(4)(A), 130 Stat. 1628, 1709 (Dec. 16, 2016). In 2018, the SFWMD proposed a substantial modification to the design of the EAA Reservoir to make it larger, and issued a so-called Section 203 Post Authorization Change Report to support that modification. Congress authorized the revised reservoir design in 2018. Pub. L. No. 115-270, § 1308(a), 132 Stat. 3765, 3819 (Oct. 23, 2018).

31. In 2020, the Corps issued Final Environmental Impact Statements for the revised EAA Reservoir project. On January 24, 2020, the Corps issued the draft Final Environmental Statement ("January 2020 FEIS"), entitled "Central and Southern Florida, Everglades Agricultural Area (EAA), Florida." On May 1, 2020, the Corps issued the Final Environmental Impact Statement entitled "Central and Southern Florida, Everglades Agricultural Area Reservoir and Stormwater Treatment Area, Florida, Final Environmental Impact Statement for the SFWMD's Section 203 Study" (the "May 2020 FEIS"). Both the January 2020 draft FEIS and the final May 2020 FEIS address construction of the EAA Reservoir and the Reservoir STA, and requirements of the Savings Clause.

32. On April 17, 2020, the Corps issued a Record of Decision regarding construction of the Reservoir STA (the "April 2020 STA ROD"), and on the same day issued a permit to allow the SFWMD to begin work on the Reservoir STA ("Reservoir STA Permit").

33. In the April 2020 STA ROD, the Corps acknowledged that the Reservoir STA "was designed to function with the [EAA] reservoir," but left open the possibility that the EAA Reservoir would not be constructed.

34. On May 15, 2020, the Corps issued another Record of Decision for the EAA Reservoir project (the "May 2020 Reservoir ROD"). The May 2020 Reservoir ROD approved the revised project and reiterated that it is subject to the requirements of WRDA 2000.

35. In May 2021, the Corps and SFWMD entered into a Project Partnership Agreement that governs the two agencies' responsibilities for building and operating the EAA Reservoir project. The Project Partnership Agreement provides that the project is subject to the May 2020 Reservoir FEIS, which addresses compliance with the Savings Clause.

36. The 2015 Record of Decision for the Central Everglades Planning Project, the April 2020 Reservoir STA ROD, the Reservoir STA Permit, the May 2020 Reservoir ROD, and 2021 Project Partnership Agreement each constitute final agency action subject to judicial review under the APA. Collectively, these documents and the environmental documents incorporated into them, are referred to herein as the "EAA Reservoir Decisions."

**C. Timeline for EAA Reservoir Project and Impact on Water Supply.**

37. Although planned as an integrated CERP project, the Reservoir STA and EAA Reservoir are on different construction timelines. The SFWMD has started construction of the Reservoir STA. While the Reservoir STA is under construction, the agencies have not yet started construction of the EAA Reservoir itself, and it will take years to actually build the reservoir due

to funding limitations. This means that the Reservoir STA likely will be operational for a substantial period of time –years – before the EAA Reservoir is operational.

38. If the Reservoir STA is operated without the EAA Reservoir, then any Lake Okeechobee water treated in the Reservoir STA will not be stored but instead discharged to the Water Conservation Areas. This will directly affect water supply for existing legal users in the EAA, including Okeelanta, because that water will not be available during dry periods and droughts.

39. Okeelanta supports the EAA Reservoir project as it was originally designed, and Okeelanta's affiliates even relinquished valuable leases on land to be used for the project. However, Okeelanta has two significant concerns about the Corps' plans for the implementation and operation of the project, both arising from the Corps' failure to properly analyze the water supply impacts of the project operations.

### D. The Corps Used the Wrong Water Supply Baseline in Its Savings Clause Analysis, in Violation of WRDA 2000, the CERP Programmatic Regulations, and the APA.

40. Okeelanta's first unaddressed concern is that the Corps used the wrong water supply baseline in its Savings Clause analysis.

