# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| OKEELANTA CORPORATION, ) <br> ) <br> Plaintiff ) <br> ) <br> v. ) <br> ) <br> UNITED STATES ARMY CORPS OF ) <br> ENGINEERS, ) <br> ) <br> Defendant. ) <br> ) <br> _____/ | Case No.: 9:21-cv-81505-DMM |
| UNITED STATES SUGAR CORPORATION, ) <br> ) <br> Plaintiff ) <br> ) <br> v. ) <br> ) <br> UNITED STATES ARMY CORPS OF ) <br> ENGINEERS, *et al.,* ) <br> ) <br> Defendant. ) <br> ) <br> _____/ | Case No.: 9:21-cv-81506-DMM |
| SUGAR CANE GROWERS COOPERATIVE OF ) <br> FLORIDA, ) <br> ) <br> Plaintiff ) <br> ) <br> v. ) <br> ) <br> UNITED STATES ARMY CORPS OF ) <br> ENGINEERS, ) <br> ) <br> Defendant. ) <br> ) <br> _____/ | Case No.: 9:21-cv-81508-DMM |

**THE FLORIDA FRUIT AND VEGETABLE ASSOCIATION'S AND FLORIDA FARM BUREAU FEDERATION'S JOINT *AMICUS CURIAE* BRIEF FILED IN SUPPORT OF PLAINTIFFS', SUGAR CANE GROWERS COOPERATIVE OF FLORIDA, UNITED STATES SUGAR CORPORATION, AND OKEELANTA CORPORATION, <u>JOINT MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................... iii

**STATEMENT OF CORPORATE DISCLOSURE OF JOINT *AMICUS CURIAE*, THE FLORIDA FRUIT AND VEGETABLE ASSOCIATION** ......................................................... v

**STATEMENT OF CORPORATE DISCLOSURE OF JOINT *AMICUS CURIAE*, THE FLORIDA FARM BUREAU FEDERATION** ........................................................................... v

**STATEMENT OF INTEREST** .................................................................................................. vi

**PRELIMINARY STATEMENT** ............................................................................................... vii

**ARGUMENT** ................................................................................................................................ 1

    **I.   The federal project will compete for water Florida already has allocated to Florida's diverse farming industry.** ................................................................................................. 1

    **II.   Florida's regulatory program for use of water both protects water resources and provides certainty to legal users.** ................................................................................. 3

    **III.   Federal law assures that legal users under Florida's water use program will be protected while the Government implements Everglades restoration.** ................. 4

    **IV.   Federal law requires performance of a new technical analysis to evaluate a stand-alone STA using the correct baseline for Lake Okeechobee water levels.** ............ 5

    **V.   Conclusion** ................................................................................................................... 8

## TABLE OF AUTHORITIES

**Cases**

*Sierra Club v. U.S. Army Corps of Eng'rs*
295 F.3d 1209 (11th Cir. 2002) ........................................................7

*Tequesta v. Jupiter Inlet Corp.*
371 So. 2d 663 (Fla. 1979) ........................................................3

**Statutes**

Pub. L. No. 106-541, § 601(b)(1)(A) ........................................................5

Pub. L. No. 106-541, § 601(b)(5)(A) ........................................................5, 6, 7

Pub. L. No. 106-541, § 601(b)(5)(B) ........................................................5

Pub. L. No. 106-541, § 601(h)(2)(A) ........................................................5

Pub. L. No. 106-541, § 601(h)(4)(a)(iii) ........................................................5, 6

Pub. L. No. 115-270, §1308(a) ........................................................5

§ 373.016(1), Fla. Stat. ........................................................3

§ 373.016(2), Fla. Stat. ........................................................3

§ 373.016(4)(a), Fla. Stat. ........................................................3

§ 373.042, Fla. Stat. ........................................................2

§ 373.0421, Fla. Stat. ........................................................2

§ 373.219(1), Fla. Stat. ........................................................3

§ 373.223(1), Fla. Stat. ........................................................2, 4

§ 373.223(1)(b), Fla. Stat. ........................................................4

§ 373.236(1), Fla. Stat. ........................................................4

