UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

OKEELANTA CORPORATION,                    )
                                          )
   Plaintiff,                             )
                                          )          Case No. 9:21-cv-81505-DMM
      v.                              )
                                          )
UNITED STATES ARMY CORPS OF               )
ENGINEERS,                                )
                                          )
    Defendant.                         )


UNITED STATES SUGAR CORPORATION,          )
                                          )
   Plaintiff,                             )
                                          )          Case No. 9:21-cv-81506-DMM
      v.                              )
                                          )
UNITED STATES ARMY CORPS OF               )
ENGINEERS, CHRISTINE E. WORMUTH,          )
in her official capacity as Secretary of the Army, )
MICHAEL L. CONNOR, in his official capacity as )
Assistant Secretary of the Army (Civil Works)[1], )
LIEUTENANT GENERAL SCOTT A.               )
SPELLMON, in his official capacity as     )
Commanding General and Chief of Engineers for )
the United States Army Corps of Engineers, )
COLONEL JAMES L. BOOTH[2], in his official )
Capacity as Commanding District Engineer for the )
United States Army Corps of Engineers,    )
Jacksonville District,                    )
                                          )
    Defendants.                        )

---

[1] Automatically substituted for Jaime A. Pinkham pursuant to Fed. R. Civ. P. 25(d).

[2] Automatically substituted for Andrew D. Kelly pursuant to Fed. R. Civ. P. 25(d).

SUGAR CANE GROWERS COOPERATIVE )
OF FLORIDA, )
                                     )
  Plaintiff, )
                                     )      Case No. 9:21-cv-81508-DMM
     v. )
                                       )
UNITED STATES ARMY CORPS OF )
ENGINEERS, )
                                     )
    Defendant. )

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division

Peter Kryn Dykema
Sally J. Sullivan
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
peter.dykema@usdoj.gov
sally.sullivan@usdoj.gov
Phone: (202) 305 0436
Fax: (202) 305 0274

*Attorneys for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

FACTS ....................................................................................................................... 2

    A.    The Genesis and Substance of WRDA 2000 Section VI ....................... 2

    B.    Central Everglades Planning Project (CEPP) ...................................... 4

    C.    The EAA Phase ..................................................................................... 5

    D.    The Claims at Issue (and Those no Longer at Issue) ........................... 6

ARGUMENT ............................................................................................................. 8

    A.    Legal Standards .................................................................................... 8

    B.    The Plain Language of the WRDA 2000 Savings Clause Supports the Corps' Interpretation .................................................................... 9

    C.    If There Were any Ambiguity in the WRDA 2000 Savings Clause, All Extrinsic Aids to Interpretation Favor the Corps' Reading ................ 12

        1.    Plaintiffs' reading of the Savings Clause would produce unreasonable results that Congress could not have intended .......... 12

        2.    Reading WRDA 2000 as a whole confirms the Corps' interpretation ...... 13

        3.    The Corps' reading of the savings clause is entirely consistent with the Corps' programmatic regulations .......................................... 14

        4.    The Corps' interpretation of the WRD 2000 Savings Clause is entitled to *Chevron* deference .................................................. 15

    D.    Plaintiffs Do Not Challenge The Corps' Application The Savings Clause, As the Corps Interpreted the Clause .................................................. 19

    E.    The Corps' Complied With NEPA ...................................................... 19

        1.    The Corps' Evaluated Reasonable Alternatives In Compliance With NEPA ................................................................................................. 20

        2.    The STA and Reservoir are part of the same project and NEPA does not require the Corps to analyze them separately ........................... 22

CONCLUSION ......................................................................................................... 25

i

TABLE OF AUTHORITIES

**Cases**

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*,
  729 F.3d 937 (9th Cir. 2013) ........................................................................................ 10

*Auer v. Robbins*,
  519 U.S. 452 (1997) ....................................................................................................... 14

*Boeing Co. v. United States*,
  680 F.2d 132 (Ct. Cl. 1982) ......................................................................................... 16

*Chevron U.S.A., Inc. v. NRDC*,
  467 U.S. 837 (1984) ........................................................................................... 10, 15, 16

*Christensen v. Harris County*,
  529 U.S. 576 (2000) ....................................................................................................... 18

*Citizens for Smart Growth v. Sec'y of Dep't of Transp.*,
  669 F.3d 1203 (11th Cir. 2012) .................................................................................. 8, 9

*Citizens to Pres. Overton Park v. Volpe*,
  401 U.S. 402 (1971) .......................................................................................................... 9

*City of Arlington, Tex. v. F.C.C.*,
  569 U.S. 290 (2013) ....................................................................................................... 16

*City of Oxford, Ga. v. F.A.A.*,
  428 F.3d 1346 (11th Cir. 2005) .................................................................................. 24

*Coal. for Advancement of Reg'l Transp. v. Fed. Highway Admin.*,
  576 F. App'x 477 (6th Cir. 2014) .............................................................................. 24

*Conservancy of Sw. Fla., Inc. v. Williams*,
  No. 13-14477-CIV, 2018 WL 11422990 (S.D. Fla. Dec. 21, 2018) ...................... 20

*D'Olive Bay Restoration & Pres. Comm., Inc. v. U.S. Army Corps of Engineers*,
  513 F. Supp. 2d 1261 (S.D. Ala. 2007) ..................................................................... 25

*Defenders of Wildlife v. Salazar*,
  877 F. Supp. 2d 1271 (M.D. Fla. 2012) ..................................................................... 25

*Defs. of Wildlife v. U.S. Dep't of Navy*,
  895 F. Supp. 2d 1285 (S.D. Ga. 2012) ....................................................................... 22

*Dep't of Transp. v. Public Citizen*,
  541 U.S. 752 (2004) .......................................................................................................... 8

*Druid Hills Civic Ass'n v. Fed. Highway Admin.*,
  772 F.2d 700 (11th Cir. 1985) ................................................................................. 9, 20

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
  36 F. 4th 850 (9th Cir. 2022) ...................................................................................... 20

*Fed. Election Comm'n v. Nat'l Rifle Ass'n of Am.*,
    254 F.3d 173 (D.C. Cir. 2001) ................................................................. 18

*Fla. Wildlife Fed'n v. U.S. Army Corps of Engineers*,
    401 F. Supp. 2d 1298 (S.D. Fla. 2005) ..................................................... 23

*Friends of Ompompanoosuc v. Fed. Energy Regulatory Comm'n*,
    968 F.2d 1549 (2d Cir. 1992) .................................................................... 20

*Fuerst v. Hous. Auth. of City of Atlanta, Georgia*,
    38 F. 4th 860 (11th Cir. 2022) ................................................................. 11

*Greenfield v. Yucatan Foods, L.P.*,
    18 F. Supp. 3d 1371 (S.D. Fla. 2014) ...................................................... 18

*Hill v. Boy*,
    144 F.3d 1446 (11th Cir. 1998) ............................................................... 25

*Hylton v. U.S. Att'y Gen.*,
    992 F.3d 1154 (11th Cir. 2021) ............................................................... 13

*Judulang v. Holder*,
    565 U.S. 42 (2011) ...................................................................................... 9

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) .............................................................................. 14

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976) ................................................................................... 24

*Koons Buick Pontiac GMC, Inc. v. Nigh*,
    543 U.S. 50, (2004) ................................................................................... 14

*Mayo Found. for Med. Educ. & Rsch. v. United States*,
    562 U.S. 44 (2011) ................................................................................... 15

*Miami-Dade Cnty. v. U.S. E.P.A.*,
    529 F.3d 1049 (11th Cir. 2008) ............................................................... 10

*Natural Resources Defense Council, Inc. v. Hodel*,
    865 F.2d 288 (D. C. Cir. 1988) ................................................................ 23

*NRDC v. Van Antwerp*,
    Case No. 9:07-cv-80444-DMM 6, DE 193 (2009) .............................. 2, 3

*Piedmont Heights, Civic Club v. Moreland*,
    637 F.2d 430 (5th Cir 1981) ..................................................................... 20

*Ray v. Spirit Airlines, Inc.*,
    767 F.3d 1220 (11th Cir. 2014) ............................................................... 13

*Resolution Trust Corp. v. Dunmar Corp.*,
    43 F.3d 587 (11th Cir. 1995) ..................................................................... 8

*Robertson v. Methow Valley Council,*
    490 U.S. 332 (1989)................................................................................................ 9

*Robinson v. Shell Oil Co.,*
    519 U.S. 337 (1997)................................................................................................ 14

*S. Utah Wilderness Alliance v. Dabney,*
    222 F.3d 819 (10th Cir. 2000) .............................................................................. 18

*Save Our Cumberland Mountains v. Kempthorne,*
    453 F.3d 334 (6th Cir. 2006) ................................................................................ 20

*Sierra Club v. Callaway,*
    499 F.2d 982 (5th Cir.1974) ................................................................................. 9

*Sierra Club v. U.S. Army Corps of Engineers,*
    295 F.3d 1209 (11th Cir. 2002) ....................................................................... 24, 25

*Sierra Club, Inc. v. Leavitt,*
    488 F.3d 904 (11th Cir. 2007) .............................................................................. 18

*Skidmore v. Swift & Co.,*
    323 U.S. 134 (1944)................................................................................................ 17

*Stewart Park and Reserve Coal., Inc. (SPARC) v. Slater,*
    352 F.3d 545 (2d Cir. 2003) ........................................................................... 22, 23

