UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| OKEELANTA CORPORATION, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No.: 9:21-cv-81505-DMM |
| | ) | |
| UNITED STATES ARMY CORPS OF ENGINEERS, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____/ | | |
| UNITED STATES SUGAR CORPORATION, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No.: 9:21-cv-81506-DMM |
| | ) | |
| UNITED STATES ARMY CORPS OF ENGINEERS, et al., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____/ | | |
| SUGAR CANE GROWERS COOPERATIVE OF FLORIDA, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No.: 9:21-cv-81508-DMM |
| | ) | |
| UNITED STATES ARMY CORPS OF ENGINEERS, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____/ | | |

**JOINT AMICUS CURIAE BRIEF OF:**

**SANIBEL-CAPTIVA CONSERVATION FOUNDATION, INC., SANIBEL-CAPTIVA ISLANDS CHAMBER OF COMMERCE, INC., FLORIDA KEYS FISHING GUIDES ASSOCIATION, INC., ISLAMORADA CHAMBER OF COMMERCE, INC., CAPTAINS FOR CLEAN WATER, INC., THE EVERGLADES FOUNDATION, INC. AND FLORIDA BAY FOREVER, INC.**

**FILED IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES**                                                                    ii

**STATEMENT OF CORPORATE DISCLOSURE OF AMICI CURIAE**                      iii

**STATEMENT OF INTEREST**                                                          iii

**PRELIMINARY STATEMENT**                                                             v

**SUMMARY OF THE ARGUMENT**                                                          1

**ARGUMENT**                                                                                     3

    I.  Plaintiffs' Interpretation of the Savings Clause Would Hinder CERP's Ability to
        Restore the Everglades.                                                          3

    II.  Plaintiffs Suggest an Even Broader Interpretation of Section 601 of WRDA 2000 That
        Threatens the Corps' Basic Authority to Manage the C&SF Project to Protect Fish and
        Wildlife and the Communities That Depend on Healthy Ecosystems.         7

**CONCLUSION**                                                                                  10

# TABLE OF AUTHORITIES

**Cases**

*Black Warrior Riverkeeper v. Ala. DOT*, 2016 U.S. Dist. LEXIS 5839 ........................................6

**Statutes**

28 U.S.C. § 2401 ……………………………….……………………………………………..6

Water Resources Development Act,
 Pub. L. No. 106-541. 114 Stat. 2572 (Dec. 11, 2000)
 - Section 601 (generally)  ...................................................................1, 4, 8, 10
 - § 601(b)(1) ….......................................................................................................8
 - § 601(h)(5) ….......................................................................................................7
 - § 601(h)(5)(A) ….................................................................................................4
 - § 601(h)(5)(A)(i) ….............................................................................................4
 - § 601(h)(5)(B) ….................................................................................................6

**Rules**

Fed. R. Ev. 201(b) ...................................................................................................5, 10

**Regulations**

33 C.F.R. Part 385 .........................................................................................................4

33 C.F.R. § 385.36(a) ...................................................................................................4

33 C.F.R. § 385.36(b) ...................................................................................................4

33 C.F.R. § 385.3 ..........................................................................................................4

**Other Authorities**

S. REP. No. 106-362, at 34 (2000) (Conf. Rep.)..........................................................3

Combined Operational Plan ("COP") Final Environmental Impact Statement ……………9, 10

U.S. Army Corps of Engineers, Jacksonville District. Sept. 24, 2021.
 "USACE awards first construction contract for CEPP EAA Reservoir ........................5

## STATEMENT OF CORPORATE DISCLOSURE OF AMICI CURIAE

Consistent with Rule 26.1, Fed. R. App. Pro., the amici curiae listed herein respectfully submit this corporate disclosure statement and jointly state as follows:

Amici Curiae have no parent corporations, and no publicly held company owns more than ten percent of their stock.

## STATEMENT OF INTEREST

The **Sanibel Captiva Conservation Foundation, Inc.,** ("SCCF") is a 501(c)(3) non-profit organization founded in 1967.  SCCF's mission is to protect and care for Southwest Florida's coastal ecosystems through a focus on water quality research, policy and advocacy, sea turtles and shorebirds, native landscaping, habitat and wildlife management and environmental education. SCCF is the largest private landowner on Sanibel Island, managing more than 1,200 acres on Sanibel plus more than 600 additional acres on surrounding islands and watersheds. SCCF has been working on the Comprehensive Everglades Restoration Plan ("CERP") for more than 25 years, beginning with the Central and Southern Florida Project Restudy in the 1990s to present day. SCCF has provided extensive science and monitoring to support Everglades restoration efforts.

