UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NOS. 21-81505-CIV-DMM, 21-81506-CIV-DMM, 21-81508-DMM

OKEELANTA CORP.,

    Plaintiff,

v.

UNITED STATES ARMY CORPS
OF ENGINEERS

    Defendant.

_____

UNITED STATES SUGAR CORP.,

    Plaintiff,

v.

UNITED STATES ARMY CORPS
OF ENGINEERS, *et al.*,

    Defendants.

_____

SUGAR CANE GROWERS
COOPERATIVE OF FLORIDA,

    Plaintiff,

v.

UNITED STATES ARMY CORPS
OF ENGINEERS,

    Defendant.

_____/

**[PROPOSED] BRIEF OF *AMICUS CURIAE* SOUTH FLORIDA WATER MANAGEMENT DISTRICT IN SUPPORT OF DEFENDANT UNITEDSTATES <u>ARMY CORPS OF ENGINEERS' CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

The South Florida Water Management District ("District"), as *amicus curiae*, submits the following brief in support of the United States Army Corps of Engineers, and states as follows:

### Statement of Interest

The South Florida Water Management District is one of five water management districts created by the Florida Legislature to manage Florida's water resources. As the Court has noted, "[t]he . . . District's mission is to manage and protect the water resources within its boundaries by improving water quality, flood control, natural systems, and water supply within the region." *Grimshaw v. S. Fla. Water Mgmt. Dist.*, 195 F. Supp. 2d 1358, 1360 (S.D. Fla. 2002). The District is unique among Florida's water management districts, as it has been specially designated by the Legislature to engage in projects related to the restoration of the Everglades. For instance, the District is the local sponsor for the federal Central and Southern Florida Project, and the District administers Florida's Everglades Trust Fund. *See* Art. X, § 17(a), Fla. Const.; Fla. Stat. § 373.1501.

In Executive Order 19-12, Governor DeSantis directed the District to take decisive actions to expedite restoration of the Everglades, Lake Okeechobee, and the St. Lucie and Caloosahatchee Estuaries. Since 2019, the State has secured over $3.3 billion in funding for Everglades restoration and protection of water resources. The Legislature also declared that an emergency exists in the St. Lucie and Caloosahatchee Estuaries due to the high-volume discharges from Lake Okeechobee and directed the District to take specific actions to facilitate the prompt construction of the EAA project, including the A-2 Stormwater Treatment Area ("A-2 STA"). Fla. Stat. § 373.4598.

As the Court knows, the District holds one of the permits at issue in this case — a Section 404 permit authorizing construction of the A-2 STA. All three plaintiffs in these consolidated actions are seeking to invalidate the District's permit. [Okeelanta Am. Compl., at p. 18; U.S. Sugar Compl., at 24; Sugar Cane Growers Compl., at p. 14.] This Court has previously acknowledged the "high stakes" for the permit holder in an action to invalidate a permit pursuant to the Administrative Procedures Act ("APA"), as well as the permit holder's "unique and important perspective" that it can contribute to the Court's consideration of the matter. *See Fla. Wildlife Federation v. U.S. Army Corps of Eng'rs*, No. 05-80339-CIV-DMM, 2005 U.S. Dist. LEXIS 51196, at *14-15 (S.D. Fla. July 29, 2005). In granting leave for the Florida Fruit and Vegetable Association and the Florida Farm Bureau Federation (together, "*Amici*") to file an *amicus* brief, the Court expressed an interest in getting a "different perspective on the scope and consequences

2

of the issues before the Court." [D.E. 54, at 2.] Through this brief, District seeks to provide further context to the A-2 STA project and the resulting consequences in the event the District's permit is invalidated.

## Argument

While there are process arguments to deliberate in this proceeding, the Court should recognize that the A-2 Reservoir and A-2 STA create 240,000 acre/feet of new water storage on public lands that will be used to supplement water supplies for the Plaintiffs and *Amici*. Water is not "lost" by this component of the Comprehensive Everglades Restoration Plan ("CERP"), water is gained. Functionally, the A-2 Reservoir and A-2 STA represent a place to capture stormwater when it rains so that water can be used later during dry periods.