41. As explained previously, WRDA 2000 provides that the Corps cannot eliminate or transfer an existing legal source of water supply available at the time WRDA 2000 was enacted in December 2000 without first finding a comparable replacement water supply.

42. The CERP Programmatic Regulations require the Corps and SFWMD to identify the pre-CERP baseline, i.e., conditions that existed at the time WRDA 2000 was enacted. 33 CFR § 385.35(a). The pre-CERP baseline is defined as "the hydrologic conditions in the South Florida ecosystem on the date of enactment of WRDA 2000, as modeled by using a multi-year period of record based on assumptions such as land use, population, water demand, water quality, and

11

assumed operations of the Central and Southern Florida Project." *Id.* § 385.4. The regulations further provide that "[t]he Corps of Engineers and the non-Federal Sponsor shall determine if implementation of the project will cause an elimination or transfer of existing legal sources of water by comparing the availability of water with the recommended project with the pre-CERP baseline." *Id.* § 385.36(a).

43. On information and belief, the Corps and SFWMD never issued a final, approved Pre-CERP baseline. The Corps and SFWMD did issue a "final draft" of the Pre-CERP baseline in April 2005, that identified the pre-CERP baseline as the Lake Okeechobee "Water Supply and Environment" (or "WSE") Regulation Schedule according to WSE decision trees. A lake regulation schedule is a portion of the Corps' Water Control Manual for the C&SF Project that defines how the Corps and SFWMD operate water control structures around Lake Okeechobee, and determines the target amount of water to be stored in the lake. The WSE schedule was the operating manual in effect in December 2000 when WRDA 2000 was enacted.

44. The Savings Clause analysis performed by the Corps for the EAA Reservoir project did not analyze the effect of the project on water supply that existed when WRDA 2000 was enacted in December 2000. Instead, the Corps analyzed the effect of the project on water supply that existed as of approximately 2018, which is the date of the analysis referenced in the May 2020 FEIS. This is a violation of WRDA 2000, § 601(h)(5)(A)(1), and the Programmatic Regulations, 33 CFR § 385.36(a).

45. The Corps' Savings Clause analysis also did not use the Corps' pre-CERP baseline as required by its own regulations. Instead, it used a different baseline, specifically, the 2008 Lake Okeechobee Regulation Schedule ("LORS 2008"). LORS 2008 was a temporary schedule adopted specifically to protect the Herbert Hoover Dike during repairs by lowering average water levels in

128353482.1

the lake. LORS 2008 provides a much lower water supply performance than was delivered under the WSE schedule. The repairs to the Herbert Hoover Dike now are substantially complete, but the Corps continues to use LORS 2008 as the baseline. This is a violation of WRDA 2000, § 601(h)(5)(A), and the CERP Programmatic Regulations, 33 C.F.R. § 385.36(a).

46. Okeelanta and other water users have asked the Corps for years to protect water supply and comply with the Savings Clause. Okeelanta and its affiliates submitted multiple comment letters to the Corps in the planning process for the EAA Reservoir dating back to 2012 raising concerns about water supply and the sufficiency of the Corps' Savings Clause analysis. The Corps refused to determine compliance with the Savings Clause based on water supply that existed when WRDA 2000 was enacted, but suggested that it would further address water supply concerns at a later time.

47. However, in the 2021 Project Partnership Agreement, which establishes the agencies' legal obligations regarding implementation of the project, the Corps and SFWMD indicated that the project would be subject to the May 2020 FEIS, which simply repeats the erroneous Savings Clause analysis found in earlier planning documents. The Programmatic Regulations require that Project Partnership Agreements "shall ensure that the Corps … and [SFWMD] not … [e]liminate or transfer existing legal sources of water until a new source of comparable quantity and quality as that available on the date of the enactment of WRDA 2000 is available to replace the water to be lost as a result of implementation of the Plan." 33 CFR § 385.27(d)(1). The failure of the Corps in the Project Partnership Agreement to ensure that there will be no loss of water supply that existed in December 2000 when WRDA 2000 was enacted violates the Programmatic Regulations and WRDA 2000 itself.