§ 373.536(6)(4), Fla. Stat. ........................................................4

§ 373.701(2)(a), Fla. Stat. ........................................................3

**Regulations**

33 C.F.R. § 385.36(a) ........................................................5, 6

Fla. Admin. Code R. 40E-2.011(1) ……………………………………………………………..3

Fla. Admin Code R. 40E-2.011(2) ……………………………………………………………...3

Fla. Admin. Code R. 40E-2.041 ………………………………………………………………...2

Fla. Admin. Code R. 40E-2.091(1) …………………………………………………………..1, 3

Fla. Admin. Code R. 40E-2.301(1) …………………………………………………………..2, 4

Fla. Admin. Code R. 40E-2.301(2) …………………………………………………………..1, 3

Fla. Admin. Code R. 40E-2.321 ………………………………………………………………...4

Fla. Admin. Code R. 40E-2.331 ………………………………………………………………...4

Fla. Admin. Code R. 40E-8.221(1) …………………………………………………………..2, 4

**Other Authorities**
Exec. Order Number 19-12, § 1D, Office of the Governor, State of Fla. (2019) ……………….8

Applicant's Handbook for Water Use Permit Applications within the South Florida Water Management District, effective June 13, 2022
        Section 2.3.1.B …………………………………………………………………………4

        Section 3.2.1.F. ………………………………………………………………………..1

        Section 3.2.1.F., Figure 3-3 …………………………………………………………..1

*Florida Agriculture by the Numbers* (Fla. Dep't Agric. & Consumer Services), 2020 …………..1

*Florida Statewide Agricultural Irrigation Demand Estimated Agricultural Water Demand, 2019-2045* (Fla. Dep't Agric. & Consumer Services), June 30, 2021 ……………………………….2

**STATEMENT OF CORPORATE DISCLOSURE OF JOINT *AMICUS CURIAE*, FLORIDA FRUIT AND VEGETABLE ASSOCIATION**

Consistent with Rule 26.1, Fed. R. App. Pro., *amicus curiae* the Florida Fruit and Vegetable Association, respectfully submits its corporate disclosure statement and states as follows:

Florida Fruit and Vegetable Association is an agricultural marketing association organized under Chapter 618, *Florida Statutes*, it has no parent corporations, and no publicly held company that owns more than ten percent of its stock.

**STATEMENT OF CORPORATE DISCLOSURE OF JOINT *AMICUS CURIAE*, THE FLORIDA FARM BUREAU FEDERATION**

Consistent with Rule 26.1, Fed. R. App. Pro., *amicus curiae* the Florida Farm Bureau Federation, respectfully submits its corporate disclosure statement and states as follows:

The Florida Farm Bureau Federation is not-for-profit organization organized under Chapter 617, *Florida Statutes*, it has no parent corporations, and no publicly held company that owns more than ten percent of its stock.

## **STATEMENT OF INTEREST**

The Florida Fruit and Vegetable Association ("FFVA") is Florida's leading full-service specialty crop organization and has approximately 1,300 association members who represent all aspects of the agricultural industry. FFVA is a longstanding Florida agricultural organization that has been serving Florida's grower-shipper community since 1943. Its mission is to enhance the business and competitive environment for the production and marketing of fruits, vegetables, and other crops. FFVA members represent the diverse nature of Florida farming and grow a broad range of crops including, vegetables, citrus, tropical fruit, berries, sod, sugar cane, tree crops, and more. Many FFVA members are family-owned growing operations located in south Florida, specifically in and around Lake Okeechobee.

FFVA is authorized to file this joint motion and *amicus curiae* brief based on direction from its Board of Directors who voted and approved filing this pleading on June 3, 2022.

The Florida Farm Bureau Federation ("Farm Bureau") is Florida's largest agricultural organization and is composed of approximately 134,000 members from all across Florida. It is the voice of Florida agriculture and represents a diverse range of farm owners who produce over 300 of Florida's agricultural commodities. Its mission is to increase the net income of farmers and ranchers and to improve the quality of rural life.