*Sullivan v. Everhart,*
    494 U.S. 83 (1990).................................................................................................. 15

*Susquehanna Valley All. v. Three Mile Island Nuclear Reactor,*
    619 F.2d 231 (3d Cir. 1980) .................................................................................. 24

*Thomas v. Peterson,*
    753 F.2d 754 (9th Cir. 1985) ................................................................................ 23

*United States v. Mead Corp.,*
    533 U.S. 218 (2001)......................................................................................... 15, 18

*United States v. Morton,*
    467 U.S. 822, (1984).............................................................................................. 15

*Vieux Carre Prop. Owners, Residents & Assocs., Inc. v. Pierce,*
    719 F.2d 1272 (5th Cir. 1983) .............................................................................. 24

*Vt. Yankee Nuclear Power Corp., v. Nat. Res. Def. Council, Inc.,*
    435 U.S. 519 (1978)................................................................................................ 20

*Warshauer v. Solis,*
    577 F.3d 1330 (11th Cir. 2009) ............................................................................ 14

*Wilderness Watch v. Mainella,*
    375 F.3d 1085 (11th Cir. 2004) ............................................................................ 22

iv

*Wos v. E.M.A. ex rel. Johnson*,
  568 U.S. 627 (2013) ..................................................................................................... 17

*Wright v. Everson*,
  543 F.3d 649 (11th Cir. 2008) ..................................................................................... 17

**Statutes**

28 U.S.C. § 2401(a) ........................................................................................................... 16

42 U.S.C. § 405(a) (1982 ed.) .......................................................................................... 18

5 U.S.C. § 706(2)(A) ........................................................................................................... 9

5 U.S.C. §§ 706(2)(A), (D) ............................................................................................... 17

Fla. Admin. Code Ann. r. 40A-2.301(c)-(d) ................................................................... 10

Fla. Stat. § 373.223(3) (West 2022) ................................................................................ 10

Fla. Stat. §§ 373.223(1)(b)-373.233 (West 2022) .......................................................... 11

*Water Resources Development Act*,
  Pub. L 104–303, 110 Stat. 3658 (1996) ..................................................................... 15

*Water Resources Development Act*,
  Pub. L. No. 106-541. 114 Stat. 2572 (Dec. 11, 2000) ....................................... passim

*Water Resources Development Act*,
  Pub. L. No. 116-260. 134 Stat. 1182 (Dec. 27, 2020) ................................................ 8

**Rules**

Fed. R. Civ. P. 25(d) ........................................................................................................... 1

**Regulations**

33 C.F.R. § 385.26(b)(1) .............................................................................................. 20, 21

33 C.F.R. § 385.3 ............................................................................................................... 13

33 C.F.R. § 385.35 (a) ....................................................................................................... 13

33 C.F.R. § 385.36(c) ........................................................................................................ 21

33 C.F.R. § 385.5 ........................................................................................................... 4, 20

33 C.F.R. §§ 385.36(a-b) .................................................................................................. 16

33 C.F.R. pt. 385 .......................................................................................................... 4, 20

40 C.F.R. § 1502.14 .......................................................................................................... 22

40 C.F.R. § 1502.14(a) ...................................................................................................... 22

40 C.F.R. § 1506.13 .......................................................................................................... 22

40 C.F.R. § 1508.25 .......................................................................................................... 25

40 C.F.R. Part 1500 ................................................................................................................ 22

68 Fed. Reg. 64,200 (Nov. 12, 2003) ....................................................................................... 4

70 Fed Reg. 24,008 (May 6, 2005) ......................................................................................... 20

72 Fed. Reg. 58,833 (Oct. 17, 2007) ...................................................................................... 20

85 Fed. Reg. 43,304 (July 16, 2020) ...................................................................................... 22

**Other Authorities**

146 Cong. Rec. H11816-03, H11824, 2000 WL 1651211 ........................................................ 3

Andrea K. Gerlak & Tanya Heikkila, *Comparing Collaborative Mechanisms in Large-Scale Ecosystem Governance*,
46 Nat. Resources J. 657 (Summer 2006) ............................................................................. 18

*Applicant's Handbook for Water Use Permit Applications within the South Florida Water Management District*,
Section 2.2 (June 13, 2022) .................................................................................................... 11

*Everglades Restoration: Forging New Law in Allocating Water for the Environment*,
8 Env't. Law. 255 (2002) ....................................................................................................... 18

S. Rep. 106-362, at 52 (2000) ................................................................................................ 18

S. Rep. 106-362, at 53 (2000) ................................................................................................ 12

## INTRODUCTION

As the Court knows, this case involves two project features of the Central Everglades Planning Project (CEPP)—a 10,500-acre water storage facility ("Reservoir") and a 6,500-acre stormwater treatment area ("STA"), designed to operate in tandem. 2020 ROD 37008.[3] STA construction is well underway and is expected to be complete before the Reservoir is operable.

CEPP comprises components of the Comprehensive Everglades Restoration Plan (CERP). Under Section 601(h)(5)(A) (the "Savings Clause") of the 2000 Water Resources Development Act (WRDA), the Corps is required to make sure that "implementation" of CERP does not eliminate or transfer existing legal sources of water until a new source of water of comparable quantity and quality is available.

Because the STA and Reservoir are intended to operate in tandem, Savings Clause analyses conducted both by the Corps and by its state partner, the South Florida Water Management District (SFWMD), mainly focused on their combined effect on existing water sources. Integrated operations of the STA and Reservoir cannot proceed until both are built. As such, the Corps conditioned its permitting of SFWMD implementation of the STA to allow only an initial grow-in period that will not divert water from any existing water sources.

Plaintiffs and *Amici* are (or represent) agricultural interests challenging the Corps' compliance with the Savings Clause. Plaintiffs' admirably concise summary judgement brief helpfully focuses the case. It is useful to note at the outset what Plaintiffs are *not* arguing.

In particular, Plaintiffs do not challenge the Corps' conclusions regarding hydrology. Thus they do not question the findings that:

- The combined operation of the STA and Reservoir will actually increase water available to agricultural users in the area;
- The initial grow-in period of the STA, standing alone, will not diminish the water available to agricultural users in the area.

Instead, Plaintiffs (and *Amici*) argue that the Corps' Savings Clause analysis is *conceptually* flawed. They argue:

---

[3] The Corps filed four separate administrative records. *See* DE 38-44, 48. References to "2020 ROD" identify materials contained in the record for the Corps' May 15, 2020 *Everglades Agricultural Area (EAA) Final Environmental Impact Statement (EIS) and Record of Decision (ROD)*. The 2020 EIS/ROD itself is found at 2020 ROD 36998-42268. The May 15, 2020 EIS/ROD were issued following publication of a final draft, and solicitation of comments, in January 2020. 2020 ROD 31303-35928.

- The Corps should have included the effects of post-2000 non-CERP events (such as LORS 2008) in analyzing the effects of the STA and Reservoir; and
- The Corps should have conducted a Savings Clause analysis of the effect of a fully operational STA without the Reservoir.

Defendants respectfully submit that the answer to both arguments is straightforward. Whether the Savings Clause requires the exclusion of post-2000 non-CERP developments is a matter of statutory construction; the Corps' reading of the statute is supported by the statute's plain language, by the extrinsic evidence of Congress's intent, and by the deference owed the Corps' interpretation of a statute Congress entrusted the Corps to implement. A straightforward reading of the Savings Clause also demonstrates that the Corps was not required to conduct a Savings Clause analysis of the stand-alone impacts of the fully-operational STA without the Reservoir, which is not proposed as part of the Federal project. The dispositive (and undisputed) fact is that a fully operational STA has not been permitted and cannot be permitted without additional regulatory analysis, including additional Savings Clause analysis. Any future operations will be consistent with CERP regulations and documented in an appropriate Operating Manual. Consequently the National Environmental Policy Act (NEPA) in no way requires the speculative analysis Plaintiffs demand, and, for the same reasons, it would be impossible to conclude, under the Administrative Procedure Act (APA), that the Corps' not performing (at this time) the analysis Plaintiffs demand is arbitrary and capricious or otherwise unlawful.

The Court should deny Plaintiffs' motion and grant Defendants summary judgment.

## FACTS

### A.  The Genesis and Substance of WRDA 2000 Section VI

As this Court has recounted, Congress, in WRDA 1992 and WRDA 1996, directed the Corps to perform an analysis of potential revisions to the Central and South Florida (C&SF) Project and thereby develop a comprehensive plan "for the purpose of restoring, preserving, and protecting the South Florida ecosystem." *NRDC v. Van Antwerp*, Case No. 9:07-cv-80444-DMM 6, DE 193 (2009) (quoting Pub. L. No. 104-303, § 528(b), 110 Stat. 3658, 3767-68 (1996)). In April of 1999, in accordance with Congress's mandate, the Corps released the "[C&SF] Project Comprehensive Review Study Final Integrated Feasibility Report and Programmatic

Environmental Impact Statement" (known as the "Yellow Book," or the "Restudy"). *Id* at 6-7; *see* 2015 ROD 3341-7373.[4]

The Restudy presented a plan of immense scope, encompassing projects gathered under thirteen categories. 2015 ROD 3350-53; *see also id.* 3656-3722; 2020 ROD 4201 ("As approved by Congress, the Plan contains 68 major components that anticipate the creation of approximately 217,000 acres of reservoirs and wetland-based water treatment areas, wastewater reuse plants, seepage management, and the removal of levees and canals in natural areas.").