For more than 60 years, the **Sanibel-Captiva Islands Chamber of Commerce, Inc.,** a 501(c)(6) non-profit organization**,** has been dedicated to fostering the growth and prosperity of the business community, while nurturing the quality of life for all those who live, visit and work on Sanibel and Captiva Islands. The Sanibel-Captiva Islands Chamber advocates on behalf of its members in support of Everglades restoration efforts due to the impact that regional water management decisions and poor water quality have on its communities.

The **Florida Keys Fishing Guides Association, Inc., ("**FKFGA") is a 501(c)(6) non-profit organization with approximately 120 members.  FKFGA exists to support the current and future wellbeing of south Florida fisheries and ecosystems, and the livelihood of backcountry fishing guides which work in that environment. The FKFGA supports restoration projects, sponsors travel to speak on conservation issues, and gives grants to local schools for students to participate in research projects to benefit the fisheries and ecosystems of the Florida Keys.

The **Islamorada Chamber of Commerce, Inc.,** is a 501(c)(6) organization whose mission is to promote business by providing support, education and advocacy.  Members of the Islamorada Chamber of Commerce are affected by environmental and water quality problems that impact the Florida Keys, the Everglades, Florida Bay and surrounding areas. The Chamber advocates on behalf of its members to support Everglades restoration efforts in order to improve the quality of the environment in and around the Florida Keys.

**Captains For Clean Water, Inc.,** is a grassroots 501(c)(3) Florida non-profit organization that fights to restore and protect water resources by advancing science-based solutions, raising awareness, empowering advocacy and ensuring accountability.  With over 135,000 members and supporters, Captains unites the outdoor industry, environmental groups, business community and concerned citizens around important water resource issues particularly as they affect the Everglades and estuarine environments to protect valuable environmental resources for future generations

**The Everglades Foundation, Inc.,** is a 501(c)(3) Florida not for profit corporation that works to restore and protect America's Everglades through science, advocacy, and education.

The Everglades Foundation seeks a restored Everglades with abundant freshwater for consumption, enjoyment, ecological health, and economic growth for generations to come.

**Florida Bay Forever, Inc.,** is a 501(c)(3) non-profit organization based in Islamorada, Florida. The organization was founded in 2016 in response to a devastating seagrass die-off, algal blooms, and fish kills on Florida Bay, by concerned citizens who depend on a healthy Florida Bay for their livelihoods and community. Everglades restoration and the health of Florida Bay are inextricably linked as they are part of one hydrological system. Florida Bay Forever's mission is to protect and preserve Florida Bay through education and advocacy, giving Monroe County residents and visitors a voice to encourage sending water south.

These organizations – together the Everglades Amici – advocate for and have members who use, enjoy and depend on a healthy Everglades, Florida Keys, Caloosahatchee and St. Lucie estuaries, and Lake Okeechobee.  Their interest in this case is to ensure that CERP is implemented to restore, preserve, and protect America's Everglades and to safeguard the U.S. Army Corps of Engineers' ("Corps") ability to effectively manage its infrastructure throughout south Florida for the protection of fish, wildlife and Everglades National Park.

All of the Everglades Amici were authorized to file this joint motion and amicus curiae brief based on direction from their Boards of Directors who approved filing this brief.

## PRELIMINARY STATEMENT

Consistent with Rule 29(a)(4)(E), Fed. R. App. Pro., Everglades Amici jointly state that this brief was authored in whole by counsel for Everglades Amici, and was not authored, in whole or in part, by parties' counsel. No individuals or entities contributed funds to prepare this brief; it was prepared by the Everglades Law Center, Inc., pro bono.

## SUMMARY OF THE ARGUMENT

Everglades Amici appear in this matter to describe the far-reaching implications of the Sugar Industry Plaintiffs' unprecedented interpretation of the Savings Clause of Section 601 of the Water Resources Development Act of 2000 ("WRDA 2000"), originally a bill entitled "Restoring the Everglades, an American Legacy Act."  Plaintiffs seek to ensure that each Comprehensive Everglades Restoration Plan ("CERP") project be designed and implemented to ensure that agricultural interests are at the front of the line to receive the benefits of restoration projects, "at least as much water supply as was available when WRDA 2000 was enacted" (DE at 8), regardless of what intervening event may have reduced their water supplies. But this is not what the law says or means.  Rather than serving as an insurance policy for water users, protecting them from untold future harm, the Savings Clause was intended to ensure that the implementation of CERP itself – and its 68 identified projects designed to make more water available for the environment – would not transfer existing water supplies away from water users or the environment until CERP projects made new sources available.