Plaintiffs and *Amici* have made two primary arguments to the Court to invalidate a slew of agency actions by the U.S. Army Corps of Engineers ("COE"). First, they argue that COE used the wrong "baseline" in analyzing any adverse water supply impacts to existing agricultural water users resulting from the EAA project. Second, they argue that COE insufficiently evaluated the A-2 STA's operations, as they contend the A-2 STA will be operated as a stand-alone feature. COE has addressed these arguments with a thorough rebuttal, and the District will not duplicate those arguments. [*See* D.E. 56.]

Nevertheless, the consequences of agency action—or its reversal—can be relevant. *See, e.g., PDK Labs. Inc. v. U.S. Drug Enforcement Agency*, 362 F.3d 786, 799 (D.C. Cir. 2004) (applying harmless error review to agency action under the APA). One of the agency actions Plaintiffs seek to undo in their lawsuit is COE's issuance of a Section 404 Clean Water Act Permit, dated April 17, 2020, to the District for construction of the A-2 STA ("Section 404 Permit"). As the permit holder, the District highlights for the Court the likely consequences of revoking the Section 404 Permit in this case. Further, because *Amici* have injected arguments regarding water rights under Florida law, the District seeks to clarify that analysis, as *Amici* express only a portion of the overall story and regulatory framework.

For the following additional reasons, the Court should deny the Motion for Summary Judgment [D.E. 50].

I.  **Environmental Consequences**

A.  **Continued Discharges From Lake Okeechobee into the Northern Estuaries**

The principal features of the Everglades Agricultural Area ("EAA") project are a 10,500-acre reservoir, approximately 23 feet deep ("Reservoir"); a 6,500-acre stormwater treatment area (the A-2 STA); and conveyance improvements to the Miami and North New River Canals within the EAA. The EAA project is designed to improve the quantity, quality, timing, and distribution of water flows to the central Everglades (Water Conservation Area 3) and Everglades National Park. The project also provides flexibility in Lake Okeechobee operations by increasing storage, treatment, and conveyance to the south of the lake, which will reduce damaging discharges from Lake Okeechobee to the St. Lucie and Caloosahatchee Estuaries.

Residents and landowners in and around the St. Lucie and Caloosahatchee River Estuaries will be some of the main beneficiaries of the A-2 STA and Reservoir. Water releases to the Northern Estuaries have historically caused significant harm to the estuaries, as the influx of fresh water from Lake Okeechobee reduces the salinity of the water and caused blue-green algae, or cyanobacteria, to thrive.[1] For instance, "[h]igh-flow releases lasting more than 60 days in the Caloosahatchee River Estuary or more than 42 days in the St. Lucie Estuary have been found to be particularly damaging to the oyster populations." [EIS,[2] 3-24.] "Currently, many oyster and seagrass beds are stressed and have been reduced or eliminated from their former areas by extreme salinity fluctuations." [EIS, 3-24.] Oyster beds in the St. Lucie Estuary, for instance, "support more than 300 species of aquatic animals" and "help make the estuary healthier by filtering impurities out of the water."[3] The stress on the two Northern Estuary ecosystems from these Lake

---

[1] *See, e.g.,* Fla. Stat. § 373.4598(1); Avianne Tan, *Here's What's Causing the Toxic Algae Blooms Infesting Florida's Coastlines and Waterways*, ABC News, July 5, 2016, *available at* https://abcnews.go.com/US/causing-toxic-algae-blooms-infesting-floridas-coastlines-waterways/story?id=40346683 (attached as Exhibit A); Merrit Kennedy, *Thick, Putrid Algae Bloom Overwhelms Miles of Florida Coastline*, NPR News, July 2, 2016, *available at* https://www.npr.org/sections/thetwo-way/2016/07/02/484477038/thick-putrid-algae-bloom-overhwlems-miles-of-florida-coastline (attached as Exhibit B.).