### E. The Corps Failed to Consider the Water Supply Impact of the Reservoir STA Operating on its Own Prior to the Completion of the EAA Reservoir, in Violation of WRDA 2000 and the APA.

48. Okeelanta's second unaddressed concern is that the different timelines for completion and operation of the Reservoir STA and EAA Reservoir were not appropriately considered by the Corps in conducting its WRDA 2000 Savings Clause analysis.

49. The Corps and SFWMD evaluated compliance with the Savings Clause based on modeling the concurrent operation of the Reservoir STA and EAA Reservoir, and determined that the combined project will increase agricultural and urban water supply over current levels because the EAA Reservoir will store water. That water storage component is a critical element of the water supply analysis.

50. Unfortunately, the Savings Clause analysis in the May 2020 FEIS did not evaluate the effect of only the Reservoir STA being in operation. The Corps simply assumed that the EAA Reservoir and Reservoir STA would be completed at the same time, ignoring the history of lengthy delays in implementation of CERP projects.

51. This creates a significant risk to Okeelanta and other legal water users, because it is apparent that if there is no EAA Reservoir or other repository for water storage, then the Reservoir STA would likely simply increase the amount of water delivered from Lake Okeechobee to the Water Conservation Areas. The plan for the Central Everglades Planning Project, of which the Reservoir STA is a part, calls for its facilities to be used to deliver new water to the Water Conservation Areas from Lake Okeechobee, not simply change the management of existing water deliveries. This would have the effect of eliminating an existing source of water supply for existing

14

legal water users, including Okeelanta, before replacing that supply with the operational EAA Reservoir.

52. Okeelanta and its affiliates sent a letter to the Corps in February 2020 that raised this concern about the water supply impact of operating the Reservoir STA before completion of the EAA Reservoir. The Corps did not respond to the comment letter or revise its analysis, but instead issued the April 2020 STA ROD and May 2020 Reservoir ROD.

53. The Corps must correct this analytical error and conduct a Savings Clause analysis that considers the impact on water supply of the standalone operation of the Reservoir STA, consistent with its obligations under WRDA 2000, § 601(h)(5)(A), and the CERP Programmatic Regulations, 33 CFR §§ 385.26(a)(3)(x), 385.36(a).

54. The Corps should further be required to conduct a revised Savings Clause analysis using the proper baseline and evaluating the water supply impact of the Reservoir STA operating on its own, consistent with its obligations under WRDA 2000, § 601(h)(5)(A), and the CERP Programmatic Regulations, 33 CFR §§ 385.26(a)(3)(x), 385.36(a).

55. Proceeding without doing the proper analyses harms Okeelanta by increasing the risk of reduced water supply for its farms. Okeelanta uses water that will be sent to the EAA Reservoir and Reservoir STA, and if not properly operated, those project features will reduce the water supply available during dry periods and droughts. This injury to Okeelanta falls directly within the zone of interests intended to be protected by WRDA 2000 and NEPA, which include land use and resource management and the protection of water supply needs for existing legal users. Okeelanta has further suffered a procedural injury due to the Corps' failure to comply with its obligations under WRDA 2000 and NEPA, because the procedural requirements in those statutes are designed to protect the interests of existing legal water users such as Okeelanta.

## COUNT ONE
### Violation of WRDA 2000

56. Okeelanta re-alleges Paragraphs 1 through 55 as though fully set forth herein.

57. The EAA Reservoir Decisions, including the Record of Decision for the Central Everglades Planning Project, the April 2020 STA ROD, Reservoir STA Permit, the May 2020 Reservoir ROD, and Project Partnership Agreement, each constitute final agency action subject to judicial review under the APA.