The Farm Bureau advocates before all government branches on the values of agriculture and agricultural land within local communities. As part of its advocacy efforts, the Farm Bureau maintains policy positions on all types of matters that impact its farmer members, including water issues, competing water uses, Lake Okeechobee operations including its regulation schedules, minimum flows and levels, and engagement with Florida's five water management districts. It is specifically interested in this proceeding because many of its south Florida farmers are existing legal users who hold consumptive use permits from the South Florida Water Management District and primary surface water allocations from Lake Okeechobee and its service area.

The Farm Bureau is authorized to file this joint motion and *amicus curiae* brief based on direction from its Board of Directors who approved filing this pleading on June 8, 2022.

## **PRELIMINARY STATEMENT**

      Consistent with Rule 29(a)(4)(E), Fed. R. App. Pro., FFVA and the Farm Bureau jointly state that this brief was authored in whole by counsel for FFVA and the Farm Bureau, and was not authored, in whole or in part, by parties' counsel.  Further FFVA and the Farm Bureau jointly state that the parties or parties' counsel did not contribute money intended to fund the preparation or submission of this motion or *amicus curiae* brief, and no person other than the joint *amicus curiae*, its members, or its counsel contributed money that was intended to fund preparation or submission of this motion or *amicus curiae* brief.

# ARGUMENT

I. **The federal project will compete for water Florida already has allocated to Florida's diverse farming industry.**

It is often said that south Florida weather can be one of extremes, having the potential to produce droughts and hurricanes in the same year. During its "wet season" the region typically experiences significant rainfall, and water managers regularly discharge fresh water to tide to prevent inland flooding. During its "dry season" water becomes limited, and water managers can be challenged to accommodate municipal, tribal, agricultural, and environmental demands. Fortunately, state law provides the framework under which water users obtain a measure of predictability and certainty in their water supply.

Lake Okeechobee and its surrounding area is a portion of south Florida that is highly managed for both flood control and water supply. This area is known as the "Lake Okeechobee Service Area" or "LOSA." The State defines LOSA to include Lake Okeechobee and its hydraulically connected integrated canal system.[1] LOSA is *not* synonymous with the "Everglades Agricultural Area" or "EAA." LOSA includes portions of Okeechobee, Glades, Highlands, Lee, Palm Beach, and Martin Counties. Applicant's Handbook, Section 3.2.1.F., Figure 3-3.

Agriculture is a significant enterprise in these six counties, and important to Florida's overall economy and the Country's food security.[2] There is more than 1.7 million acres of land dedicated to agriculture in these counties, approximately 10 percent of which is irrigated for sugar

---

[1] *Applicant's Handbook for Water Use Permit Applications within the South Florida Water Management District, effective June 13, 2022* ("Applicant's Handbook"), Section 3.2.1.F., *available at* https://www.sfwmd.gov/sites/default/files/documents/wu_applicants_handbook.pdf. The Applicant's Handbook is adopted by rule at Fla. Admin. Code R. 40E-2.091(1), 40E-2.301(2).

[2] Cash receipts from Florida agricultural products totaled $7.80 billion in 2019. *Florida Agriculture by the Numbers* (Fla. Dep't Agric. & Consumer Services), 2020, at 10, *available at* https://www.fdacs.gov/ezs3download/download/78734/2318004/Media/Files/Marketing-Development-Files/Florida-Agriculture-by-the-Numbers-2019-Statistical-Report/florida-ag-by-the-numbers-2020.pdf. Florida is the first or second largest domestic producer by value of 15 agricultural commodities, including oranges, grapefruit, tomatoes, snap beans, and cabbage. *Id.* at 14.

1

cane.³ FFVA and Farm Bureau farmers and grower-members who live and work in these counties often are family-owned, multigenerational agricultural operations who have been producing a wide variety of crops such as leafy greens, cabbage, green beans, radishes, Chinese vegetables, celery, citrus, sugar cane, rice, and sod, for decades. South Florida agriculture simply is not synonymous with "sugar cane."