In the 2000 WRDA,[5] Congress adopted and authorized the Corps' Restudy as the framework for modifications to the C&SF Project, which became known as CERP. Water Resources Development Act of 2000, Pub. L. No. 106-541, § 601, 114 Stat. 2572 (Dec. 11, 2000). Congress envisioned the Corps playing the key role: as one Congressman put it, "[o]nly if the Corps of Engineers carries out their restoration initiative properly will [the Everglades] survive." 146 Cong. Rec. H11816-03 (2000), 146 Cong. Rec. H11816-03, H11824, 2000 WL 1651211.

Congress also directed the Corps (with its collaborators) to promulgate systematic regulations giving effect to Congress's intent. Section 601(h)(3)(A) directed that "[n]ot later than 2 years after the date of enactment of this Act, the Secretary shall, after notice and opportunity for public comment, . . . promulgate programmatic regulations to ensure that the goals and purposes of the Plan are achieved." 2000 WRDA, Pub. L. 106–541, 114 Stat. 2572 § 601(h)(3)(A). The Corp published the final Programmatic Regulations at 68 Fed. Reg. 64,200 (Nov. 12, 2003) (later codified at 33 C.F.R. pt. 385).

The Programmatic Regulations detail the process for formulating six "Guidance Memoranda" that would guide the planning and implementation of the Plan's many components. 33 C.F.R. § 385.5. The Regulations specify the subject matter for the guidance memos, require

---

[4] The Restudy was an immense collaborative effort. "The responsible lead agency" was the Corps; the "responsible cooperating agencies [were] the South Florida Water Management District, the U.S. Fish and Wildlife Service, the U.S. Environmental Protection Agency, the National Park Service, the Florida Game and Fresh Water Fish Commission, the U.S. Geological Survey, the Natural Resources Conservation Service, and the Florida Department of Environmental Protection." 2015 ROD 3343.

[5] Our references to "WRDA 2000" are shorthand for Title VI of that statute – the Title that dealt with the Everglades and CERP. The other titles of the 2000 legislation address water resource issues throughout the country not relevant to this case.

notice-and-comment promulgation procedures, and require collaboration with several governmental and Tribal entities. *Id*. As the Corps recounted, the Current "Final Draft" Guidance Memoranda were formulated *via* an involved process:

> As part of the consultation process . . ., a draft of … the six Guidance Memoranda was made available for review by agencies and the public in November 2004. . . until January 2005. Meetings were held with stakeholder groups during this period. . . . Comments were received from a number of agencies, stakeholder groups, and individuals. These comments were posted on the CERP web site. The USACE and SFWMD then prepared a final draft of … the Guidance Memoranda [that] . . . was submitted to the Secretary of the Army for approval and concurrence by the Secretary of the Interior and the Governor. On May 6, 2005, the Department of the Army placed a Notice of Availability in the Federal Register to indicate the availability of the final draft of the Guidance Memoranda and that public comments would be accepted until June 6, 2005. Following the close of the public comment period, the comments were reviewed and considered. Due to the extensive comments that were received and the concerns that were raised by the public, the May 2005 draft was revised and this revised final draft was prepared for public comment.

2020 ROD 4206-207.

**B. Central Everglades Planning Project (CEPP)**

The Central Everglades Planning Project (CEPP) introduced several components of CERP. As stated in the 2014 EIS: "The purpose of the CEPP is to improve the quantity, quality, timing and distribution of water flows to the Northern Estuaries, central Everglades (Water Conservation Area 3 [WCA 3] and Everglades National Park [ENP]), and Florida Bay while increasing water supply for municipal and agricultural users." 2015 ROD 59546 at pdf 9 (of 393). As required by WRDA 2000 Section 601(d)(2), the CEPP Project Implementation Report (PIR) and Environmental Impact Statement (EIS) was initiated by the Corps in 2011 in partnership with the SFWMD, the non-Federal sponsor for CERP. The PIR/EIS was completed in December 2014, 2015 ROD 59546; the Chief of Engineer's report was signed on December 23, 2014, 2015 ROD 68250; and Congress authorized CEPP for construction in Section 1401(4) of WRDA 2016.

The 2014 PIR/EIS for CEPP described a system in which Lake Okeechobee water currently sent to the St. Lucie and Caloosahatchee estuaries would instead be directed, first, to flow equalization basins (FEBs) that would attenuate high flows and enhance water quality, and then to State-operated stormwater treatment areas (STAs). 2015 ROD 59546 at pdf 9 (of 392).

4

Case 9:21-cv-81505-DMM   Document 59   Entered on FLSD Docket 09/02/2022   Page 13 of 34

The STAs are man-made wetlands that naturally "reduce phosphorus concentrations in the water to meet required water quality constraints." *Id*. The goal is to "re-establish a 500,000-acre flowing system through the northern most extent of the remnant Everglades" while "maintain[ing] levels of flood protection and water supply" for "urban and agricultural" areas. *Id*.

### C. The EAA Phase

In March 2018, SFWMD submitted a Section 203 study to the Secretary of the Army recommending changes to CEPP for what is called the Everglades Agricultural Area (EAA).[6] PPA 8320-8652. Specifically, SFWMD recommended: a 10,500-acre, above-ground reservoir (with a storage capacity of 240,000 acre-feet) (the "Reservoir"); a 6,500-acre STA (the "STA"); and conveyance improvements to increase capacity in the Miami Canal (by 1,000 cfs) and in the North New River Canal (by 200 cfs). *See*, *e.g.*, PPA 8337, 8454-45. SFWMD's Savings Clause analysis concluded that: "The existing level of service for existing legal users is maintained. . .". PPA 8573. Annex B to the Section 203 Study contains the Savings Clause analysis. PPA 8743-8818. The conclusion was that water shortages would be reduced (*i.e.*, water availability would be increased) for water users. PPA 8768 ("The severity, duration, and magnitude of water supply shortages for existing legal users decrease with the project."). [7]

In Section 1308(a) of WRDA 2018, Congress authorized the EAA project in accordance with section 601 of the WRDA 2000, as recommended in the May 2018 addendum to SFWMD's Section 203 Study, "with such modifications as the Secretary considers appropriate."

The Corps completed a NEPA analysis that considers the potential impacts of the EAA project described in SFWMD's Section 203 Study alongside a range of alternatives. *See* Central and Southern Florida, Everglades Agricultural Area Reservoir and Stormwater Treatment Area, Florida, Final Environmental Impact Statement. 2020 ROD 36998. Meanwhile, in August 2019, SFWMD submitted to the Corps a Clean Water Act Section 404 and Rivers and Harbors Act

---

[6] Section 203 of the WRDA of 1986, as amended, authorizes non-Federal interests to undertake feasibility studies of proposed water resources development projects for submission to the Secretary of the Army. SFWMD's Section 203 Study was titled Central Everglades Planning Project, Post Authorization Change Report (PACR), Feasibility Study and DRAFT Environmental Impact Statement, March 2018 (Addendum May 2018).

[7] Savings Clause analyses in many Corps and SFWMD documents use the same key acronyms: "The Existing Condition Baseline (EARECB), . . . the Future Without Project baseline (EARFWO) and . . . future with the project (TSP)." PPA 8754.

Section 10 permit application to construct the STA. Therefore, the Corps' 2020 Final EIS provided the NEPA analysis for both its permit decision (on SFWMD's application) and its Civil Works project decision (implementing CEPP). The Corps signed a Record of Decision (ROD) for the regulatory permit decision on April 17, 2020. 2020 ROD 36503. The permit was subsequently modified in May 2020, and March 2021. PERMIT 17395; PERMIT 19620. The Corps' Assistant Secretary for Civil Works signed a ROD for the Civil Works project in May 2020. PERMIT 12112.

In Section 324 of WRDA 2020, Congress modified the original CEPP authorization to include the EAA project. Therefore, the EAA project features are now known as the "EAA Phase" of CEPP.

The EAA Phase includes two main project features, the "A-2" Stormwater Treatment Area (STA) and the "A-2" Reservoir (Reservoir). Case No. 9:21-cv-81506, DE 1 (U. S. Sugar Compl.) ¶ 1; Case No. 9:21-cv-81505, DE 1 (Okeelanta Compl.) ¶ 2; Case No. 9:21-cv-81508, DE 1 (Sugar Cane Growers Cooperative Compl.) ¶ 2. Consistent with CEPP, the essence of the EAA Phase is the treatment and delivery, to the Everglades, of Lake Okeechobee waters that in recent history have been sent to the St. Lucie and Caloosahatchee estuaries. 2020 ROD 37006.

The Corps' Savings Clause analysis is set forth in Annex C of the 2020 EAA Final EIS. 2020 ROD 41097-41102. The analysis shows that with implementation of CEPP, as modified to include the EAA Phase, water availability for agricultural users will be *improved*. *See* 2020 ROD 37089 (water supply shortfalls are slightly reduced); 2020 ROD 37267 ("Over the entire period of simulation, the average annual volume water shortages decline . . ."); 2020 ROD 37268 (similar).