Were this Court to adopt Plaintiffs' flawed interpretation of the law, the carefully crafted plan for Everglades restoration developed over decades would cease to be a plan to restore America's Everglades, and would serve instead primarily as an insurance policy for agricultural water supply before any restoration objectives could be met.  Under Plaintiffs' reading, restoration projects would need to be planned, constructed, and operated to replace any and all water lost to water users since December 2000, regardless of how or why water supplies had been reduced. Unfairly diverting the benefits of Everglades restoration projects to hold agricultural water users harmless even under changing conditions would proportionately reduce the environmental benefits of the projects and could significantly impact the ability of CERP to

achieve its restoration objectives.  Water captured and stored by new restoration infrastructure would be unavailable to flow to and through the historic Everglades wetlands in the Water Conservation Areas, Everglades National Park, Biscayne Bay and Florida Bay, restoring habitat critical to all manner of wildlife, including endangered and threatened species, providing water supply for Florida's lower east coast, and buffering against sea level rise and the resultant loss in fresh groundwater. Damaging discharges to coastal estuaries would be a likely result of the need to keep Lake Okeechobee levels higher to ensure agricultural water supply needs are met. These impacts will harm the interests of the Everglades Amici who advocate for and rely on healthy ecosystems in the Everglades, the coastal estuaries and the Keys.

There are countless scenarios that could result in a reduction of water supply that are unrelated to CERP: climatological changes, reduced rainfall, land use changes, the threat of saltwater intrusion, groundwater protection, the integrity of the Herbert Hoover Dike or other Corps infrastructure, statutory requirements such as those to protect human health or avoid jeopardy to endangered and threatened species are just some examples of events unrelated to CERP that could trigger a violation of the Savings Clause under Plaintiffs' interpretation and reduce or eliminate the ability of CERP projects to provide the water needed for restoring the Everglades.

In addition, Plaintiffs contend that the Savings Clause applies to any change the Corps seeks to make in the way it operates and manages the Central and Southern Florida Project ("C&SF Project"), despite explicit language limiting the requirements of the law to the 68 projects included in CERP.  In Plaintiffs' reading, the Corps' original authority granted in 1948 to operate its multibillion dollar C&SF infrastructure to provide flood control, regional water supply for urban and agricultural areas as well as Everglades National Park, prevention of

saltwater intrusion, preservation of fish and wildlife, recreation, and navigation[1] must be exercised first and above all else to ensure a constant, steady source of water supply in at least the same quantity as was available in December 2000, regardless of the circumstances or impacts to its other critical objectives.

Plaintiffs' reading of the law is contrary to common sense, to the plain meaning of WRDA 2000, to its implementing regulations, and to the agencies' long standing interpretation of the law and regulations since WRDA 2000 was adopted.  It is further inconsistent with how the Corps has implemented modifications to the operations of the C&SF system including modifications of Lake operations through the Lake Okeechobee Regulation Schedule ("LORS 2008") and modifications to operations at the southern end of the system through the implementation of the Combined Operations Plan ("COP"). Plaintiffs' interpretation would hamstring the Corps' ability both to engage in maintenance of its aging infrastructure and to effectively implement CERP, the 22 year old plan to restore America's Everglades.

**ARGUMENT**

**I.**    **Plaintiffs' Interpretation of the Savings Clause Would Hinder CERP's Ability to Restore the Everglades.**

In order to support their claim that "[t]he Corps violated the Savings Clause by failing to ensure that the [Everglades Agricultural Area A-2 Reservoir and Stormwater Treatment Area ("EAA A-2 Reservoir and STA Project")] Project will provide at least as much water supply as was available when WRDA 2000 was enacted" (DE 50 at 8), Plaintiffs ignore a key phrase in the law:  that the specific requirements related to the elimination or transfer of sources of then-existing, legal water supplies apply only to an elimination or transfer *"as a result of*

---

[1] See S. REP. No. 106-362, at 34 (2000) (Conf. Rep.).