[2] "EIS" refers to the May 15, 2020 *Everglades Agricultural Area (EAA) Final Environmental Impact Statement (EIS) and Record of Decision (ROD)* (2020 ROD 36998-42268).

[3] Molly Bartles, *Study: St. Lucie River Oysters Can Handle a Lot, But Not Lake Okeechobee Discharges*, TCPalm, Feb. 23, 2016, *available at* https://archive.tcpalm.com/news/indian-river-

4

Okeechobee freshwater discharges has led to many highly detrimental environmental and economic issues, including fish kills, loss of tourism, and human and animal illness.[4]

As set forth in the Final EIS, the COE's recommended plan (i.e., the A-2 STA and Reservoir, as authorized by COE) should "provide an overall 55% reduction in freshwater release volumes and a 63% reduction in the number of freshwater release events to the Northern Estuaries from Lake Okeechobee, in conjunction with other authorized projects." [EIS, 4-1.] "The reduction in freshwater releases improves the salinity conditions in the estuaries by reducing the number of events that exceed the preferred salinity envelope by 39% in the St. Lucie Estuary and by 45% in the Caloosahatchee Estuary." [EIS, 4-1.]

Operation of the A-2 STA has the potential to accelerate the delivery of these anticipated benefits by diverting water south—sooner rather than later. Having the operational flexibility to send more water from Lake Okeechobee south would reduce the ecosystem stress placed annually on the Northern Estuaries when water must be sent from Lake Okeechobee down the Caloosahatchee and St. Lucie Rivers. In turn, this flexibility helps to sustain and improve the quality of oyster and submerged aquatic vegetation, resulting in healthier ecosystems, increased fish populations, clearer water, and lower likelihood of harmful algal blooms. Delaying construction of the A-2 STA would cause unnecessary damage to the Northern Estuaries that could otherwise be limited or avoided altogether.

B. **Delayed Water Quantity Improvements for the Everglades**

Redirecting water from Lake Okeechobee to the central Everglades that would otherwise need to be sent to the Northern Estuaries will likewise have significant, near-term benefits. Overall, the A-2 STA and reservoir will allow an increase flow of roughly 210,000 acre-feet of water south towards the central Everglades. [EIS, ES-1.] This extra water will "reduce compartmentalization and fragmentation of the Everglades landscape, thus facilitating the

---

lagoon/health/study-st-lucie-river-oysters-can-handle-a-lot-but-not-lake-o-dicharges-2c5e9b66-4546-5b4c-e053-0100-369902021.html (attached as Exhibit C).

[4] *See, e.g.,* Laura Ruane, *Florida's Algae Crisis: How is it Affecting Tourism and Other Businesses?*, Naples Daily News, July 14, 2018, *available at* https://www.naplesnews.com/story/news/local/2018/07/14/floridas-algae-crisis-how-affecting-businesses/783906002 (discussing the effect on real estate, tourism, and commercial fishing, among other industries) (attached as Exhibit D); Avoiding Harmful Algae and Cyanobacteria, CDC.gov, https://cdc.gov/habs/be-aware-habs.html

resumption of sheetflow and related patterns of hydroperiods and water depth that would benefit from deliveries of additional water." [EIS, 4-2.] "Additional water flowing into the Everglades would also result in beneficial shifts in habitat for desired wildlife species." [EIS, 4-2.] "Increased hydroperiods would slow the rate of soil oxidation and decrease the extent of damaging peat fires." [EIS, 4-3.]

Operation of the A-2 STA and Reservoir has the potential to accelerate the delivery of these anticipated benefits. The Everglades landscape is critically dependent on its underlying organic soils and the regional land surface gradient created by the pre-drainage gradual sheet flow of water from the southern banks of Lake Okeechobee to the southwest coast and Florida Bay. When dry, these soils are vulnerable to oxidation and fire which, in turn, leads to soil loss. Delaying construction and Reservoir further delays southward dry-season flow and increases the risk of wildfires.