58. The Corps violated WRDA 2000, the Programmatic Regulations, and the APA by failing to analyze whether the EAA Reservoir would eliminate or transfer an existing legal source of water supply that existed when WRDA 2000 was enacted in December 2000.

59. The Corps violated WRDA 2000, the Programmatic Regulations and the APA by conducting its WRDA 2000 Savings Clause Analysis using the incorrect water supply baseline.

60. The Corps violated WRDA 2000, the Programmatic Regulations and the APA by conducting its WRDA 2000 Savings Clause Analysis without evaluating the water supply impacts of the standalone operation of the Reservoir STA, given that the Corps knew that the Reservoir STA was likely to be in operation for years prior to the completion of the EAA Reservoir.

61. Such action was arbitrary, capricious, an abuse of discretion, and contrary to law, and was without observance of procedures required by law within the meaning of 5 U.S.C. § 706(2).

## COUNT TWO
### Violation of NEPA

62. Okeelanta re-alleges Paragraphs 1 through 55 as though fully set forth herein.

63. The EAA Reservoir Decisions, including the Record of Decision for the Central Everglades Planning Project, May 2020 Reservoir ROD, April 2020 STA ROD, Reservoir STA Permit, and 2021 Project Partnership Agreement, each constitute final agency action subject to judicial review under the APA.

64. The Corps purported to comply with NEPA in connection with the EAA Reservoir Decisions based on environmental documents referenced and incorporated into those decisions. Those environmental documents include the May 2020 FEIS, January 2020 FEIS, and the Final Integrated Project Implementation Report and Final Environmental Impact Statement for the Central Everglades Planning Project. None of those documents analyzed the effects on water supply of operating the Reservoir STA prior to construction of the EAA Reservoir. This means that the Corps failed to consider the water supply effects of operating the Reservoir STA before the EAA Reservoir is completed, and incorrectly led the public to believe that the project will not affect water supply.

65. The Corps violated NEPA, its implementing regulations, and the APA by failing to evaluate the water supply impacts of the standalone operation of the Reservoir STA, given that the Corps knew that the Reservoir STA was likely to be in operation for years prior to the completion of the EAA Reservoir.

66. By so doing, the Corps failed to consider an important aspect of the problem presented, offered an explanation of water supply impacts which runs counter to the evidence, and made a determination on water supply that is so implausible that it cannot be the result of differing viewpoints or the result of agency expertise.

67. In addition, the Corps' use of the incorrect water supply baseline reflects a failure to take the necessary hard look at the water supply impacts of the EAA Reservoir and Reservoir

STA, and means that the Corps did not base its water supply analysis on factors that Congress intended the Corps to consider.

68.  The Corps' action was arbitrary, capricious, an abuse of discretion, and contrary to law, and was without observance of procedures required by law within the meaning of 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

Okeelanta respectfully requests that the Court grant the following relief for the violations of law alleged in this action:

A.  Vacate and remand the approvals of the EAA Reservoir and Reservoir STA to the Corps for proper review and planning for how those facilities will be operated consistent with the Savings Clause of WRDA 2000.

B.  Declaratory relief that the Corps approved operation of the EAA Reservoir and Reservoir STA without compliance with law and in violation of WRDA 2000 and NEPA.

C.  Award Okeelanta its attorneys' fees and costs.

D.  Grant such other relief as may be authorized by law.

Dated:  January 27, 2022

          Respectfully submitted,

          /s/  *T. Neal McAliley*
          T. Neal McAliley
          Florida Bar No. 172091
          nmcaliley@carltonfields.com
          Charles Throckmorton
          Florida Bar No. 101203
          cthrockmorton@carltonfields.com
          CARLTON FIELDS, P.A.
          2 MiamiCentral
          700 NW 1st Avenue, Suite 1200
          Miami, Florida 33136

Tel: (305) 530-0050
Fax: (305) 530-0055

*Attorneys for Okeelanta Corporation*

19

128353482.1