Within LOSA, water availability has suffered since 2008—when the federal government changed the regulation schedule for Lake Okeechobee. Those operational changes increased the likelihood of significant ecological harm within the Lake. *See* §§ 373.042, 373.0421, Fla. Stat. (establishing Florida's "minimum flows and minimum levels" program that protects a surface water or groundwater from "withdrawal[s] [that] would be significantly harmful to the water resources or ecology of the area."); Fla. Admin. Code R. 40E-8.221(1) (establishing a minimum level for Lake Okeechobee). Consequently, the State restricted future increased allocations to "existing legal users." § 373.223(1), Fla. Stat.; Fla. Admin. Code R. 40E-2.041, 40E-2.301(1). FFVA and Farm Bureau farmers and grower-members are existing legal users of surface water from LOSA.

The federal project at issue in this case also would withdraw surface water from LOSA. PPA_008337.⁴ The Project, formally known as the "A-2 Reservoir and Stormwater Treatment Area," essentially is a water storage reservoir and associated wetlands, the latter having the capability to remove nutrients from or "treat" water stored in the reservoir before distributing that water south into the Everglades. 2020_ROD_037008-037010; 2020_ROD_037017. The wetland treatment area, commonly known as an "STA," requires intensive management. In order to work properly and provide effective treatment, emergent aquatic vegetation and submerged aquatic vegetation are planted and must be consistently maintained at very precise water levels.

---

³ *Florida Statewide Agricultural Irrigation Demand Estimated Agricultural Water Demand, 2019-2045* (Fla. Dep't Agric. & Consumer Services), June 30, 2021, at Apps. A, C, *available at* https://www.fdacs.gov/Agriculture-Industry/Water/Agricultural-Water-Supply-Planning.

⁴ Defendants, the United States Army Corps of Engineers, et. al., ("Federal Defendants") filed four separate administrative records which consistent of documents identified by four different Bates numbering prefixes (2015_ROD, 2020_ROD, PERMIT, and PPA). For consistency with the Federal Defendants and Plaintiffs, FFVA and the Farm Bureau shall reference the administrative record and the use the identified Bates prefixes herein.

2

PERMIT_0011596. Constant hydration is required and if the water level in the STA is too high or too low, the plants may not survive and the treatment it was intended to provide does not occur. The reservoir component of the Project is essential to store and attenuate water delivered to the STA in order to maintain the necessary water levels. PERMIT_0011597-0011598. Additionally, both the STA and reservoir consume a significant amount of water in evaporation and transpiration.

In theory, the Project would withdraw water from LOSA during the wet season when there is excess fresh water to fill the reservoir. 2020_ROD_037479. The reservoir would then meter out water into the STA on a year-round basis. A significant concern in this case is the likelihood that the Project proceeds without its reservoir component, and the un-analyzed effects that operation of a stand-alone STA would have on "existing legal users" within LOSA by directly taking water from LOSA during the dry season. ECF 27 p. 2, n. 2[5]; ECF 31 (*E.g.,* Okeelanta's Compl. ¶¶ 48-55); ECF 50 p. 16.

## II. Florida's regulatory program for use of water both protects water resources and provides certainty to legal users.

All water in Florida is subject to control through the State's regulatory program for the consumptive use of water implemented by the water management districts. §§ 373.016(1), 373.016(2), 373.701(2)(a), Fla. Stat.; *Tequesta v. Jupiter Inlet Corp.,* 371 So. 2d 663, 670-72 (Fla. 1979). FFVA and Farm Bureau members that farm within LOSA must secure authorization to use and manage surface water to irrigate their farms by obtaining a consumptive use permit from the South Florida Water Management District ("SFWMD"), the State agency established to provide stewardship of south Florida's water resources. §§ 373.016(4)(a), 373.219(1), Fla. Stat.; Fla. Admin. Code R. 40E-2.011(1), 40E-2.011(2). SFWMD evaluates consumptive use applications based on statutory requirements in section 373.223, *Florida Statutes*, specific science-based criteria contained in Chapter 40E, Florida Administrative Code, and the *Applicant's Handbook for Water Use Permit Applications within the South Florida Water Management District, effective June 13, 2022*, adopted by rule. Fla. Admin. Code R. 40E-2.091(1), 40E-2.301(2). Protecting existing legal users along with ensuring that a water use is "reasonable-beneficial," in the public

---

[5] The Court, in its Order Denying Motion to Dismiss (ECF 27), chose to cite to Okeelanta's complaint as "Okeelanta Compl." proceeded with *"e.g."*. For consistency with the Court, FFVA and Farm Bureau shall use the same reference herein.