**D. The Claims at Issue (and Those no Longer at Issue)**

Plaintiffs and *Amici* challenge two aspects of the Corps' decision-making and review with respect to the EAA Phase. The first is the decision to analyze the effect on water sources of the EAA Phase *after* taking into account changes in water availability caused, after WRDA 2000's enactment, by what the Corps refers to as "intervening non-CERP activities." (The Corps' Guidance Memoranda define "intervening Non-CERP activities" as "changes in permitted demands and structural or operational changes to the C&SF Project or other water resources systems in the South Florida ecosystem that are made by Federal, State, tribal, and local governments and which [are] not included in [CERP]." 2020 ROD 4404.).

6

The second is the Corps' decision to analyze (under NEPA and the Savings Clause) the combined effect of the STA and Reservoir, rather than the STA alone.

The plain language of the Savings Clause only obligates the Corps to find alternate sources for "water to be lost as a result of implementation of the Plan [*i.e.*, CERP]." WRDA 2000, §601(h)(5)(A). That language, the Corp concluded, means that the Savings Clause does not apply to changes in water availability caused by actions or developments unrelated to CERP. As the Corps explained:

> The Savings Clause only applies to changes from the date of enactment of WRDA 2000 that result from "implementation of the Plan." In some cases, the existing legal sources of water and the level of service for flood protection that existed at that time may be altered or changed before a CERP project is implemented. These changes may result from actions by Federal, Tribal. State, and local governments–actions that are wholly outside the CERP process. These "intervening" conditions, brought about by the implementation of non-CERP activities after the date of enactment of WRDA 2000, but before a CERP project component becomes operational, may change the hydrologic conditions from those reflected in the Pre-CERP Baseline. Examples include construction of government public works projects that impact the configuration of the C&SF Project system . . . ; construction of projects that impact the use of water from the C&SF Project system (e.g., stormwater treatment areas); changes to operations of the C&SF Project system . . . and the issuance of consumptive use permits under State law. . . . [Accordingly, t]he Savings Clause does not require CERP to make up for reductions in quantity and quality of existing legal sources of water or levels of service for flood protection caused by intervening non-CERP activities, but it does prohibit CERP projects from further reductions.

2020 ROD 4269 (Guidance Memoranda). Plaintiffs' particular grievance concerns the treatment of LORS 2008 as an intervening non-CERP activity. "LORS 2008" refers to modifications to the Corps' Lake Okeechobee Regulation Schedule. Prior to 2008, Lake Okeechobee was operated under the Water Supply and Environmental Regulation Schedule (WSE). 2015 ROD at pdf 66 (of 392). The changes implemented by LORS 2008, which lowered the lake level by a foot or so, were required for lake ecology reasons but mainly for safety reasons related to the upkeep of the Herbert Hoover Dike that contains the Lake. *Id.*

The decision to analyze the STA and Reservoir together was based on the fact that they are designed and intended to function together. PERMIT 11595 ("the A-2 STA was designed to function with the reservoir. Therefore, the Corps looked at alternatives that considered both the STA and reservoir assuming both will be constructed. The federal project includes the STA and reservoir . . ."). The permit for the STA is strictly limited to three preliminary phases that,

7

collectively, go no further than the grow-in of phosphate-metabolizing vegetation. PERMIT 11592-93 (permit ROD); PERMIT 11769-70 (permit).[8] Actual operation of the STA is not allowed, and cannot be allowed until after additional permits are sought and additional Savings Clause/NEPA analysis performed. *See*, *e.g.*, PERMIT 11777 (Special Condition 14).

The Corps did consider the hydrologic impact of the OTMP (the grow-in period). And determined that because the water to be used for OTMP was already being used to irrigate the acreage devoted to the STA, other water sources will not be impacted.[9]

Plaintiffs' motion thus narrows the claims and issues presented. Because Plaintiffs' arguments relate entirely to project features (Reservoir and STA) that were not part of CEPP until 2020 (*see* Section 324 of WRDA 2020, Public Law 116-260) Plaintiffs present no argument against the original CEPP, and their claims against the 2015 ROD should be deemed abandoned and summary judgment should be granted in favor of the Corps on those claims. *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").[10]

Plaintiffs have also dropped any claim against the Corps' issuance of the permit for the STA grow-in period (the permit does not authorize anything else, *see* PERMIT 11592, 11769-11770.) Because Plaintiffs do not question the Corps' conclusions regarding the hydrologic impact of the permit, Plaintiffs have abandoned any claim against the permit. In addition, Plaintiffs did not comment on the grow-in operations when the Corps publicly noticed the operations plan and have, therefore, prudentially waived any claim against the permit. *See*, *e.g.*, *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 764 (2004).

## ARGUMENT

### A.    Legal Standards

Plaintiffs invoke NEPA and the APA, which involve similar analysis because NEPA challenges are reviewed under the APA. *Citizens for Smart Growth v. Sec'y of Dep't of Transp.*,

---

[8] These grow-in phases are referred to as the Operational Testing and Monitoring Period (OTMP). PERMIT 11770.

[9] PERMIT 11770 (DA Permit 4/17/20); PERMIT 11592 (4/16/20 ROD); 2020 ROD 37047-48; *see also id.* 37086 (3,000 of the acres to be used were previously used for sugarcane).

[10] For the same reason, any claims regarding the Project Partnership Agreement (PPA) should be deemed abandoned and summary judgment should be granted in favor of the Corps. Plaintiffs are not a party to the PPA and make no arguments related to its conditions.

669 F.3d 1203, 1210-11 (11th Cir. 2012). A court may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Citizens for Smart Growth*, 669 F.3d at 1210. This is an "exceedingly deferential" standard, *see id.*, and "a court is not to substitute its judgment for that of the agency." *Judulang v. Holder*, 565 U.S. 42, 53 (2011) (citations omitted); *see also Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).

NEPA does not mandate particular results: it "prohibits uninformed--rather than unwise--agency action." *Robertson v. Methow Valley Council*, 490 U.S. 332, 351 (1989). A court reviewing NEPA compliance may only ask whether the agency took a "hard look" at environmental consequences. *Druid Hills Civic Ass'n v. Fed. Highway Admin.*, 772 F.2d 700, 709 (11th Cir. 1985). "A challenging party has the burden of showing by a preponderance of the evidence that the agency did not comply with NEPA's procedures." *Citizens for Smart Growth*, 669 F.3d at 1211 (citing *Sierra Club v. Callaway*, 499 F.2d 982, 992 (5th Cir.1974)).

### B.    The Plain Language of the Savings Clause Supports the Corps' Interpretation

The Corps complied with the Savings Clause. The Clause states:

> Until a new source of water supply of comparable quantity and quality as that available on the date of enactment of this Act is available to replace the water to be lost as a result of implementation of the Plan [*i.e.*, CERP], the Secretary and the non-Federal sponsor shall not eliminate or transfer existing legal sources of water [including water used for irrigation].

WRDA 2000, Pub. L. 106-541,114 Stat. 2572 § 601(h)(5)(A).[11] The question before the Court is whether this clause obligates the Corps to replace water that has been diverted by "intervening

---

[11] We note preliminarily that any ambiguity created by the term "legal sources of water" is easily resolved (and appears to be undisputed). As *Amici* have explained, DE 55 at 4, the phrase refers to consumptive rights under Florida law. The Corps' Guidance Memoranda define the term as follows:

> Existing legal source means the quantity and quality of water available within a water basin (including seepage, surface water, direct rainfall, and groundwater) used for a water supply, which is legally protected by Federal or State law, including the quantity and quality necessary for protection of the source of supply, consistent with State and Federal law, as of December 11, 2000, for: (i) An agricultural or urban water supply; . . .

non-CERP activities." The Corps concluded that it does not. 2020 ROD 4269-4270. Plaintiffs and *Amici* disagree. DE 50 at 10-13; DE 55 at 5-6.

Under the *Chevron* two-step process, the first question is whether, on this issue, the Savings Clause is ambiguous.[12] It is not.

The key language in the Savings Clause—the reference to "water to be lost *as a result of implementation of the Plan*"—has a plain meaning on its face and does not present any ambiguity. As explained above, the Corps interpreted this language to plainly mean that the Corps did not need to consider in its Savings Clause analysis any water "lost" as a result of something other than an action implementing CERP. 2020 ROD 4269-4270. The text supports that interpretation. The "Plan" of course is CERP. *Id.* § 601(a)(4). "The phrase 'as a result of' in its plain and ordinary sense means 'caused by' and requires a showing of a causal connection . . . " *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 945 (9th Cir. 2013) (citations omitted) (applying California law). If Plaintiffs' water source has been curtailed by LORS 2008, it has not been curtailed by CERP, because LORS 2008 is not a part of CERP and thus does not represent an "implementation" of CERP. CERP has not caused the alleged loss of water. The Corps' analyses thus comply with the Clause's plain meaning. *See, e.g.*, 2020 ROD 13483 ("Savings Clause analysis only applies to changes from date of enactment of WRDA 2000 that result from 'Implementation of the Plan.'").

And even if the language were not plain on its face that Congress intended to limit the Savings Clause to effects caused *by implementation of CERP*, the legislative history would remove any ambiguity.