*implementation of the Plan.*"[2]  WRDA 2000 § 601(h)(5)(A)(emphasis added). In fact, Plaintiffs

often omit this phrase throughout their motion when quoting from Section 601(h)(5)(A).[3]

As iterated by the Corps in its Opposition, both the Programmatic Regulations that

implement Section 601 of WRDA 2000, found at 33 C.F.R. Part 385, and the 2007 Final Draft

Guidance Memorandum also explicitly direct the Corps in their Savings Clause analysis to focus

on water lost *as a result of implementation* of specific CERP projects. *See* DE 59 at 9-19; 33

C.F.R. § 385.36(a), (b); July 2007 Final Draft Guidance Memorandum, 2020_ROD_004195

through 2020_ROD_004412, at Section 3.8 (explaining that "Intervening non-CERP Activities"

are not covered by the Savings Clause because "[t]he Savings Clause only applies to changes

from the date of enactment of WRDA 2000 that result from 'implementation of the Plan.'")

While Plaintiffs' challenge is to the EAA A-2 Reservoir and STA Project, their Motion

for Summary Judgment makes clear that the Corps action that they contend "depriv[ed them] of

essential water supply that is necessary for their farming operations and maintaining their lands"

(DE 50 at 1), is not the EAA A-2 Reservoir and STA Project, but rather revisions to the Lake

Okeechobee Regulation Schedule made in 2008 ("LORS 2008") designed to lessen the impact of

high volume water releases on coastal estuaries and reduce the likelihood of catastrophic failure

---

[2] The "Plan", in turn, is defined as the **"**Comprehensive Everglades Restoration Plan contained in the 'Final Integrated Feasibility Report and Programmatic Environmental Impact Statement,' dated April 1, 1999, as modified by section 601 of WRDA 2000, and any subsequent modification authorized in law", i.e. the 68 projects of CERP.  33 C.F.R. § 385.3.

[3] *See, e.g.,* DE 50 at 4 ("The Programmatic Regulations also require the Corps to develop a guidance memorandum, approved by the Secretary of the Army, that 'describes the process for determining if existing legal sources of water are to be eliminated or transferred... .' 33 C.F.R. § 385.36(b)."); 10 ("The Corps never even evaluated, much less ensured, that the EAA Project will not 'eliminate or transfer existing legal sources of water . . . for . . . an agricultural or urban water supply' that was 'available on the date of enactment of this Act.' WRDA 2000, § 601(h)(5)(A)(i)."); 11 ("First, the Corps' position ignores the plain language of WRDA 2000, which clearly provides that the Corps cannot eliminate or transfer an existing legal source of water supply 'available on the date of enactment of this Act' (December 11, 2000). 33 C.F.R. § 385.3").

of the Herbert Hoover Dike.[4]  Sugar Industry Plaintiffs note that LORS 2008 – the action they

seek to have redressed by way of the EAA A-2 Reservoir and STA Project – reduced the water

available in Lake Okeechobee by approximately 1-1.5 feet, or *500,000 acre-feet*. *See* DE 50 at 5.

By comparison, the EAA A-2 Reservoir and STA project being challenged by the Plaintiffs is

*designed to store up to 240,000 acre feet of water* and to "provid[e] an average of approximately

*210,000 acre-feet (ac-ft)* per year of additional flow into the central portion of the Everglades."

Central Everglades Planning Project, EAA Final Environmental Impact Statement ("EIS")

(January 2020), 2020_ROD_031303 through 2020_ROD_035928, at ES-1 (emphasis added). As

the Corps explained in its press release for an initial construction phase of the project, this is a

"massive civil works project" that will "store a volume similar to about a half a foot on Lake

Okeechobee" at a cost "estimated at $3.5 billion."[5] And yet this entire project would supply less

than half of what the Sugar Industry Plaintiffs contend it must first replace as a result of the

Corps' actions in 2008 to address threats and concerns entirely unrelated to CERP.