Operation of the A-2 STA and Reservoir will also likely improve fish and wildlife populations. Rehydration of the Everglades will promote submerged aquatic plants that allow growth of periphyton, a primary dietary component of certain invertebrates and small fishes. The expansion of rehydrated areas thus increases prey availability, allowing larger predator species to survive.

## II.     Financial Impacts

The District is constructing the A-2 STA in two phases with State funds. On June 1, 2020, the District issued a notice to proceed on construction of the A-2 STA inflow and outflow canal, seepage canal, and powerline corridor. The substantial completion date for this phase of construction was September 4, 2022. To the extent that construction extends beyond that date, the bulk of that work will be conducted on lands that are outside of the jurisdiction of the Clean Water Act.

The second phase is more problematic. That contract, No. 4600004380, is for construction of the remaining portions of the STA. On its face, that contract is worth almost $176 million. By virtue of three change orders, the contract price has increased to roughly $261.6 million. The District issued the notice to proceed on March 15, 2021, and to date, the District has paid $81.2 million to the contractor. Invalidating the District's Section 404 Permit will lead to three main categories of costs: (1) the contractual costs of terminating the contract for convenience, including the fee due to the contractor and the cost of materials already fabricated; (2) the costs associated

with maintaining the appropriate site conditions while construction is halted; and (3) inflated costs to re-award the contract to complete construction at a later date. While the amounts of these expenses are variable, the District estimates that revoking the Section 404 Permit would increase the cost of completion by $91.1 million, bringing the total to $352.7 million assuming an 18-month idle time. Should the re-permitting and re-bidding process take longer, expenses would be greater.

### III.   Regulatory Consequences

Invalidating the Section 404 Clean Water Act permit to construct the A-2 STA will result in a domino effect of compounding delays and costs due to regulatory requirements. In addition to receiving a federal Section 404 Clean Water Act permit, the District received a Comprehensive Everglades Restoration Plan Regulation Act ("CERPRA") Permit authorizing construction of the A-2 STA under Florida law. Among other conditions, the CERPRA Permit includes the following condition entitled "Wetland Impact and Restoration":

> Construction of the A-2 STA, once authorized, will result in conversion of agricultural lands into an open water wetland habitat of 6,500 +/– acres. Therefore, at this time, the Department will not require additional mitigation to offset the functional loss of wetland areas. **If construction does not move forward as planned in order to meet the goals and objectives of the project, then the Permittee shall coordinate with the Department to determine whether or not restoration or additional activities are necessary to offset the functional loss of any impacted wetlands.**

(Emphasis added.) Put another way, construction of the A-2 STA as planned is essentially "self-mitigating," i.e., the District need not engage in wetlands mitigation because the ultimate outcome is a 6,500-acre functional wetland. Should construction of the STA be halted, wetlands impacted by construction of the STA that would have otherwise been timely mitigated upon completion of the STA will instead sit unmitigated until construction resumes. This means the District may be required, in the interim, to restore wetlands or engage in other mitigation methods to offset the existing construction impacts, leading to additional project costs and further delays to construction.

Moreover, as the District often observes in its restoration projects, significant project delays—like those that would result from invalidating the permit—tend to result in site changes that are more attractive to protected species. Should protected species take advantage of any pause in construction to reoccupy the site, construction could be delayed for even more months or years due to constraints posed by the Endangered Species Act.

IV.  **"Grow-In," Maintenance, and Interim Operations of the A-2 STA Have No Effect on Existing Water Users**

*Amici* complain that interim operations of the STA "without its reservoir component" would have a damaging effect on "'existing legal users' within LOSA by directly taking water from LOSA during the dry season." [D.E. 55, at 3.] More to the point, *Amici* make the hyperbolic claim that if the STA takes "surface water from a source other than the Reservoir, either water will be diverted away from LOSA consumptive use permittees like FFVA and Farm Bureau growers and farmers or Lake Okeechobee's minimum level will be violated." [D.E. 55, at 7.]