3

interest, and not harmful to the environment are key tenants of Florida's statutory scheme. § 373.223(1), Fla. Stat.

When SFWMD issues a consumptive use permit, it authorizes a specific water allocation, for a particular use, from an identified water source, for an allotted time period, typically in 20-year durations. § 373.236(1), Fla. Stat.; Fla. Admin. Code R. 40E-2.321.  The 20-year permit duration is intended to give water users certainty so they can properly make financial investments that are dependent on the water allocation.  Consumptive use permits are subject to review at the end of the permit duration to allow SFWMD to reassess and determine whether the permitted use continues to meet regulatory criteria. Fla. Admin. Code R. 40E-2.331.  A consumptive use permit holder has "existing legal user" status which provides protections from competition and new uses. §§ 373.223(1)(b), 373.233, Fla. Stat.  A consumptive use permit also is an acknowledgment that the permitted water allocation does not harm the regional water resources and is consistent with regulatory criteria, including consumptive use restrictions and restrictions that protect the region's natural resources, such as Lake Okeechobee's minimum level. Fla. Admin. Code R. 40E-2.301(1), 40E-8.221.

Moreover, a SFWMD-issued consumptive use permit gives the permittee a 1-in-10 level of certainty that its annual or monthly allocation of water will be available from the identified source. § 373.536(6)(4), Fla. Stat.; Applicant's Handbook Section 2.3.1.B.  The 1-in-10 level of certainty provides protections that a permitted user's specified water allocation will be available in times of drought that is less severe than a 1-in-10-year drought.[6]  FFVA and Farm Bureau members rely on these allocation assurances when planning and making future investments.  For instance, citrus farmers depend on the security of a 20-year consumptive use permit when deciding whether to cultivate a new grove because it is a long-term perennial crop and as an example, citrus trees typically take five years to begin producing fruit.

**III.     Federal law assures that legal users under Florida's water use program will be protected while the Government implements Everglades restoration.**

The Water Resources Development Act 2000 ("WRDA 2000"), authorized the Comprehensive Everglades Restoration Plan ("CERP") as the "framework for modification and operational changes to the CS&F Project that are needed to restore, preserve, and protect the South

---

[6] A 1-in-10-year drought is statistically likely to occur not more than once every 10 years. Applicant's Handbook Section 2.3.1.B.

Florida ecosystem while providing for other water-related needs of the region, including water supply and flood protection." Pub. L. No. 106-541, § 601(b)(1)(A). The WRDA 2000 "Savings Clause" recognizes Florida's comprehensive regulatory framework and provides assurances that existing legal users will not be negatively impacted by implementation of CERP. Pub. L. No. 106-541, § 601(h)(2)(A); Pub. L. No. 106-541, § 601(b)(5)(B). The Savings Clause states:

> [u]ntil a new source of water supply of comparable quantity and quality as that available on the date of enactment of this Act is available to replace the water to be lost as a result of implementation of the Plan, the Secretary and the non-Federal sponsor shall not eliminate or transfer existing legal sources of water, including those for—an agricultural or urban water supply . . . .

Pub. L. No. 106-541, § 601(b)(5)(A).

FFVA and the Farm Bureau supported the enactment of WRDA 2000 and the state-federal partnership to implement the CERP project components. *E.g.*, 2020_ROD-041739-041741 (Farm Bureau comment letter related to the Project). The Savings Clause was highly negotiated and is a critical pillar of WRDA 2000. It balances Florida's control over the State's water supply with the plan to restore the Everglades. The Savings Clause's plain language affirmatively promises that the federal government will not undermine Florida's consumptive use regulatory framework or usurp existing legal users' permitted water allocations when implementing CERP projects. Pub. L. No. 106-541, § 601(b)(5)(A). The Savings Clause applies to all CERP projects including this Project. Pub. L. No. 106-541, § 601(h)(4)(a)(iii); 33 C.F.R. § 385.36(a).