Subsection (h)(5) is a savings clause that is designed to preserve the existing legal rights of persons and entities served by the Central and South Florida

---

2020 ROD 4264. Neither Plaintiffs nor *Amici* take issue with the Corps' definition. As *Amici* note, the holder of a consumptive use permit has "existing legal user" status. DE 55 at 4 (citing Fla. Stat. §§ 373.223(1)(b), 373.233)

[12] First, the court must ask "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842 (1984). If the will of Congress is clear from the statute itself, the inquiry ends—"the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. "[I]f the statute is silent or ambiguous," however, the court must next ask whether the agency's construction of the statute is reasonable. *Id.* at 843–44. "[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844. *See, generally, Miami-Dade Cnty. v. U.S. E.P.A.*, 529 F.3d 1049, 1162-64 (11th Cir. 2008).

> project and potentially affected *by implementation of the Plan*. Subsection
> (h)(5)(A) addresses the rights of existing legal water users. The subsection states
> that the Secretary shall ensure that *the implementation of the Plan*, including
> physical or operational modifications to the C&SF Project, does not cause
> significant adverse impact on existing legal water users.

S. Rep. 106-362, at 53 (2000) (emphasis added).

Neither Plaintiffs nor *Amici* identify anything ambiguous in the statute's "implementation of the Plan" language. They instead focus entirely on the Clause's reference to "water suppl[ies] available on the date of enactment of this Act." We explain the relevance of that phrase below; for now it is most revealing to note that Plaintiffs' reading completely ignores the implementation clause. Their arguments ask the Court to rewrite the Savings Clause to read:

> "Until a new source of water supply of comparable quantity and quality as that
> available on the date of enactment of this Act is available[,] ~~to replace the water
> to be lost as a result of implementation of the Plan~~, the Secretary and the non-
> Federal sponsor shall not eliminate or transfer existing legal sources of water."

The result removes the definition of "lost" water that the "new source" would be intended to replace. But the Court is obliged "to disfavor an interpretation [that] would render a clause, sentence, or word . . . superfluous, void, or insignificant." *Fuerst v. Hous. Auth. of City of Atlanta, Georgia*, 38 F. 4th 860, 869 (11th Cir. 2022) (citations and internal quotation marks omitted). And the language Plaintiffs ask the Court to ignore—" water to be lost as a result of implementation of the Plan"—unambiguously resolves the issue presented by this case. *Amici* agree that the "'Savings Clause' . . . provides assurances that existing legal users will not be negatively impacted *by implementation of CERP*." DE 55 at 5 (emphasis added).[13]

There is no inconsistency between Congress's reference to a "water supply of comparable quantity and quality as that available on the date of enactment of this Act" and its directive that only water "lost as a result of implementation of the Plan" needs to be replaced. The statute is clear that the need to identify a new source of water only applies if it is the Plan's implementation that has resulted in the "water lost." Thus, restoration to a pre-CERP 2000 baseline is not necessary where (as here) a non-CERP intervening event has altered existing legal sources of water. As the Corps explained in the Guidance Memoranda, "[w]hen the Pre-CERP

---

[13] *Amici* do throw their support behind Plaintiffs' position that WRDA 2000 mandates the use of a pre-WRDA baseline for all Savings Clause analyses, *id.* at 6, but do not argue the point other than by alluding to "a myriad of reasons which are discussed in detail" in Plaintiffs' filings.

Baseline conditions have already been altered by this kind of intervening non-CERP activity, a different analysis is required for the purpose of applying the Savings Clause." 2020 ROD 4269.

Further, "the Savings Clause does not prohibit CERP projects from reducing benefits increased by intervening non-CERP activities." 2020 ROD 4270. If, in other words, a user's water source has been increased by non-CERP-related events, the guarantee provided by the Savings Clause goes no further than to assure that, in implementing CERP, such source would not be reduced to a level below that which existed at the time of CERP's enactment. It does not automatically, and after the fact, grandfather water source rights created after 2000; without the "date of enactment" language, automatic grandfathering would be the result, and would allow potentially extensive interference with the achievement of CERP's goals. And that is why understanding the pre-CERP status quo (the "pre-CERP baseline") is potentially significant. *See* 33 C.F.R. § 385.3 (Programmatic Regulations defining pre-CERP baseline.)[14]

The language of WRDA 2000 is unambiguous and requires judgment for Defendants.

**C.    If There Were any Ambiguity in the WRDA 2000 Savings Clause, All Extrinsic Aids to Interpretation Favor the Corps' Reading**

Several factors lend extra weight to the Corps' interpretation and application of the Savings Clause. Plaintiffs' interpretation, for one thing, would produce intolerable results that Congress could not have intended, and in some respects amounts to a collateral (and untimely) attack on LORS 2008. Second, the context of the statute as a whole supports the idea that non-CERP activities are not subject to the Savings Clause. Finally, contrary to Plaintiffs' assertions, the Corps' Guidance Memoranda are consistent with the Corps' programmatic regulations and are owed deference under *Chevron*.

**1.    Plaintiffs' reading of the Savings Clause would produce unreasonable results that Congress could not have intended.**

The Corps' interpretation of the Savings Clause is the only reasonable interpretation for two reasons. First, if Plaintiffs are correct that subsequent non-CERP-related developments cannot impact water use beyond the levels that existed at the time of CERP, the result would be

---

[14] Plaintiffs are correct (DE 50 at 7) that the Programmatic Regulations require development of an approved pre-CERP baseline. 33 C.F.R. § 385.35 (a). And it is also true, as noted, that a pre-CERP baseline may prove necessary in cases where legal water usage has been increased after 2000, or where there have been no non-CERP intervening impacts to water sources. But neither Plaintiffs nor *Amici* suggest that either situation is present here.

intolerable. Extreme weather events, for example, could require that the Corps, under its stewardship obligations under the Flood Control Acts of 1948 (P.L. 80-858) and 1954 (P.L. 83-780), dramatically increase or decrease Lake Okeechobee releases in ways that  would make it impossible to preserve agricultural water supplies at the levels that existed in the year 2000. The Court should not presume that Congress intended to tie the Corps' hands with respect to its critically important duties to provide flood control and protect the environment when Congress did not explicitly limit those other authorities in WRDA 2000.

Under Plaintiffs' reading, the Corps would be required to restrict the performance of all of its responsibilities in Florida so as to maintain agricultural and other water supplies that existed in 2000, even though the many statutes that charge the Corps with water management duties say no such thing. "[J]ust as we apply a 'strong presumption against implied repeals,' we apply a presumption against implied changes to the meaning of a still-in-force statute." *Hylton v. U.S. Att'y Gen.*, 992 F.3d 1154, 1160 (11th Cir. 2021) (*quoting Ray v. Spirit Airlines, Inc.*, 767 F.3d 1220, 1222 (11th Cir. 2014) (internal citation omitted)). "If Congress wanted to alter the scope of [existing law], it would have done so explicitly." *Id.*

### 2.  Reading WRDA 2000 as a whole confirms the Corps' interpretation.

Plaintiffs' interpretation is also incorrect because it is contrary to Congressional statements elsewhere in WRDA 2000. Congress gave clear guidance that it did *not* want WRDA 2000 to interfere with the Corps' ongoing statutory responsibilities.

> (B) INTEGRATION.—In carrying out the Plan, the Secretary shall integrate the activities described in subparagraph (A) with ongoing Federal and State projects and activities in accordance with section 528(c) of the Water Resources Development Act of 1996 (110 Stat. 3769). Unless specifically provided herein, nothing in this section shall be construed to modify any existing cost share or responsibility for projects as listed in subsection (c) or (e) of section 528 of the Water Resources Development Act of 1996 (110 Stat. 3769).

WRDA 2000, Pub. L 106–541, 114 Stat 2572, § 601(b)(1)(B). The referenced Section of WRDA 1996 reads: "(c) INTEGRATION OF OTHER ACTIVITIES.— (1) IN GENERAL.—In carrying out activities described in subsection (b) [*i.e.*, formulating and implementing the Comprehensive Plan], the Secretary shall integrate such activities with ongoing Federal and State projects and activities, including— [listing four illustrative examples]." Water Resources Development Act of 1996, Pub. L 104–303, 110 Stat 3658, § 528 (c). Requiring the Corps to "integrate" CERP

13

projects into the Corps' "ongoing . . . projects and activities" is the opposite of requiring that CERP overwrite all ongoing Corps projects and activities.

Plaintiffs' argument (DE 50 at 9) that the Savings Cause analysis must assume continued use of the WSE regulation schedule for Lake Okeechobee thus boils down to an argument that LORS 2008 violated WRDA 2000. But there is no indication in WRDA 2000 that Congress intended to tie the Corps' hands in its non-CERP related regulation of Lake Okeechobee or any other part of the C&SF Project. Indeed, the integration clause suggests the opposite and, in all events, any legal challenge to LORS 2008 is time-barred. *See* 28 U.S.C. § 2401(a) (providing that all civil actions against the United States must be commenced within six years after the claim accrues).

To determine whether statutory language is ambiguous, the court must consider "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997); *Warshauer v. Solis*, 577 F.3d 1330, 1335 (11th Cir. 2009).[15] The statutory context of the Savings Clause thus confirms that that clause unambiguously supports the Corps' actions in this case.

### 3. The Corps' reading of the savings clause is entirely consistent with the Corps' programmatic regulations

As relevant here the Corps' Guidance Memoranda provide that "[t]he Savings Clause does not require CERP to make up for reductions in quantity and quality of existing legal sources of water . . . caused by intervening non-CERP activities." 2020 ROD 4269. Plaintiffs claim that this is inconsistent with the Corps' programmatic regulations–that, in other words, the Guidance Memoranda misread or misapply the regulations. An agency's interpretation of its own regulations is entitled to deference, a "doctrine [that] enables the agency to fill out the regulatory scheme Congress has placed under its supervision." *Kisor v. Wilkie*, -- U.S. --, 139 S. Ct. 2400, 2418 (2019) (discussing – and limiting – the deference owed agency interpretations under *Auer v. Robbins*, 519 U.S. 452 (1997)).