---

[4] *See, e.g.* DE 50 at 5 ("LORS 2008 reduced the amount of water in the Lake by approximately 1.0–1.5 feet, equating to approximately 500,000 acre-feet less water in the Lake available for water users, including Plaintiffs."), 11 ("the Corps' position that LORS 2008 is somehow exempt from WRDA 2000's requirements is inconsistent with the entire structure of the statute."), 8 ("the Corps compared water supply for the EAA Project to water supply available with the LORS 2008 regulation schedule….It is undisputed that LORS 2008 provides a lower level of level of water supply than [Lake Okeechobee operations before LORS 2008 was implemented]."). *See also* LORS 2008 Final EIS, 2020_ROD_Supplement_042273 through 2020_ROD_Supplement_043093, at ii (discussing need for project including "ecological reasons, such as continued deterioration of Lake Okeechobee's littoral zone and both the Caloosahatchee and St. Lucie estuaries" as well as "structural integrity issues with the [Herbert Hoover Dike] levee system that protects the surrounding communities from flood damage.").
[5] *See* U.S. Army Corps of Engineers, Jacksonville District. Sept. 24, 2021. "USACE awards first construction contract for CEPP EAA Reservoir" (available at: https://www.saj.usace.army.mil/Media/News-Releases/Article/2788228/usace-awards-first-constr uction-contract-for-cepp-eaa-reservoir/)(last visited September 5, 2022). *See* Fed. R. Ev. 201(b)("The court may judicially notice a fact that is not subject to reasonable dispute because it….can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."). *See also* Central Everglades Planning Project, EAA Final EIS, 2020_ROD_031303 through 2020_ROD_035928, at 3-8 (noting $3.6 billion + cost and 240,000 acre foot capacity).

LORS 2008 is not included in CERP, is not one of the 68 clearly delineated CERP projects, and was not authorized or approved as a CERP Project. *See* LORS 2008 Final EIS, 2020_ROD_Supplement_042273 through 2020_ROD_Supplement_043093, at Executive Summary, pages i-v.  LORS 2008 clearly qualifies as an "intervening non-CERP event." *See* July 2007 Final Draft Guidance Memorandum,  2020_ROD_004195 through 2020_ROD_004412, at 3-E-1.[6]  But Plaintiffs essentially assert that there is no such thing as a non-CERP event.[7]  If, as under the position espoused by the Plaintiffs,  there are no "intervening, non-CERP events", then anything, virtually anything at all, that reduces or adversely affects the quantity or quality of agricultural water supply that was in place in December of 2000 must be redressed when the Corps seeks to implement a CERP project.

Everglades Amici appear in this matter not only to explain the error of Sugar Industry Plaintiffs' legal interpretation, but also to demonstrate the far-reaching consequences of their argument and its application beyond the LORS 2008.[8]  Plaintiffs outright reject the concept that their water supply could be impacted by intervening non-CERP activities. In their words, "[t]he

[6]Plaintiffs had every opportunity to challenge LORS 2008 as a violation of WRDA 2000; however they declined to do so and the time to raise those claims is now passed. *See,* 28 U.S.C. § 2401; *Black Warrior Riverkeeper v. Ala. DOT*, 2016 U.S. Dist. LEXIS 5839, *61, *63 n14 (addressing six year statute of limitations in review of an EIS).

[7] *See* DE 50 at 10 ("...the Corps stated there are some modifications to the C&SF Project that are not subject to WRDA 2000.... which it unilaterally labeled as 'intervening non-CERP activities.'"), 12 ("...the term used by the Corps in the draft memorandum – 'intervening non-CERP activities' – is found nowhere in WRDA 2000 or the Programmatic Regulations"), 13 ("The regulations also say nothing about 'intervening non-CERP activities.'").

[8] The Sugar Industry's argument could also shield farmers from the same range of changes if those changes reduced the flood protection benefits provided by the C&SF Project after 2000. Although the focus of Plaintiffs' Complaints is the portion of WRDA 2000's Savings Clause that protects water supplies, the law uses the same language to address the maintenance of flood protection:  "*Implementation of the Plan* shall not reduce levels of service for flood protection that are…in existence on the date of enactment of this Act; and…in accordance with applicable law." *See* WRDA 2000 § 601(h)(5)(B)(emphasis added). If this flood control savings clause applies to changes regardless of whether they are caused by "implementation of the Plan", the universe of events and changes since 2000 that any new CERP Project must address before devoting any water to Everglades restoration expands even further.

term is a fiction." DE 50 at 12.[9] Under this interpretation taken to its logical conclusion, the

consequences for restoration could be extreme. If climatological changes result in less rain

within the Lake Okeechobee watershed, requiring operational adjustments to prevent muck fires

in the Everglades or other harm to natural systems, CERP projects would be required to first

supply any water lost to agricultural users as a result of those climatological changes.  If climate

shifts lead to more intense storms requiring more frequent releases from Lake Okeechobee to

prevent flooding and ensure dike sustainability, new Everglades restoration infrastructure would

first need to be operated to restore any water lost to agricultural users as a result of those

operational shifts. If the Corps is required by law to implement operational changes to address

harm to human health or endangered species as a result of harmful algal blooms within Lake