Not quite. The answer lies within the District's own consumptive use permitting program—a state regulatory program created and implemented by the water management districts to ensure that Florida's water resources are appropriately protected while being allocated amongst the various water users of the state. First, COE was clear in the Section 404 Permit that an analysis on water use will be required before it will issue a permit to operate the STA and Reservoir. [Section 404 Permit, Special Condition 14 (PERMIT 11777).] The District agrees. Nevertheless, the District does not need to, and will not, "take" water from existing legal users for interim operations, i.e., the initial grown-in, protection, and maintenance of the STA vegetation during the interim period prior to completion of the Reservoir. As noted in the EIS, in order to construct the STA, the District acquired land previously used for agricultural operation. The Lake Okeechobee water uses permitted to the former property owners to support their farming are no longer in use and have not been otherwise reallocated. The water previously reserved for farming activities can instead be used to support the project: "The 17,900 acres removed from agricultural operations from construction of the A2 STA and A2 Reservoir has a supplemental irrigation requirement that will sustain vegetation in the A2 STA during the grow-in period while interim operations are in place." [EIS, 3-20-21.] In addition to these 17,900 acres, the District removed another 16,000 acres from agricultural production, which had associated water allocations, for construction of the A-1 Flow Equalization Basin ("FEB").

While water use is not a property right in Florida, permitted water uses follow the land, in that a loss of legal control over the land results in a loss of the right to any permitted consumptive use associated with that land. *See Applicant's Handbook for Water Use Permit Applications*, §§ 2.1.1-2.1.2, 5.1.3 incorporated by reference in Fla. Admin. Code R. 40E-2.091(1) (requiring water permit applicants to demonstrate need by, among other things, showing legal control over both the

8

project site and the withdrawal facilities and requiring surrender of the permit upon transfer of the property). In other words, the agricultural water users do not take the permitted water use with them when they vacate their lands for the A-2 STA, Reservoir, and A-1 FEB. Ergo, that water will be available to support the STA without the need to take any additional water from Lake Okeechobee or divert water from LOSA permit holders as *Amici* erroneously fear.

More specifically, the lands acquired for the A-1 FEB, the A-2 STA, and the Reservoir include the following water allocations that will no longer be used for farming and available for construction and interim operation of the A-2 STA:

| Permit No. | Project Name | Acres | Water Allocation (mil. gallons/year) |
|---|---|---|---|
| 50-01606-W | Talisman East | 6,308.00 | 3,863.12 |
| 50-00166-W | Cabasa Farm | 9,265.00 | 5,674.04 |
| 50-00582-W | Woerner South | 970.00 | 594.04 |
| 50-00656-W | Okeelanta – Tennant North and South Culverts | 1,632.16 | 999.56 |
| 50-08986-W | Sugar Farms – Palm Beach Co. | 16,285.27 | 30,607.14 |
| | | Total Water Allocation | 44,737.90 mil. gal./yr. |

That 44,773.9 million gallons per year represents roughly 64,766.06 acre-feet[5] of water per year, or 9.96 inches per acre per month. As set forth in the EIS, this water is intended to be used during "grow-in" and during "interim operations." [EIS, 3-20, 3-21.] Notably, it is estimated that only around 15,400 acre-feet per year of that water will be needed to grow and protect wetland vegetation within the STA before the Reservoir is complete, a quantity of water significantly less than the 64,766.06 acre-feet of water per year previously permitted for farming operations on the same property. The remainder of the previously allocated water will continue to be set-aside to support future project needs.

At present, the previously permitted water is not being used and remains in Lake Okeechobee unless the Lake's regulation schedule necessitates its release into the St. Lucie or Caloosahatchee Rivers. In simple terms, the District has no plans, and does not need, to take water from existing legal users in order to inundate and maintain the STA. During this initial inundation and maintenance period, the STA will either utilize the previously allocated water uses or the

---

[5] The volume unit of acre-feet represents the volume of water associated with an acre of land with one foot of water on it, or 325,851.43 gallons.

excess stormwater that would otherwise be discharged into the greater Everglades or northern estuaries.