**IV.      Federal law requires performance of a new technical analysis to evaluate a stand-alone STA using the correct baseline for Lake Okeechobee water levels.**

The Project was one of the first CERP project components advanced by the United States Army Corps of Engineers ("Corps") and has a long and litigious history. It has survived numerous revisions and federal agency actions. 2015_ROD_068482; Pub. L. No. 115-270, §1308(a) (Oct. 2018); 2020_ROD_037006-0037008. In recent years, the Project has been revised to be a 23-foot-deep multi-purpose storage component ("Reservoir") and 6,500-acre stormwater treatment area ("STA"), designed to operate as a single unit. 2020_ROD_037008.

Under WRDA 2000 and the National Environmental Protection Act ("NEPA") the Corps must "compare the availability of water with the recommended project with the pre-CERP baseline" when it analyzes the technical feasibility of any CERP project. 33 C.F.R. § 385.36(a).

During its analysis of the Project, the Corps used Lake Okeechobee's current, lower regulation schedule instead of using the pre-CERP baseline envisioned in WRDA 2000. PPA-008756; 2020_ROD-037255. Lake Okeechobee's current, lower regulation schedule is the inappropriate pre-CERP baseline for a myriad of reasons which are discussed in detail in Plaintiffs' Complaints and their Joint Motion for Summary Judgment. ECF 31 (*E.g.,* Okeelanta's Compl. ¶¶ 40-47); ECF 50 pp. 7-10. The Corps should not be allowed to use Lake Okeechobee's current, lower regulation schedule as the pre-CERP baseline in its required NEPA and Savings Clause analyses. The plain language of WRDA 2000 requires the Corps to use the appropriate pre-CERP baseline and the Lake Okeechobee regulation schedule that existed on December 11, 2000. Pub. L. No. 106-541, §§ 601(b)(5)(A), 601(h)(4)(a)(iii); 33 C.F.R. § 385.36(a).

In addition to using the incorrect pre-CERP baseline, there is another issue. The Project's two components likely will be completed at different times and the STA will operate on its own without the Reservoir for at least two years but possibly permanently. Yet, the Corps has not evaluated that scenario under NEPA or the Savings Clause. 2020_ROD_0037008; 2020_ROD_0037026-037055; PERMIT_011593-011595. If the Reservoir and STA are allowed to proceed under the Corps current federal approvals—which evaluate the Project as one unit—FFVA and Farm Bureau members and other existing legal users in LOSA will suffer the consequences.

SFWMD anticipates STA construction will be complete ahead of schedule and ready to begin operations and treating water in 2025. PERMIT_01144; PERMIT_0116231; PERMIT_011769; 2020_ROD_031002. But the Corps has not moved as swiftly. At best, the Corps may begin initial construction of the Reservoir sometime this year and is scheduled to complete construction in 2027. A two-year operations testing and monitoring period pushes the Reservoir's official operations date to 2029. Even with this extended timeline, there is real doubt—from the Corps itself—that this project component will ever be built. 2020_ROD_037017 ("If the Corps constructs the proposed A-2 Reservoir…"); *see also* PERMIT_011595.

There is blatant disregard of state and federal law in separating the Reservoir and STA. 2020_ROD_037017; 2020_ROD_037087-037088; PERMIT_011595. The Corps' technical analysis under WRDA 2000 and NEPA contemplated the Reservoir and STA operating together, not as separate project components. 2020_ROD_0037008; 2020_ROD_0037026-037055; PERMIT_011593-011595. When operating in tandem, the Corps' federal approvals apparently

6

show that the Reservoir and STA comply with the Savings Clause, albeit inappropriately using Lake Okeechobee's current lower, regulation schedule as a baseline. *Id.* Part of this purported compliance occurs because the Reservoir's storage is predicted to gather and hold water during times of excess and distribute water to the STA and then south during dry periods. 2020_ROD_037008; 2020_ROD_037018-037021. Unfortunately, the harmony envisioned in the Corps' federal approvals will not occur in reality.