Here there is no inconsistency between the Guidance Memoranda and the regulations. The regulations (33 C.F.R. § 385.36 (a-b) *Elimination or transfer of existing legal sources of*

---

[15] The context may also be used, of course, to resolve any ambiguity as may exist. *See Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60, (2004) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme") (citations and internal quotation marks omitted).

*water*) state, repeatedly, that Savings Clause analysis is required only for an "elimination or transfer" of "legal sources of water" *that result from project implementation*. The regulations are thus emphatic in stating that the Savings Clause is not implicated by water reductions caused by other, non-CERP, actions. And there is no way for the Corps to analyze whether CERP projects, such as the EAA Phase of CEPP, will reduce available water sources except by taking into account changes caused by non-CERP factors, which is exactly what the Corps has done here.

And, as noted, Congress specifically required that the Corps "integrate" CERP with "ongoing Federal and State projects and activities." PL 106–541, 114 Stat 2572, § 601(b)(1)(B). The programmatic regulations, in other words, require that Savings Clause analysis account for post-2000 C&SF Project operations, and in doing so the regulations comply with Congress's express directives. Thus the Corps' Guidance Memoranda faithfully apply the regulations.

### 4. The Corps' interpretation of the WRDA 2000 Savings Clause is entitled to *Chevron* deference

Plaintiffs' position (DE 50 at 11-13) that the Corps' interpretation of WRDA 2000 is not entitled to *Chevron* deference is incorrect. For one, the statute is plain on its face and the Court need not even reach *Chevron* step 2. But, in any event, the Corps would be entitled to *Chevron* deference in reasonably interpreting any ambiguous term in WRDA 2000 because of the central role that Congress has given the Corps in formulating and implementing CERP.

The Supreme Court's teaching is that:

> When Congress has "'explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation,'" *Chevron*, 467 U.S., at 843–844, 104 S. Ct. 2778, and any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute.

*United States v. Mead Corp.*, 533 U.S. 218, 227–28 (2001) (quoting *Chevron*, 467 U.S. at 843–844) (also citing *United States v. Morton*, 467 U.S. 822, 834, (1984)); APA, 5 U.S.C. §§ 706(2)(A), (D)). The rationale is that "the power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Mayo Found. for Med. Educ. & Rsch. v. United States*, 562 U.S. 44, 55–56 (2011)  (quoting *Chevron*, 467 U.S. at 843). And while discussions of *Chevron* deference often allude to the "filling" of "gaps," Congress's delegation of rulemaking authority is equally deserving of deference whether it be specific or general: application of *Chevron* "does not turn on whether Congress's delegation of authority

15

was general or specific." *Id*. at 57; *see also Sullivan v. Everhart*, 494 U.S. 83, 87, 88–89 (1990) (applying *Chevron* deference to rule promulgated pursuant to delegation of "general authority to 'make rules and regulations and to establish procedures, not inconsistent with the provisions of this subchapter, which are necessary or appropriate to carry out such provisions'" (*quoting* 42 U.S.C. § 405(a) (1982 ed.)); *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 306 (2013) ("a general conferral of rulemaking or adjudicative authority" is sufficient "to support *Chevron* deference for an exercise of that authority within the agency's substantive field.").

CERP provides an especially compelling case for applying *Chevron* deference to the Corps' interpretation of any ambiguous terms in statutes authorizing that Plan. We say this, in large part, because of CERP's unique history.

As recounted above, CERP has from the beginning been a collaborative undertaking by Congress and the Corps. Of particular relevance to *Chevron* analysis is Congress's tasking the Corps with promulgating programmatic regulations, which is a broad delegation of legislative authority. *See* Andrea K. Gerlak & Tanya Heikkila, *Comparing Collaborative Mechanisms in Large-Scale Ecosystem Governance*, 46 Nat. Resources J. 657, 706 (Summer 2006) ("Programmatic regulations lay out the course of implementation . . . [and] provide the legal framework for how [CERP[ will be implemented . . ."). The legislative history of WRDA 2000 confirms the expansive authority contemplated by the delegation. S. Rep. 106-362, at 52 ("The [programmatic] regulations shall establish a process to: provide guidance for the development of project implementation reports, project cooperation agreements, and operating manuals to ensure that the goals and objectives of the Plan are achieved . . .") (2000)).[16] Congress's assigning to the Corps the responsibility, in a "programmatic" way, for creating the regulatory construct that would achieve the "goals and purposes" of the CERP legislation (which was itself based in large part on the Corps' Restudy), typifies the kind of "express delegation of [legislative] authority" that triggers *Chevron* deference. *Chevron*, 467 U.S. at 843-44.

"Where there is a broad congressional grant of administrative authority to prescribe rules and regulations to effectuate the provisions of [an] Act" a court's "scope of review is limited"

---

[16] *See also Everglades Restoration: Forging New Law in Allocating Water for the Environment*, 8 Env't. Law. 255, 292 (2002) (footnotes omitted) ("The legislation requires the establishment of a process by which the appropriate federal and state agencies will develop detailed plans and operating agreements and ensure consistency among the sixty-eight separate elements comprising the Plan to guarantee that 'the goals and objectives of the Plan are achieved.'").

and allows " ... invalidat[ing] such a regulation only if it clearly contradicts the terms or purposes of the statutes." *Boeing Co. v. United States*, 680 F.2d 132, 139 (Ct. Cl. 1982) (citation and internal quotation marks omitted). As the Eleventh Circuit summarized, a regulation adopted pursuant to "an express delegation of authority" "is reviewed only to see if it is arbitrary, capricious, or manifestly contrary to the statute." *Wright v. Everson*, 543 F.3d 649, 654 (11th Cir. 2008) (citing *Chevron*).

Plaintiffs cite *Mead* for the idea that the Corps' Guidance Memoranda would be entitled only to limited deference, but those memoranda are a far cry from the unpublished, *ad hoc* letter rulings at issue in *Mead*. Here, CERP was, at Congress's direction, designed by the Corps; WRDA 2000 adopted CERP as the Corps proposed it in the Restudy; WRDA 2000 gave the Corps extensive responsibility and authority for promulgating programmatic regulations interpreting and implementing WRDA 2000; the Corps' Programmatic Regulations were promulgated in accordance with WRDA 2000, in collaboration with numerous Federal, State, and Tribal authorities after full notice and comment[17]; the Programmatic Regulations specifically detail the process for formulating the Guidance Memoranda. 33 C.F.R. § 385.5.[18] It is true that the final steps that will take the Guidance Memoranda from draft to final form have not yet been completed, but to give those Guidance Memoranda less weight because of this is to celebrate form over substance.[19]

Contrary to Plaintiffs' suggestion (DE 50 at 13), the 2007 CERP Guidance Memoranda were developed with extensive public notice and comment. *See* 70 Fed Reg 24008 (May 6, 2005); 72 Fed. Reg. 58833 (Oct. 17, 2007); 2020 ROD 4206-207. Accordingly, Plaintiffs'

---

[17] 2020 ROD 4041, 33 C.F.R. Part 385 (December 12, 2003).

[18] The regulations define the subject matter for the guidance memos, require that notice-and-comment procedures be followed, and require collaboration with several governmental and Tribal entities. *Id*.

[19] Plaintiffs' complaint that the Guidance Memoranda have not been finalized also ignores 33 C.F.R. § 385.26(b)(1), which provides that "Project Implementation Reports approved by the Secretary of the Army . . . before the development of the guidance memorandum may use whatever method that, in the Secretary of the Army's discretion, is deemed appropriate and is consistent with applicable law, policy, and regulations." The methodology set forth in the guidance memoranda has been deemed appropriate and is consistent with Section 601(h)(5)(A) of WRDA 2000.

reliance on *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627 (2013) (DE 50 at 12) for the idea that agency guidelines are entitled only to the limited deference prescribed by *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944) is misplaced. *Wos* rests on *Christensen v. Harris County*, 529 U.S. 576 (2000), whose holding concerned internal agency guidelines that were not "subject to the rigors of the Administrative Procedure Act, including public notice and comment." 576 U.S. at 587. *See also Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 915 (11th Cir. 2007) ("Because there is no indication that the EPA's guidance letter was the product of a 'formal [agency] adjudication,' 'notice-and-comment rulemaking,' or 'any other circumstances reasonably suggesting that Congress ever thought of [guidance letters] as deserving ... deference,' the EPA's guidance letter is not entitled to *Chevron* deference") (quoting *Mead Corp.*, 533 U.S. at 230-31) (also citing *Christensen*, 529 U.S. at 587). These holdings are inapplicable to Guidance Memoranda that have been subjected to extensive public notice and comment (and intergovernmental review) like those here. *See Fed. Election Comm'n v. Nat'l Rifle Ass'n of Am.*, 254 F.3d 173, 185 (D.C. Cir. 2001) (holding that *Chevron* deference applies to FEC opinion letters which, unlike the letter rulings and guidance at issue in *Wos* and *Christensen*, resulted from a formal process, were authorized by Congress, and were binding on the agency).