Okeechobee, new Everglades restoration projects would first be required to replace water lost to

agricultural users as a result.  In short, Plaintiffs' interpretation of WRDA 2000's Savings Clause

would remake the law that Congress called the "Restoring the Everglades, an American Legacy

Act" into an insurance policy for agricultural water users, holding them harmless from a host of

threats to their water supply completely unrelated to the 68 Projects included in CERP.

II.     **Plaintiffs Suggest an Even Broader Interpretation of Section 601 of WRDA 2000
        That Threatens the Corps' Basic Authority to Manage the C&SF Project to Protect
        Fish and Wildlife and the Communities That Depend on Healthy Ecosystems.**

        Sugar Industry Plaintiffs' fundamental misinterpretation of the Savings Clause goes

beyond the implementation of CERP to threaten the Corps' basic authority to manage and

operate the C&SF Project. *See* DE 50 at 11-12 (Sugar Industry Plaintiffs arguing that WRDA

2000's "provisions indicate that the comprehensive plan applies to all C&SF Project

modifications undertaken for environmental and other water-related purposes"). Sugar Industry

---

[9] Sugar Industry Plaintiffs do not explain what the words "to be lost as a result of implementation
of the Plan" in Section 601(h)(5) mean.

Plaintiffs read Section 601 of WRDA 2000 – a law that explicitly adopts a Comprehensive Everglades Restoration Plan composed of 68 components to modify the C&SF Project and establishes specific procedures for the implementation of that Plan – as applying to any project or operational change the Corps undertakes as part of its operation and management of the C&SF Project, whether or not it is included in the Plan, and potentially long before restoration benefits are being implemented. Plaintiffs cherry pick words and phrases from one subsection of the law[10] to cut from whole cloth the false narrative that the law completely replaced the Corps' authority to manage and operate the C&SF System and installed a new set of requirements for all changes forevermore to the then 50-year old project. Like Plaintiffs' interpretation of the Savings Clause, this broader interpretation of the law's scope is unsupported. *See* DE 59 at 13-14 ("Plaintiffs' interpretation is also incorrect because it is contrary to Congressional statements elsewhere in WRDA 2000. Congress gave clear guidance that it did *not* want WRDA 2000 to interfere with the Corps' ongoing statutory responsibilities.").

Everglades Amici emphasize that, in addition to having no basis in the law itself, Plaintiffs' broader interpretation would undermine the Corps' ability to protect water resources throughout south Florida and the people and businesses that depend upon healthy ecosystems. A requirement to maintain agricultural water use as it existed in December 2000 could conflict with other objectives of the C&SF project, including both the Corps' duty to avoid failure of its infrastructure (what was primarily at stake in LORS 2008)[11] and its duty to comply with the

---

[10] DE 50 at 11 (quoting the words "comprehensive plan" and "framework" and "integrated ... with ongoing Federal and state projects," from Section 601(b)(1) without reference to details in other parts of the law regarding the specific projects included in the "comprehensive plan" and the differences in requirements for other non-CERP projects); 11-12 ("The Corps' position that WRDA 2000 does not apply to all C&SF Project modifications, and that the agency can pick and choose when it complies with the statute, is inconsistent with the CERP being a "comprehensive" plan, that is the "framework" for future modifications to the C&SF Project.").

[11] *See* LORS 2008 Final EIS, 2020_ROD_Supplement_042273 through 2020_ROD_Supplement_043093, at ii. The Corps' summary of its analyses in the Final EIS for

Endangered Species Act and ensure that its actions do not jeopardize the continued existence of endangered and threatened species (at issue in the many changes to C&SF Project operations south of Tamiami Trail from the time of the passage of WRDA 2000 until the 2020 adoption of the Combined Operations Plan).[12]  Sugar Industry Plaintiffs contend that the Savings Clause

LORS 2008 is instructive as to the effects of an interpretation of the law that would remove the Corps' general responsibility to balance competing needs and instead requires maintaining a subset of uses in existence as of December 2000.  *See, e.g.,* LORS 2008 Final EIS, 2020_ROD_Supplement_042273 through 2020_ROD_Supplement_043093, at iii:

> For a multiple purpose lake, such as Lake Okeechobee, a regulation schedule attempts to balance competing objectives including flood control, water supply, navigation and preservation of fish and wildlife resources. Thus, managing for better performance of one objective often reduces the ability to satisfy other competing objectives. An objective of the study is to minimize high lake stage events. The alternatives performed well in meeting this objective. However, there is a trade-off when decreasing the high lake stage events, which is increasing the frequency of low stage events. When water levels reach extreme low stages, there is always the potential for navigation, water supply, and fish and wildlife resource impacts throughout the study area. Lowering lake stages can also create or contribute to adverse conditions in the Caloosahatchee and St. Lucie Estuaries.

*See also id.* at pages iii-iv:

> There will always be a level of controversy involved in the operation of a large, complex, multi-purpose project, such as Lake Okeechobee. As authorized, the project has many purposes, including flood control, water supply for agriculture, municipalities, and Everglades National Park (ENP), preservation of fish and wildlife, recreation, navigation and prevention of salt water intrusion. More often than not, trade-offs will exist in order to meet project purposes.

[12] *See* Combined Operational Plan ("COP") Final EIS, (available at https://www.saj.usace.army.mil/Missions/Environmental/Ecosystem-Restoration/G-3273-and-S-356-Pump-Station-Field-Test/)(last visited Sept. 5, 2022), Appendix D.2, Biological Opinion for COP at 1 (discussing history of operations adjustments to prevent jeopardy to the Cape Sable Seaside Sparrow and COP's achievement of required adjustments). The COP's Final EIS reflects the Corps' general authority that requires balancing sometimes-competing interests, making clear the impacts of an interpretation that would require the Corps first and foremost hold agricultural water supplies constant at 2000 levels in operational modifications. *See, e.g.,* COP Final EIS at Executive Summary (discussing operational tradeoffs), and 1-1 ("The proposed operations will also be consistent with the original purposes of the C&SF project to provide flood control, water supply for agricultural municipal, and industrial uses, regional groundwater control and prevention of saltwater intrusion, enhancement of fish and wildlife, and recreation."). *See* Fed. R. Ev. 201(b)("The court may judicially notice a fact that is not subject to reasonable dispute because it….can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

means that no matter what else the Corps may need to do in operating the C&SF Project, it cannot take any action that would reduce agricultural water supply below what it was in December 2000. Nothing in the law supports such an expansive, environmentally devastating interpretation of the scope of the Savings Clause.[13]

## CONCLUSION

The Restoring the Everglades, an American Legacy Act was codified as Section 601 of WRDA 2000 to approve the 68 projects in CERP as a plan to redress five decades of harm to America's Everglades. Yet, Sugar Industry Plaintiffs put forward an interpretation of its provisions that would – paradoxically – eviscerate its potential to restore the Everglades and instead lock in expansive, heretofore non-existent protections for agricultural water supplies, putting projects conceived, developed and implemented as Everglades restoration projects to the task of replacing any and all water lost as a result of anything from climate change to the protection of human health and safety.  As organizations who advocate for and whose members use, enjoy and depend on a healthy Everglades, the Florida Keys, the Caloosahatchee and St. Lucie estuaries, and Lake Okeechobee, we respectfully request this Court reject the Sugar Industry Plaintiffs' unprecedented interpretation of Section 601 of WRDA 2000 and hold that the Savings Clause does not require the Corps to implement CERP or operate its C&SF Project infrastructure to maintain or replace agricultural water supplies reduced as a result of non-CERP actions since December 2000.

---

[13] Because all parties acknowledge that Plaintiffs' challenge is to a CERP project, this Court need not reach this broader claim that all non-CERP projects are also subject to the Savings Clause.

Respectfully submitted this 6th day of September, 2022.

/s/ S. Ansley Samson
**S. ANSLEY SAMSON**
ansley@evergladeslaw.org
Florida Bar No.: 86398

**LISA INTERLANDI**
lisa@evergladeslaw.org
Florida Bar No.: 146048

**ELIZABETH FATA CARPENTER**
elizabeth@evergladeslaw.org
Florida Bar No.: 123542

Everglades Law Center, Inc.
378 Northlake Blvd. #105
North Palm Beach, FL 33408
(786) 496-3309

*Attorneys for Everglades Amici*

Electronically filed via CM/ECF