Regardless, at this point in time, COE has granted the District one permit—a permit to *construct* the STA. For Plaintiffs and *Amici* to hypothesize about future operations is premature and amounts to speculation. COE recognized the amorphous state of future operations in the District's Section 404 Permit, stating as follows:

> The Permittee shall not operate the STA beyond what is described in the project description until written authorization is granted by the Corps subject to a future evaluation and modification and a National Pollutant Elimination System (NPDES) permit has been received. A minimum of six months prior to planned operation of the facility, the Permittee shall submit an operation plan to the Corps for review and approval. The National Environmental Policy Act analysis for the project will be updated to reflect the operations plan and coordinated for public and agency review as appropriate.

[Section 404 Permit, Special Condition 14 (PERMIT 11777).] Under National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, federal agencies are instructed to consider interrelated projects as a whole, not as individual pieces. *See* 40 C.F.R. § 1502.4(a) ("Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement."). Indeed, the Court has previously admonished COE for improperly "segmenting" its NEPA analysis of one portion of a larger construction project. *See Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 401 F. Supp. 2d 1298 (S.D. Fla. 2005).

"For NEPA purposes, an agency need not speculate about the possible effects of future actions that may or may not ensue." *Safeguarding the Historic Hanscom Area's Irreplaceable Res., Inc. v. Fed. Aviation Admin.*, 651 F.3d 202, 218 (1st Cir. 2011). NEPA does not require a supplemental EIS "every time new information comes to light after the EIS is finalized." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373 (1989). Instead, agencies must apply a "rule of reason"; supplemental analysis is required when "new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered." *Id.* at 374 (citation omitted) (alteration in original). Here, COE acknowledges that additional NEPA analysis may be required before STA operations may begin in earnest, based on the construction and inundation of the STA using the existing

sources of water. Any supplemental analysis will necessarily take into account existing legal users' water needs.[6]

In sum, the District is not mulcting water from existing legal users in order to construct or inundate the A-2 STA. To the extent that future operations will require additional water, the existing administrative record makes clear that the District and COE will evaluate the effect of that need on other water users before the District operates the STA and Reservoir.

[The remainder of this page has been intentionally left blank.]

---

[6] *Amici* imply that the Court should scrap the entire EIS, i.e., "perform a revised technical review of the Reservoir and STA that analyzes separate and distinct construction and operational timetables." [D.E. 54, at 8.] Curiously, *Amici* cite *Sierra Club v. U.S. Army Corps of Engineers*, 295 F.3d 1209, 1216 (11th Cir. 2002), which discusses the need for supplemental NEPA review, rather than complete invalidation of the existing EIS.

V.     **Conclusion**

For the foregoing reasons, the District asks this Court to deny Plaintiffs' Motion for Summary Judgment [D.E. 50]. In the event the Court determines that COE violated the APA, the District suggests that remand without vacating the Section 404 Permit offers sufficient procedural relief to Plaintiffs when compared with the environmental, fiscal, and regulatory burden vacatur would place on the District, the State, and ordinary taxpayer citizens of Florida.[7]

Dated: September 6, 2022                                             Respectfully Submitted,

SOUTH FLORIDA WATER
MANAGEMENT DISTRICT
Julia Lomonico, Interim General Counsel

 /s/ Robert C. Glass
Robert C. Glass
Florida Bar No. 052133
Julia Lomonico
Florida Bar No. 102633
South Florida Water Management District
Office of Counsel
3301 Gun Club Road, MSC 1410
West Palm Beach, FL 33444
roglass@sfwmd.gov
litigation@sfwmd.gov
pguzman@sfwmd.gov
561-682-2157

---

[7] Vacatur of the offending agency action is not mandatory in the event of an APA violation. *See Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 98 (D.C. Cir. 2002) (noting "the decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed") (citation and internal quotation marks omitted).