If the STA begins using water as a stand-alone project, the surface water will come from Lake Okeechobee and its integrated canal system, in competition with other existing legal users. 2020_ROD_037046; PERMIT_011597-011598. If the Corps' and SFWMD's timetables are accurate there will be a multi-year period when the STA will need water before the Reservoir is complete. But having the STA operate alone could be permanent. 2020_ROD_037017; PERMIT_011595. Once the STA starts taking surface water from a source other than the Reservoir, either water will be diverted away from LOSA consumptive use permittees like FFVA and Farm Bureau growers and farmers or Lake Okeechobee's minimum level will be violated. 2020_ROD_037046; 2020_ROD_037079; PERMIT_011597-011598. Diverting water to the STA and away from existing legal users within LOSA violates the plain language of the Savings Clause by eliminating an existing legal source of water for the advancement of a CERP project, without providing any means of replacing the eliminated water source. Pub. L. No. 106-541, § 601(b)(5)(A).

With a new "user," existing legal users, like FFVA and Farm Bureau members, will be directly impacted by this new competition and face greater uncertainty (instead of greater assurances), increased water scarcity, and potentially greater regulatory constraints. Placing a CERP project component ahead of agricultural and municipal water supply goes against the federal law's protection of "existing legal users." *Id.* Simply, it is the antithesis of the Savings Clause's recognized protections.

In evaluating this Project, the Corps did not perform a technical analysis where the STA would be operational separate from the Reservoir and therefore did not evaluate the significant impacts to existing legal users under that scenario. 2020_ROD_0037008; 2020_ROD_0037026-037055; PERMIT_011593-011595. Once the Corps understood the Reservoir and STA were no longer a unit and were advancing on different timelines, the Corps was required to perform a revised technical analysis under NEPA. *Sierra Club v. U.S. Army Corps of Eng'rs,* 295 F.3d 1209,

7

1216 (11th Cir. 2002). The Corps cannot claim ignorance on this fact nor stick its proverbial "head in the sand." At a minimum, the Corps knew this was a possibility in April 2020 when it issued SFWMD's "404 permit" to begin constructing the treatment area. PERMIT_011591-011628. But it could have gleaned SFWMD's advanced timetable well before then. Exec. Order Number 19-12, § 1D, Office of the Governor, State of Fla. (2019). Following these failures, the Corps should now be required to perform a revised technical review of the Reservoir and STA that analyzes separate and distinct construction and operational timetables, which is the apparent reality for this CERP Project.

**V.     Conclusion**

In authorizing CERP, Florida and the federal government formalized a partnership to restore the Everglades without eroding south Florida's water supply needs. The plain language of the Saving Clause provides protections for existing legal water users under Florida's water use permitting system. In failing to recognize and technically analyze the Reservoir and its treatment area on separate timetables, the Corps has failed to meet its obligations under the Savings Clause in WRDA 2000 and NEPA. The Court should require the Corps to rectify these failures. If not, existing legal users, including FFVA and Farm Bureau farmers who have lived and worked in south Florida for decades, will lose their legal rights provided under Florida's consumptive use permitting laws. Federal law dictates that this does not happen. For these reasons, FFVA and Farm Bureau file this joint *amicus brief* and support Plaintiffs' Joint Motion for Summary Judgment and the positions taken therein.

Respectfully submitted this 22nd day of July 2022.

**MANSON BOLVES DONALDSON VARN, P.A.**

__/s/ Laura S. Olympio_____
Laura S. Olympio
Florida Bar # 117942
Brian J. Accardo
Florida Bar # 55315
Primary: LOlympio@MansonBolves.com
Primary: BAccardo@MansonBolves.com
Secondary: CDonaldson@MansonBolves.com
Secondary: VDavis@MansonBolves.com

515 N Flagler Drive, Suite 301
West Palm Beach, FL 33491
P: 561.410.7797
F: 813.514.4701
*Counsel for Joint Amicus, the Florida Fruit & Vegetable Association and Florida Farm Bureau Federation*

9

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 22nd day of July 2022, a true and correct copy of the foregoing was electronically filed with the Clerk of Court using CM/ECF. Copies of the foregoing document will be served upon counsel of record identified in the following service list by transmission of Notices of Electronic Filing generated by the Court's CM/ECF system.