On the question whether the Final Draft Guidance Memoranda are entitled to deference a useful contrast is provided by the decision in *Greenfield v. Yucatan Foods, L.P.*, 18 F. Supp. 3d 1371 (S.D. Fla. 2014), which involved draft guidance by the Food and Drug Administration regarding ingredient listing. Citing *S. Utah Wilderness Alliance v. Dabney*, 222 F.3d 819, 829 (10th Cir. 2000) for the idea that draft regulations that "have not been finalized or adopted by the agency" are afforded "neither *Chevron* deference, nor 'the lesser deference applicable to interpretative rules,'" the court in *Greenfield* explained:

> [T]he plain language of the draft guidance made clear that it is not a final, binding regulation on how evaporated cane juice should be listed in an ingredient declaration. Both in the preface and the introduction to the draft guidance, the FDA warned that the draft guidance "contains nonbinding recommendations"; "is being distributed for comment purposes only"; "does not create or confer any rights for or on any person and does not operate to bind FDA or the public"; and "do[es] not establish legally enforceable responsibilities."

18 F. Supp. 3d at 1374. Here (*contra Dabney*) the Guidelines *have* been "adopted" (by the Corps in consultation with several governmental and tribal authorities), and here there are none of the disclaimers featured in *Greenfield*. Plaintiffs are incorrect when they state that the Programmatic

Regulations tell Corps staff not to rely on these documents "until a guidance memorandum is finalized." DE 50 at 12. The regulations actually state that savings clause issues should be resolved on a "case by case" basis "[u]ntil guidance is *issued*." 33 C.F.R. § 385.36 (c) (emphasis added). Final Draft Guidance *has* been issued. And the agency also specifically accounted for the situation where the guidance was not fully finalized. *See* 33 C.F.R. § 385.26(b)(1) ("Project Implementation Reports approved by the Secretary of the Army . . . before the development of the guidance memorandum may use whatever method that, in the Secretary of the Army's discretion, is deemed appropriate and is consistent with applicable law, policy, and regulations.").

### D.     Plaintiffs Do Not Challenge the Corps' Application of the Savings Clause, As the Corps Interpreted the Clause

Neither Plaintiffs nor *Amici* challenge the correctness of the Corps' application of its interpretation of the Savings Clause to the facts. The Corps determined that interim operation of the STA will cause Plaintiffs no loss of water. DE 25 at 17. That is because the only operation allowed is shallow-water grow-in,[20] and the water needed for this process is already allocated to the acreage involved. 2020 ROD 37047-48; *see also id*. 37086 (3,000 of the acres to be used were previously used for sugarcane). The Corps also determined that combined operation of the STA and Reservoir will actually increase water availability for Plaintiffs' farms. DE 30 at 6. Plaintiffs do not allege otherwise. DE 50; Okeelanta Compl. ¶¶ 3, 39, 48-55; U.S. Sugar Compl. ¶¶ 41, 55, 66; Coop. Compl. ¶ 33. Plaintiffs challenge neither finding. Because the Corps' interpretation of the Savings Clause should be upheld under *Chevron*, and because Plaintiffs do not challenge the Corps' conclusions under the Corps' interpretation of the Clause, summary judgment should be granted in favor of Federal Defendants on the Savings Clause claims.

### E.     The Corps' Complied With NEPA

Summary judgment should also be granted in favor of Federal Defendants on the NEPA claim. The Corps prepared a rigorous environmental analysis for the EAA Phase of CEPP, as evidenced by the voluminous record in this case, which totals thousands of pages. That analysis is documented in a number of NEPA documents, including the 2020 EIS, which is the primary NEPA document at issue here. *See* 2020 ROD 31303, 36998.[21] Plaintiffs complain that the

---

[20] PERMIT 11770 (DA Permit 4/17/20); PERMIT 11592 (4/16/20 ROD).

[21] *See also* Annex C to the 2020 Final EIS/ROD, 2020 ROD 41097.

Corps' NEPA analysis suffers from two flaws: (1) it did not analyze alternatives premised on the 2000 WSE baseline; and (2) it did not analyze operations of the STA independent of the Reservoir. Both complaints lack merit.

### 1. The Corps' Evaluated Reasonable Alternatives In Compliance With NEPA

No-one questions that an EIS must contain a detailed statement of alternatives, *see* 40 C.F.R. § 1502.14,[22] but NEPA only requires an agency to consider "reasonable alternatives." *Id.* § 1502.14(a); *see also Piedmont Heights*, *Civic Club v. Moreland*, 637 F.2d 430, 436 (5th Cir 1981). "Alternatives need not include unrealistic options." *Conservancy of Sw. Fla., Inc. v. Williams*, No. 13-14477-CIV, 2018 WL 11422990, at *7 (S.D. Fla. Dec. 21, 2018) (citation omitted). As the Supreme Court has explained, the procedural requirement that alternatives be considered as part of NEPA review is "bounded by some notion of feasibility." *Vt. Yankee Nuclear Power Corp., v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978) ("Common sense also teaches us that the 'detailed statement of alternatives' cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable . . ."). "An EIS is satisfactory if the treatment of alternatives, when judged against a 'rule of reason,' is sufficient to permit a reasoned choice among the various options." *Druid Hills*, 772 F.2d at 713. And, "[a]s a general matter, the range of alternatives that must be discussed . . . is a matter within an agency's discretion." *Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 342 (6th Cir. 2006); *see also Friends of Ompompanoosuc v. Fed. Energy Regulatory Comm'n*, 968 F.2d 1549, 1558 (2d Cir. 1992) ("It is well-settled that under NEPA the range of alternatives that must be discussed is a matter within an agency's discretion.").

Of course an agency must formulate the range of reasonable alternatives in relation to the proposed project itself and the purpose and need of that project. *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F. 4th 850, 876 (9th Cir. 2022). Here, Plaintiffs challenge the EAA Phase of CEPP, whose purpose "is to improve the quantity, quality, timing and distribution of

---

[22] The Council on Environmental Quality issued new implementing regulations for NEPA in 2020. *See* 85 Fed. Reg. 43,304 (July 16, 2020). Because the challenged administrative actions were subject to previous regulations, *see* 40 C.F.R. § 1506.13 (2020), all citations herein are to the version of the regulations in effect at the time of the relevant decisions, 40 C.F.R. Part 1500 (2019).

water flows to the Northern Estuaries, Water Conservation Area 3, Everglades National Park, and Florida Bay . . ." 2020 ROD 31305. In developing reasonable alternatives that could achieve this purpose, the Corps necessarily built from certain foundational premises, including the current level of water supply—which the EIS refers to as the Existing Condition Baseline. *See* 2020 ROD 31377; 31393-31394. That baseline incorporates LORS 2008, which is currently in effect. *See* 2020 ROD 31343; 31410; PPA 8756. As discussed, LORS 2008 was an intervening non-CERP event. *See* PPA 8761-62; 2020 ROD 31415. Because LORS 2008 changed the hydrologic conditions from those in 2000, it requires a different baseline analysis for Savings Clause purposes *as well as* NEPA purposes. Indeed, given that LORS 2008 is in effect, alternatives that failed to account for that reality—or employed a different baseline—would not have been reasonable and would not have met the project's purpose. For these reasons, the Corps' decision to incorporate LORS 2008, as opposed to the 2000 WSE baseline, in both generating and analyzing project alternatives was not arbitrary and capricious and does not violate NEPA.

Plaintiffs' alternatives argument is nothing more than a repackaging of their Savings Clause argument. They argue that the Corps should have relied upon a 2000 WSE baseline, rather than LORS 2008, in analyzing project alternatives and their effects on water supply. DE 50 at 14-15. If Plaintiffs' Savings Clause argument fails, then Plaintiffs' first NEPA argument likewise fails. More directly, Plaintiffs are not arguing that the Corps failed to identify sufficient alternatives or to meaningfully address those alternatives. The Corps' NEPA documents contain a robust discussion and evaluation of alternatives and their potential effects on water supply. *See* 2020 ROD 37089-91; PERMIT 11597-11602. Plaintiffs are simply dissatisfied with the point of comparison, believing that effects on water supply should have been compared to a different benchmark. But Plaintiffs dissatisfaction does not mean that the Corps' analysis is flawed. And Plaintiffs do not point to anything other than their flawed interpretation of the Savings Clause that would have required the Corps to rely upon a different baseline.

By incorporating LORS 2008 as the baseline when comparing alternatives, the Corps supplied the public with the most accurate and complete information regarding potential effects on water supply. The Corps did not leave the public "in the dark" with respect to potential effects, as Plaintiffs allege. DE 50 at 15. To the contrary: the Corps' alternatives analysis fully and fairly informed the public about the potential effects on water supply factoring in current

hydrologic realities, *see* 2020 ROD 31343, 31396-31398. The Corps thus fulfilled the primary purposes of NEPA: analyzing potential environmental impacts and informing the public of those impacts prior to agency action. *See Wilderness Watch v. Mainella*, 375 F.3d 1085, 1094 (11th Cir. 2004).

In sum, the Corps' decision to evaluate alternatives accounting for LORS 2008 was not arbitrary or capricious and does not violate NEPA.

### 2. The STA and Reservoir are part of the same project and NEPA does not require the Corps to analyze them separately.