                                                        /s/ Laura S. Olympio  
                                                       Laura S. Olympio

**SERVICE LIST**

| | |
|---|---|
| **GREGORY M. MUNSON**<br>Florida Bar # 188344<br>**DEBORAH K. MADDEN**<br>Florida Bar # 0098816<br>**LUNA E. PHILLIPS**<br>Florida Bar # 0063673<br>GUNSTER, YOAKLEY & STEWART, P.A.<br>215 South Monroe Street, Suite 601<br>Tallahassee, FL 32301<br>P: 850-521-1980<br>F: 850-576-0902<br>Primary: gmunson@gunster.com<br>Secondary: mmcleod@gunster.com<br>Secondary: rfrazier@gunster.com<br>Las Olas Centre<br>450 East Las Olas Boulevard, Suite 1400<br>Fort Lauderdale, FL 33301<br>P: 954-462-2000<br>F: 954-523-1722<br>Primary: dmadden@gunster.com<br>Primary: lphillips@gunster.com<br>Secondary: mmcleod@gunster.com<br>Secondary: hlininger@gunster.com<br>Secondary: eservice@gunster.com<br>*Attorneys for Plaintiff, United States Sugar Corporation* | **T. NEAL MCALILY**<br>Florida Bar # 172091<br>**CHARLES THROCKMORTON**<br>Florida Bar # 101203<br>CARLTON FIELDS, P.A.<br>2 Miami Central<br>700 NW 1st Avenue, Suite 1200<br>Miami, FL 33136<br>P: 305-530-0050<br>F: 305-530-0055<br>Primary: nmcaliley@carltonfields.com<br>Primary: cthrockmorton@carltonfields.com<br>*Attorneys for Plaintiff, Okeelanta Corporation* |
| **MATTHEW PATRICK COGLIANESE**<br>Florida Bar # 471585<br>FLORIDA CRYSTALS CORPORATION<br>One North Clematis Street, Suite 200<br>West Palm Beach, FL 33401<br>P: 561-532-1528 | **GARY V. PERKO**<br>Florida Bar # 855898<br>**GARY K. HUNTER**<br>Florida Bar # 949779<br>**MOHAMMAD O. JAZIL**<br>Florida Bar # 72556 |

| | |
|---|---|
| F: 305-530-0055<br>Primary:<br>matthew.coglianese@floridacrystals.com<br>*Attorney for Plaintiff, Okeelanta Corporation* | HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK, PLLC<br>19 South Monroe Street, Suite 500<br>Tallahassee, FL 32301<br>P: 850-270-5938<br>Primary: gperko@holtzmanvogel.com<br>Primary: ghunter@holtzmanvogel.com<br>Primary: mjazil@holtzmanvogel.com<br>*Attorneys for Plaintiff, Sugar Cane Growers Cooperative of Florida* |
| **MATTHEW J. FEELEY**<br>Florida Bar # 0012908<br>OFFICE OF THE US ATTORNEY, SOUTHERN DISTRICT OF FLORIDA<br>99 N.E. 4th Street, Suite 300<br>Miami, FL 33132<br>P: 305-961-9235<br>F: 305-530-7139<br>Primary: matthew.feeley@usdoj.gov<br>**SALLY J. SULLIVAN**<br>**PETER KRYN DYEMA**<br>US DEPARTMENT OF JUSTICE, ENVIRONMENT AND NATURAL RESOURCES DIVISION<br>150 M Street NE, Suite 3.142<br>Washington, DC 20002<br>P: 202-514-9269<br>F: 202-305-0506<br>Primary: sally.sullivan@usdoj.gov<br>Primary: peter.dykema@usdoj.gov<br>Secondary: efile_nrs.ermd@usdoj.gov<br>*Attorneys for Defendants, United States Army Corps of Engineers, et al.* | |