Plaintiffs' second NEPA argument is that the Corps should have analyzed the STA separately and independently from the Reservoir. DE 50 at 16-19. *Amici* argue the same point. DE 55 at 5-8. The argument is incorrect.

Tellingly, Plaintiffs do not cite any statute, regulation, case law, or secondary source which suggests that NEPA requires an agency to *independently* analyze project components that will not be completed at the same time. DE 50 at 16-19. To the contrary, NEPA regulations focus on circumstances in which agencies must analyze separate major Federal actions together.

Take for example, the NEPA regulations' consideration of "connected actions." *See* 40 C.F.R. § 1508.25. NEPA defines connected actions as those which "are closely related and therefore should be discussed in the same impact statement." 40 C.F.R. § 1508.25; *Defs. of Wildlife v. U.S. Dep't of Navy*, 895 F. Supp. 2d 1285, 1301 (S.D. Ga. 2012), *aff'd*, 733 F.3d 1106 (11th Cir. 2013). The provision does not, however, "mandate that all connected actions be approved in the same ROD," as Plaintiffs' argument suggests. "Rather, this provision requires that an agency study impacts of the entire project at the same time." *Id.* (citing *Stewart Park and Reserve Coal., Inc. (SPARC) v. Slater*, 352 F.3d 545, 559 (2d Cir. 2003) ("Segmentation is an attempt to circumvent NEPA by breaking up one project into smaller projects and not studying the overall impacts of the single overall project.")).

That is precisely what the Corps did in this case: it studied operations of the STA and Reservoir at the same time in the same EIS because the Corps concluded that they are interdependent parts of an entire project phase. As the 2020 EIS explains, the EAA Phase of CEPP case has several components, including the STA, the Reservoir, and "conveyance improvements that would provide benefits to more than 1.5 million acres in the St. Lucie and Caloosahatchee estuaries, WCA 3A, WCA 3B, ENP, and Florida Bay." 2020 ROD 31309. The Corps did not "assume" they will operate together, as Plaintiffs contend, DE 50 at 18-19. Rather,

the Corps (and SWFMD) *planned* for and *designed* them to operate together. As the Permit ROD states, "the STA was designed to function with the reservoir. Therefore, the Corps looked at alternatives that considered both the STA and reservoir assuming both will be constructed. The federal project includes the STA and reservoir." PERMIT 11595.[23]

Unsurprisingly, Plaintiffs do not cite any provision of NEPA or case law that supports their position. Indeed, segmenting an integrated project into numerous sub-projects with separate, unconnected NEPA studies—as Plaintiffs suggest should have occurred here—would likely violate NEPA's regulations and purpose. As explained by this Court:

> The anti-segmentation rule is generally that an agency "cannot 'evade [its] responsibilities' under the National Environmental Policy Act by 'artificially dividing a major federal action into smaller components, each without a "significant" impact.' " … Segmentation is intended to prevent "agencies from dividing one project into multiple individual actions 'each of which individually has an insignificant environmental impact, but which collectively have a substantial impact.' " *Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288, 297–98 (D. C. Cir. 1988) (quoting *Thomas v. Peterson*, 753 F.2d 754, 758 (9th Cir. 1985)).

*Fla. Wildlife Fed'n v. U.S. Army Corps of Engineers*, 401 F. Supp. 2d 1298, 1313 (S.D. Fla. 2005).

In any event, the Corps' NEPA analysis did consider standalone operations of the STA insofar as such operations have been proposed by SFWMD in its permit application. Those operations are limited to a restricted grow-in process. As such, the permit describes three phases for the STA; the third and final currently authorized phase (the "Operational Testing and Monitoring Period") is limited to "initial" operations and only "includes inundating the cells of the STA to facilitate vegetation grow-in for the STA." PERMIT 11770. The ROD for the permit includes the same stipulations. PERMIT 11592. Special conditions for the permit add that "[t]he Permittee shall not operate the STA beyond what is described in the project description" and that before actual operations are commenced an operations plan (with appropriate NEPA analysis) must be submitted "[a] minimum of six months prior to planned operation of the facility." PERMIT 11614, 11777. The Florida permit issued to SFWMD is similar, providing that "[t]his

---

[23] The Permit ROD also observes the STA "can operate as a standalone feature and has independent utility," *id.*, but emphasized that "[t]he Corps' decision that this project has independent utility is made solely for the purpose of permitting and does not mean that it is or is not a separate project under CEPP." PERMIT 11618.

permit does not authorize operations. At least 90 days prior to initiating operations of any of the STA components that are constructed under this permit, the permittee shall summit an application for modification of this permit to obtain authorization to initiate operations." PERMIT 19648. In other words, should SFWMD propose to operate the STA beyond this approval, the Corps has committed to supplemental NEPA review.

The Corps has not approved standalone operations of the STA, post grow-in period. *See* 2020 ROD 31351; PERMIT 11614. Plaintiffs' (and *Amici*'s) claim that the Corps acted unlawfully in not performing an EIS (or conducting Savings Clause analysis) for a fully operational stand-alone STA is therefore meritless. A fully operational stand-alone STA is purely hypothetical. The sources, amounts, and timing of water supplies for such an operation have therefore not been suggested. NEPA does not require analysis of future, speculative stages of a project. *Vieux Carre Prop. Owners, Residents & Assocs., Inc. v. Pierce*, 719 F.2d 1272, 1278 (5th Cir. 1983); *City of Oxford, Ga. v. F.A.A.*, 428 F.3d 1346, 1354 (11th Cir. 2005) (NEPA doesn't require analysis of speculative future developments – "There is simply not enough evidence that the relocation of S.R. 142 will ever occur to justify the assessment of its environmental impacts.").

Given that an agency is afforded considerable discretion as to the timing and scope of environmental impact statements, *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976), the Corps' decision not to separately analyze a mode of STA operation that has not been planned does not amount to unlawful decision-making. *Susquehanna Valley All. v. Three Mile Island Nuclear Reactor*, 619 F.2d 231, 241 (3d Cir. 1980) ("[A]gencies . . . must be afforded some flexibility with respect to timing of the preparation of impact statements") (citations omitted); *Coal. for Advancement of Reg'l Transp. v. Fed. Highway Admin.*, 576 F. App'x 477, 488 (6th Cir. 2014) (citation omitted) (decision to analyze two related projects together under NEPA "is properly left to the informed discretion of the responsible federal agencies.").

Because Plaintiffs do not question the Corps' conclusion that interim operations of the STA during the grow-in period will not divert water, the record likewise belies Plaintiffs' contention that the Corps "failed to consider an important aspect of the problem." DE 50 at 18 (citing *Sierra Club v. U.S. Army Corps of Engineers*, 295 F.3d 1209, 1216 (11th Cir. 2002)). And the cases Plaintiffs cite do not support to Plaintiffs' position. In *Sierra Club v. U.S. Army Corps of Engineers*, the crux of the issue was whether the Corps fairly relied upon a prior EIS

24

conducted in tandem with another agency. 295 F.3d at 1223. The court concluded that the Corps had taken a "hard look" at the environmental consequences of its proposed action and that the record established that the Corps "fully complied with the related procedural requirements established by NEPA …" *See id*. The same is true here. In *Hill v. Boy*, the court found a NEPA violation where the Corps based its analysis on an incorrect assumption: that a pipeline would be removed. 144 F.3d 1446, 1451 (11th Cir. 1998). The Corps in this case has not made any incorrect assumptions but rather has limited its analysis to currently-approved operations. *See* 2020 ROD 37046. Finally, in *Defenders of Wildlife v. Salazar*, the court concluded that a supplemental EIS was needed where the amount of effected trails increased 30-fold. 877 F. Supp. 2d 1271, 1300 (M.D. Fla. 2012). Plaintiffs do not allege that any changes of this magnitude are contemplated as part of the project, or occurred after the EIS.

Plaintiffs also complain that the Corps did not "address meaningfully or respond to" comments regarding the water supply analysis. DE 50 at 17. Again, the record belies this contention. The EIS, in Appendix C, contains comment/response matrices summarizing comments received and detailing the Corps' responses to those comments. 2020 ROD 031705-031752; 2020 ROD 031810-031842; 2020 ROD 40119-40239 (Appendix C-3 summary of correspondence and communications). That stakeholders, including Plaintiffs, expressed conflicting views or disagreed with the Corps' scoping or structuring of its analysis does not equate to a NEPA violation. Indeed, "[t]he fact that conflicting views are expressed does not thereby render the agency decision invalid or lessen the deference to be accorded to the findings and actions documented in the administrative record." *D'Olive Bay Restoration & Pres. Comm., Inc. v. U.S. Army Corps of Engineers*, 513 F. Supp. 2d 1261, 1283 (S.D. Ala. 2007) (citations omitted). As the EIS demonstrates, the Corps meaningfully evaluated and responded to stakeholder comments, in full compliance with its NEPA obligations.

The Corps' decision to analyze the STA and Reservoir together in the same EIS was not arbitrary or capricious, is entitled to deference, and did not violate NEPA.

## CONCLUSION

Defendants respectfully request that the Court grant Defendants summary judgment on all claims.

Dated this 29th day of August, 2022.

Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division

*/s/Peter Kryn Dykema*
Peter Kryn Dykema
Sally J. Sullivan
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
peter.dykema@usdoj.gov
sally.sullivan@usdoj.gov
Phone: (202) 305 0436
Fax: (202) 305 0274

*Attorneys for Defendants*

Electronically filed.

26