**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| OKEELANTA CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 9:21-cv-81505-DMM |
| | ) | |
| UNITED STATES ARMY CORPS OF ENGINEERS, | ) ) | |
| | ) | |
| Defendant. | ) | |
| _____ | / | |

| | | |
|---|---|---|
| UNITED STATES SUGAR CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 9:21-cv-81506-DMM |
| | ) | |
| UNITED STATES ARMY CORPS OF ENGINEERS, et al., | ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | / | |

| | | |
|---|---|---|
| SUGAR CANE GROWERS COOPERATIVE OF FLORIDA, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 9:21-cv-81508-DMM |
| | ) | |
| UNITED STATES ARMY CORPS OF ENGINEERS, | ) ) | |
| | ) | |
| Defendant. | ) | |
| _____ | / | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

1

Plaintiffs Okeelanta Corporation ("Okeelanta"), United States Sugar Corporation ("U.S. Sugar"), and the Sugar Cane Growers Cooperative of Florida ("SCGC") (collectively, "Plaintiffs") file this Opposition in Response to the U.S. Army Corps of Engineers' and its officials' (collectively, "the Corps") Cross Motion for Summary Judgment, and Reply to the Corps' Opposition to Plaintiffs' Motion for Summary Judgment (the Corps' "Cross Motion" at ECF No. 56), as provided by Local Rule 7.1(c)(1).

The Corps predicates its interpretation of the Water Resources Development Act of 2000 ("WRDA 2000") § 601(h)(5)(A) ("Savings Clause") entirely on the phrase "implementation of the Plan." This phrase, according to the Corps, allows it to treat the 2008 Lake Okeechobee Regulation Schedule ("LORS 2008") as an "intervening non-CERP activity" that resets the water supply baseline for all future Comprehensive Everglades Restoration Plan ("CERP") projects. The Corps' interpretation ignores other language in the Savings Clause, other provisions of WRDA 2000, and its own Programmatic Regulations. The Corps' position also ignores the fact that LORS 2008 is a temporary plan, never intended as a permanent CERP feature. Plaintiffs' water is not being lost by the temporary regulation schedule, but by embedding it in this permanent CERP project. As discussed below, because the Savings Clause is unambiguous, and the Corps' interpretation is inconsistent with the plain language of WRDA 2000 and the Programmatic Regulations, the Corps is entitled to no deference.

With regard to its National Environmental Policy Act ("NEPA") analysis, the Corps asserts it need not analyze how much water supply will be available with the EAA Project[1] compared to water supply available when CERP was approved in 2000. This allows the agency to claim that the EAA Project is increasing water supply, when in fact less water will be available than when

---

[1] Plaintiffs refer to the project components as the STA and the Reservoir, and the combined components as the EAA Project.

WRDA 2000 was enacted.  The Corps further asserts it may possibly conduct additional NEPA analysis in the future regarding the post-grow-in operations of the STA before the Reservoir is complete.  Given the agencies' failure to seriously consider the water supply effects of this project for years, this assertion is hollow.  Fundamentally, the Corps has advanced a flawed analysis of the straightforward language of the Savings Clause in WRDA 2000 and the requirements of NEPA.

## RELEVANT UNDISPUTED FACTS

Because the key facts regarding the Corps' water supply review in connection with the EAA Project are not in dispute, the issues raised in the pending motions are a question of law.

First, the Corps does not deny that it used the water supply available with current operations, which incorporate the effects of LORS 2008, as the baseline for determining compliance with the Savings Clause.  The Corps' project documents are clear that LORS 2008 is the baseline used for determining compliance with the Savings Clause.  "The CEPP existing condition and [Future Without] project condition assumption for the operation of Lake Okeechobee is the 2008 Lake Okeechobee Regulation Schedule."  2015_ROD_059610; *see also* 2015_ROD_060957 ("Significant changed assumptions from the Pre-CERP baseline include the 2008 Lake Okeechobee Regulation Schedule....").  The Section 203 study was equally clear, reflecting LORS 2008 as the existing condition and future without project condition. PPA_008392.  The 2020 FEIS relies on these earlier documents.  *See* 2020_ROD_037037 (noting use of LORS 2008 as the no action alternative operational plan); 2020_ROD_037038 ("The hydrologic modeling conducted for all 2014 CEPP Final PIR/EIS alternatives to optimize system-wide performance incorporated the current Regulation Schedule management bands of the 2008 LORS.").

While the Corps states in several places that the EAA Project increases the amount of water supply available, *see, e.g.,* ECF No. 56, at 6, that purported increase is compared to levels under LORS 2008 and even then, the agency equivocates.  *See* 2020_ROD_037010 ("Additional water supply *may* be available for agricultural/municipal water supply with the Corps Recommended Plan, but the purpose of the reservoir is environmental restoration and water supply for *the environment receives first priority*.") (emphasis added); 2020_ROD_037048 ("*When available*, the reservoir *may* also provide water to maintain canal levels within the C&SF EAA canal system.") (emphasis added).

Second, as part of its Savings Clause and NEPA analysis, the Corps failed to compare the water supply available to urban and agricultural users from the EAA Project with the water supply available in December 2000.  2020_ROD_006123.  The Corps also never analyzed the effects of operating or not operating the STA for years before the Reservoir is complete.  PPA_0084210–24.

The Corps also has not committed to updating its Savings Clause or NEPA analyses. It merely states it "may" conduct additional analyses.  PPA_008357 ("CEPP implementation *may* still require further LORS revisions to optimize system-wide performance and ensure compliance with Savings Clause requirements.") (emphasis added); 2015_ROD_059776 (same); PERMIT_011613 (stating that the Corps may "evaluate" whether to prepare additional NEPA documents); 2020_ROD_037086 ("During PED [preconstruction, engineering, and design], project assurances, Savings Clause analysis, and operating manuals would be updated consistent with the implementation phases, *as necessary*.") (emphasis added); 2020_ROD_037139 (same); 2020_ROD_037386 (similar); 2020_ROD_037386 (similar); *see also* ECF No. 37, at 16 (providing, in Order Denying Motion to Dismiss filed by the Corps: "[T]he 'future authorizations' Defendants purport are necessary are within their control and at their discretion. Per Defendants'

4

Motion, the Corps will 'update' operating manuals 'as necessary' and 'maintain' compliance with the Savings Clause.").  Most significant, however, even the Corps' non-committal reassurances to update the Savings Clause analysis make no reference whatsoever to relying on any regulation schedule other than LORS 2008 as a baseline, even in its Cross Motion. ECF No. 56, at 8–14 (arguing that LORS 2008 is an acceptable baseline).  Consequently, even if the Corps were to do such an update, every indication based on the Corps' history with this project and legal position in this proceeding is that it would continue to use the illegal baseline of LORS 2008 in direct violation of the Savings Clause.

Facts that are in dispute, although not necessary to decide this case, are the parade of horribles the NGO amici[2] say will occur if the case is decided in Plaintiffs' favor.   ECF No. 64, at 7–9.  The Corps asserts something similar.  ECF No. 56, at 12–13.  In fact, CERP remains a viable plan for restoration of South Florida's ecology while providing for the regions' water resource needs.  This was so before the Corps temporarily redistributed Plaintiffs' water supply in LORS 2008, and a ruling by this Court that the Corps cannot permanently use that water for environmental purposes before providing an alternate source only requires relying on the plan as it existed before LORS 2008's temporary redistribution.  In any event, the Corps was given ample warning of the flaw in their approach, and any challenges are of the Corps' own making. 2015_ROD_065303–06; 2015_ROD_065589–93; 2015_ROD_066294; 2015_ROD_066300–04; 2015_ROD_065380–84;  2015_ROD_065613–15;  2015_ROD_065406;  2020_ROD_041622; 2020_ROD_041689–92; 2020_ROD_041736–38; 2020_ROD_041791–93.

## ARGUMENT

## I.    The Corps Violated the Savings Clause

---

[2] Plaintiffs refer to *amicus curiae* South Florida Water Management District, ECF No. 65, and the Sanibel-Captiva Conservation Foundation, Inc. et al., ECF No. 64, as the "SFWMD amicus" and "NGO amici," respectively.

**A.    The Plain Language of the Savings Clause Is Clear, Contrary to the Corps' Interpretation, and Consistent with the Programmatic Regulations**

Plaintiffs agree with the Corps that, because the Savings Clause is unambiguous, this Court need only decide if the Corps has violated that provision.  ECF No. 56, at 10.

**1.    The Plain Language of the Savings Clause Is Clear**

In full, the Savings Clause provides:

> (5) SAVINGS CLAUSE.—
> (A) NO ELIMINATION OR TRANSFER.——Until a new source of water supply of comparable quantity and quality as that available on the date of enactment of this Act is available to replace the water to be lost as a result of implementation of the Plan, the Secretary and the non-Federal sponsor shall not eliminate or transfer existing legal sources of water, including those for—
> > (i) an agricultural or urban water supply;
> > (ii) allocation or entitlement to the Seminole Indian Tribe of Florida under section 7 of the Seminole Indian Land Claims Settlement Act of 1987 (25 U.S.C. 1772e);
> > (iii) the Miccosukee Tribe of Indians of Florida;
> > (iv) water supply for Everglades National Park;
> or
> > (v) water supply for fish and wildlife.

WRDA 2000 § 601(h)(5)(A).

This Savings Clause is an unambiguous constraint on the Corps' authority.  Until a new source of water supply comparable to that available to Plaintiffs "**on the date of enactment**" is available to replace the water lost due its implementation of the Plan, the Corp is prohibited from eliminating or transferring Plaintiffs' legal sources of water **as they existed when the Act was enacted**.

To elaborate, the opening clause requires the water supply to be maintained "as that available on the date of enactment of this Act."  For the opening "replacement" clause and the Savings Clause's prohibition clause to be logically consistent, "existing" sources are those available on the WRDA 2000 enactment date of December 11, 2000.

6

The Savings Clause further directs the Corps to replace with another source any water that may be eliminated or transferred.  Congress was careful to preserve the existing status quo by providing that the replacement water must be of "comparable quantity and quality."   Congress also directed the Corps to replace the "water to be lost as a result of implementation of the Plan." The "Plan" is defined as the original CERP plan contained in the 1999 "Yellow Book," or "Restudy," as modified by WRDA 2000 (which includes the Savings Clause).  WRDA 2000 § 601(a)(4).  As indicated by this language, WRDA 2000 did not make the government a guarantor of water supply against natural disasters like droughts or saltwater intrusion, but instead, requires the Corps to look at each CERP project and analyze whether at least the same amount of water will be available as compared to the 2000 baseline.  Congress made clear in WRDA 2000 its intent to hold water users, expressly including agricultural and urban users, harmless from Everglades restoration.  The Savings Clause told farmers and the local governments of South Florida that Everglades restoration would not be accomplished at the expense of their sources of water.

The intent to broadly preserve the water supply of existing legal users in the Savings Clause is evident elsewhere in WRDA 2000.  Restoring the South Florida Ecosystem "while providing for other water-related needs of the region, including water supply and flood protection" is described as the "overarching objective" of CERP.  WRDA 2000 § 601(h)(1).  Congress explains that CERP was "approved as a framework for modifications and operational changes to the Central and Southern Florida Project that are needed to restore, preserve, and protect the South Florida ecosystem while providing for other water-related needs of the region, *including water supply* and flood protection."  WRDA 2000 § 601(b)(1)(A) (emphasis added).  Congress put water supply on an equal footing with CERP's environmental goals by stating that restoration was needed "while providing" for water supply needs.

The legislative history of the Savings Clause is consistent with the Plaintiffs' reading of the plain language, requiring CERP to protect "agricultural water supply and other legal uses as of the date of enactment of this bill" and barring "[e]limination of existing sources of water supply … until new sources of comparable quantity and quality of water are available." S. Rep. 103-363, 106th Cong., 2d Sess. 2000, 2000 WL 1097496, at *23–24. In describing the development of CERP, the legislative history also recognizes that water supply was placed on an equal footing with other project benefits: "[CERP] defines the major project for ecosystem restoration, water supply, and other water-related purposes, as well as defining a process for implementation." *Id*. at *36; *see also id*. (describing "improve[ment] of urban and agricultural water supply" as a CERP benefit).

If not for the Savings Clause, Congress may never have agreed to and authorized CERP. As noted in the Corps' Cross Motion, the Restudy presented the original version of CERP as "an immense collaborative effort." ECF No. 56, at 3 & n.4 (citations and internal quotations omitted). In the Restudy, assurances like the Savings Clause were recognized as critical to CERP's development:

> The concept of "assurances" is key to the successful implementation of the Comprehensive Plan. Assurances can be defined in part as protecting, during the implementation phases of the Comprehensive Plan, the current level(s) of service for water supply and flood protection that exist within the current applicable Florida permitting statutes. Assurances also involve protection of the natural system.

2015_ROD_003733.

The Restudy extensively quoted work by The Governor's Commission for a Sustainable South Florida. The Commission developed a consensus-based set of recommendations concerning assurances to existing users, including the natural system. 2015_ROD_003733–37. The following

text, quoted in the Restudy, is taken from the Commission's *Restudy Plan Report,* adopted on

January 20, 1999:

> Assurances are needed for existing legal users during the period of plan implementation. It is an important principle that has helped gain consensus for the Restudy that human users will not suffer from the environmental restoration provided by the Restudy. At the same time, assurances are needed that, once restored, South Florida's natural environment will not again be negatively impacted by water management activities. Getting 'from here to there' is a challenge.

2015_ROD_003733.

Against the unambiguous language of the Savings Clause and this legislative backdrop, the

Corps asks this Court to approve a permanent reduction in the legal sources of water available to

Plaintiffs on the date of WRDA 2000's enactment.

### 2.    The Corps' Interpretation Is Contrary to the Plain Language of the Savings Clause

The Corps' defense is focused entirely on the phrase "implementation of the Plan."  ECF

No. 56, at 10–12.  The Corps claims  Plaintiffs' water supply has been lost, but because it allegedly

was not lost as a result of "implementation of the Plan," the Corps argues the Savings Clause is

inapplicable. The Corps is wrong because the water has not been "lost," and its use in the EAA

Project is part of implementing the Plan.  The Corps first temporarily transferred the water out of

the Lake during LORS 2008.  LORS 2008, however, is and was always intended to be temporary.

With the EAA Project, the Corps is now permanently transferring the water for environmental

uses. This is exactly what Congress unambiguously intended to prevent by including the Savings

Clause in WRDA 2000.

The Corps has been clear that LORS 2008 was intended to be an interim plan.

2015_ROD_059610 ("When it was approved in April 2008, the 2008 LORS was identified as an

interim schedule."); 2020_ROD_040096 (same); 2020_ROD_040557 (same); PPA_008392

(similar); PPA_011597 (similar); PPA_008982 (graph entitled "2008 Interim Lake Okeechobee Schedule in RSMBN"); PPA_010135 (same); PPA_011286 (similar); 2015_ROD_068496 (on first page, in first line of LORS 2008 Final Supplemental Environmental Impact Statement stating "Proposed Action:  To implement an interim regulation schedule for Lake Okeechobee").

The Corps also conveyed its expectation that LORS 2008 was to be in place for only three years, from 2007 to 2010.  This expectation of the Corps is clearly documented in comments from state and federal agencies, Tribal Nations, conservation organizations, local governments, and agriculture to the Corps.  *See* 2015_ROD_068760 (USFWS); 2015_ROD_069505 (J.N. "Ding" Darling National Wildlife Refuge); 2015_ROD_069530 (EPA Region 4); 2015_ROD_069335 (SFWMD    Water    Resources    Advisory    Council);    2015_ROD_069662    (SFWMD); 2015_ROD_069656 (Florida Department of Environmental Protection); 2015_ROD_069538 (Seminole Tribe); 2015_ROD_069414 (Corps letter to Miccosukee Tribe); 2015_ROD_069856 (National    Wildlife    Federation);    2015_ROD_069852    (Southwest    Watershed    Council); 2015_ROD_069858 (Conservancy of Southwest Florida); 2015_ROD_069737 (City of Sanibel); 2015_ROD_069802 (Fort Lauderdale); 2015_ROD_069705 (Lee County); 2015_ROD_069819 (Lake Worth Drainage District); 2015_ROD_069824 (SCGC).  The Corps also provided this expectation in writing.  2015_ROD_069414 (In 2006, Commander of Corps' Jacksonville District describing the purpose of the new Lake Okeechobee Regulation schedule "is to address operational changes to the current Water Control schedule for the period of 2007-2010.");  *see also* 2015_ROD_068702 (discussing options to improve water supply to Seminole Tribe of Florida during LORS 2008, and rejecting underground wells because they would not be "operational until after 2010.").

By diverting water from users that was available on December 11, 2000 for use in a permanent feature of CERP, the Corps is "eliminat[ing]" and "transfer[ring]" this source through "implementation of the Plan."   Consequently, the water was not "lost" when LORS 2008 was adopted. That water was not "lost" until the Corps incorporated that baseline into this CERP project. *See* PPA_008335; PPA_008408; 2020_ROD_037008 (describing so-called excess water directed to the estuaries being redirected to Everglades restoration through the EAA Project).  To ensure public safety, LORS 2008 temporarily released or redistributed water previously available in the Lake while the dike was repaired. It is the EAA Project that the Corps wants to use to permanently transfer that agricultural and urban source to CERP's environmental restoration purposes. The consequence is the Plaintiffs losing water available to them when WRDA was enacted without the Corps ensuring its replacement.  WRDA 2000's Savings Clause prohibits this transfer without providing a source of comparable quality and quantity.  The Corps has not offered a replacement and has never made a commitment to do so.

By permanently eliminating Plaintiffs' water supply and transferring it to this CERP project, the Corps is doing exactly what the Savings Clause was designed to prevent.  The Corps is accomplishing Everglades restoration on the backs of existing legal users of water, contrary to Congressional mandate.  The Corps is doing so because it is faster and cheaper to accomplish environmental restoration by using the water of farmers and local governments, rather than building additional water storage facilities.  *See* ECF No. 65, at 5 ("Operation of the A-2 STA has the potential to accelerate the delivery of these anticipated benefits by diverting water south—sooner rather than later."); *id*. ("Redirecting water from Lake Okeechobee to the central Everglades that would otherwise need to be sent to the Northern Estuaries will likewise have significant, near-

term benefits."); *id*. at 2 (stating direction to SFWMD to "take decisive actions to expedite restoration.").

The Corps' and NGO amici are incorrect when they argue Plaintiffs are challenging LORS 2008.  Plaintiffs are not challenging LORS 2008.  As noted above, Plaintiffs are  challenging the Corps' effort to accomplish its environmental restoration efforts by repurposing the water temporarily released under LORS 2008.   At the time LORS 2008 became effective, the Corps stated that the reduction in water was temporary and would be in place for three years.  *See, e.g.,* 2015_ROD_069414.  As the Corps notes, this new regulation schedule was mainly done to address concerns regarding the integrity of Herbert Hoover Dike.  ECF No. 56, at 7.  There was no mention in the LORS 2008 FSEIS that it would become the permanent baseline for CERP water supply. Regardless, the Savings Clause violation did not occur with the adoption of LORS 2008.  The Savings Clause violation occurred when the Corps' changed LORS 2008 from a temporary schedule necessary for dike repairs to permanently use it for environmental restoration in the challenged CERP project.

To accept the Corps' interpretation of the Savings Clause requires the Court to ignore the phrase "water supply . . . available on the date of enactment of this Act." WRDA 2000 § 601(h)(5)(A). According to the Corps, it will never determine whether a new CERP project provides the water supply available on December 11, 2000, because the Corps adopted LORS 2008.  *See* ECF No. 56, at 11.  Though the Programmatic Regulations require the Corps to develop the "pre-CERP baseline," ECF No. 45, at ¶ 43, the Corps does not intend to compare water supply available upon implementation of a CERP project to water supply available in the pre-CERP baseline.  If the Corps never compares the effect of a CERP project on "water supply . . . available

on the date of enactment of this Act," then that critical requirement is read out of the Savings Clause.

WRDA 2000 provides that CERP is a "comprehensive" plan that serves as the "*framework for modifications and operational changes* . . . needed to restore, preserve and protect the South Florida ecosystem while providing for other water-related needs of the region." WRDA 2000 § 601(b)(1)(A) (emphasis added).  This means that CERP applies to all C&SF Project modifications and operational changes the Corps makes for environmental and other water-related purposes. What is left out are events like natural disasters (such as droughts or saltwater intrusion), or actions by parties other than the Corps and its local sponsor, SFWMD.   Based on this reading, the Corps is not a guarantor of water supply affected by every factor affecting water supply.  But, it is expressly responsible for its own modifications and operational changes in the CS&F Project to the water supply as of December 11, 2000.  This interpretation of the Savings Clause harmonizes the two key phrases of the Savings Clause ("water supply . . . available on the date of enactment of this Act" and "water to be lost as a result of implementation of the Plan"). The Corps' interpretation vitiates this essential, Congressional mandate.  If WRDA 2000 does not apply to all modifications and operational changes to the C&SF Project, then CERP is not a "comprehensive" plan, despite it being defined as such in Section 601(a)(4), and it is not the "framework for modifications and operational changes," despite the language in Section 601(b)(1)(A).

Similarly, section 601(b)(1)(B) also provides that "[i]n carrying out the Plan, the [Corps] shall *integrate* the activities described in subparagraph (A) with ongoing Federal and State projects and activities" (emphasis added).  If the Corps is correct that pre-existing parts of the C&SF Project need not comply with WRDA 2000, then the CERP is not integrated with those projects, and Section 601(b)(1)(B) becomes superfluous.

Finally, the Corps also completely ignores the point made in Plaintiffs' Motion that the Corps interpretation of the Savings Clause is inconsistent with the structure of WRDA 2000. ECF No. 50, at 11–12 (citing *King v. Burwell,* 576 U.S. 473, 492–93 (2015), and *New York State Dept. of Social Servs. v. Dublino,* 413 U.S. 405, 419–20 (1973)). Instead, the Corps makes a policy argument that it needs flexibility. This ignores the fact that the Savings Clause was included in WRDA 2000 specifically to place limits on the Corps' authority. The Corps' bold reach for flexibility makes this an "extraordinary case" where precedent counsels an approach considering the "'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, [which] provide a 'reason to hesitate before concluding that Congress meant to confer such authority." *See West Virginia v. Env't Prot. Agency*, 142 S.Ct. 2587, 2608 (2022).

### 3.   The Corps' Interpretation of the Savings Clause Is Contrary to the Programmatic Regulations

The Corps fails to refute Plaintiffs' point that the agency's Savings Clause analysis violates the Programmatic Regulations. The regulations establish a very specific procedure for determining compliance with the Savings Clause: "[t]he Corps . . . shall determine if implementation of the project will cause an elimination or transfer of existing legal sources of water by comparing the availability of water with the project with the pre-CERP baseline . . .." 33 C.F.R. § 385.36(a). The Corps admits it failed to develop the pre-CERP baseline as required by the regulations, ECF No. 45, at ¶ 43, and is unapologetic about its failure to compare "the availability of water with the [EAA] project with the pre-CERP baseline." Given these admissions, it is indisputable that the Corps has failed to follow the procedure required in the Programmatic Regulations. *See* ECF No. 50, at 9.

The Corps' only response to this issue is that because this section of the Programmatic Regulations references "implementation of the project," it must mean that the Corps can exclude the so-called "intervening non-CERP activities."  ECF No. 56, at 15–20.   There are several flaws in the Corps' logic.  First, the Corps' argument reads out of the regulation the phrase "pre-CERP baseline," which is defined elsewhere in the Programmatic Regulations as "the hydrological conditions in the South Florida ecosystem *on the date of enactment of WRDA 2000*."  33 C.F.R. § 385.3 (emphasis added).  A baseline that excludes "intervening non-CERP activities" necessarily represents conditions at some date after the enactment of WRDA 2000.  In making this assertion, the Corps ignores the Eleventh Circuit case cited in Plaintiffs' Motion that an agency cannot rewrite its own regulations in the guise of interpreting them.  *See* ECF No. 50, at 13 (citing *Rafferty v. Denny's, Inc.,* 13 F.4th 1166, 1185 (11th Cir. 2021)).

Second, the very nature of the regulatory procedure makes clear that there is no such thing as "intervening non-CERP activities."  The regulation states that to apply the Savings Clause, the Corps must compare water with the proposed project to water with the pre-CERP baseline.  33 C.F.R. § 385.36(a).  It says nothing about "intervening non-CERP activities," and implicitly there are none, because otherwise the agency would never do the comparison with the pre-CERP baseline.  The Programmatic Regulations obviously assume that all post-2000 modifications and operational changes to the C&SF Project are subject to CERP, which is entirely consistent with Plaintiffs' interpretation of the Savings Clause.

Third, the Corps' interpretation of this regulation is entitled to no deference at all.  It flies in the face of the plain language of the regulation itself.  *Kisor v. Wilkie,* 139 S.Ct. 2400, 2415 (2019) ("if there is only one reasonable construction of a regulation – then a court has no business deferring to any other reading, no matter how much the agency insists it would make more sense").

15

It is based on a draft guidance memorandum that lacks the force of law, a point the agency ignores. *See* ECF No. 50, at 12.  The Corps also ignores the Eleventh Circuit case cited in Plaintiffs' Motion that found erroneous an agency's reliance on a guidance memorandum at odds with the agency's regulation.  *See* ECF No. 50, at 12 (citing *Simmons v. Block,* 782 F.2d 1545, 1549–50 (11th Cir. 1986)).

**B.    The Corps' Interpretation of the Savings Clause Is Not Entitled to Deference**

Throughout its Cross Motion, the Corps asserts its interpretation of the Savings Clause is entitled to deference.  ECF No. 56, at 15–19.  That assertion fails, for several reasons.

First, the Corps' plea for deference is inconsistent with the agency's assertion the Savings Clause is unambiguous.  ECF 56, at 10.  Where, as here, the plain language of the Saving Clause is clear, the Corps is not entitled to deference under *Chevron*.  *Josendis v. Wall to Wall Residence Repairs, Inc*., 662 F.3d 1292, 1320 (11th Cir. 2011) (stating "[w]e do not apply *Chevron* deference, however, when a statutory command of Congress is unambiguous....").  Further, the plain language is contrary to the Corps' position, as explained earlier.  *See In re MDL-1824 Tri-State Water Rights Litigation*, 644 F.3d 1160, 1193 (11th Cir. 2011) (rejecting the Corps assertion of *Chevron* deference, because the agency's interpretation cannot lead to "ignor[ing] the plain and express will of Congress").

Second, the Corps' interpretation of the Savings Clause is based on a document deserving of little weight, the 2007 draft guidance memorandum.  The Corps does not deny that a guidance document such as this lacks the force of law.  *See* ECF No. 50, at 12 (citing cases).  The guidance memorandum is also inconsistent with the agency's own Programmatic Regulations, which say nothing about "intervening non-CERP activities," and as discussed above, the Programmatic Regulations establish a procedure that assumes no such "intervening non-CERP activities" exist.

16

The agency's decision to follow a guidance document instead of its own regulation and the mandate of the Savings Clause is arbitrary and capricious, a point made in Plaintiffs' Motion which the Corps ignores.  *See* ECF No. 50, at 12–13.

This guidance memorandum has additional problems, entitling it to even less consideration. Reading the Corps' Cross Motion, one would not know until page seventeen that the agency never finalized that guidance memorandum.  The Corps writes at length about the process that went into developing that document, but in the end, all the agency has is a draft document prepared by agency staff.  The Programmatic Regulations are explicit that guidance memoranda must be "approved" by the "Secretary of the Army," 33 C.F.R. § 385.5(b)(2), who "acts through the Assistant Secretary of the Army for Civil Works," *id.* § 385.2(b).  This is important because only these high agency officials are authorized to speak for the agency on its interpretation of the Savings Clause.  Instead of stating the Secretary approved the draft guidance memorandum, the Corps' Cross Motion says that the draft memorandum was "*submitted* to the Secretary of the Army for approval," ECF No. 56, at 4 (emphasis added), but the Secretary obviously never approved the memorandum because it was never issued.  The Secretary's failure to approve the draft memorandum means it is entitled to no weight, because the regulations make clear the Secretary is the person who has the authority to speak for the agency.  *Kisor,* 139 S.Ct. at 2416–17 (2019) ("The interpretation must at least emanate from those actors, using those vehicles, understood to make authoritative policy in the relevant context.").

Plaintiffs believe there are significant reasons why the Corps never finalized the guidance memorandum.  The Programmatic Regulations establish a specific process for approving the guidance memoranda.  This reflects the importance of the issues to be addressed in the documents. The Programmatic Regulations require that the guidance memorandum receive the concurrence of

the Secretary of Interior and Florida's Governor.  33 C.F.R. § 385.5(b).  The importance of the

Governor's concurrence to the guidance memoranda was a significant part of the Programmatic

Regulations, so much so that it was prominently added by the Corps in the final draft in response

to public comment.  68 Fed. Reg. 64200, at 64203 (2003) ("While concurrence or non-concurrence

on the six guidance memoranda in § 385.5(b) is not required by law and will require additional

time to fulfill, we believe it is appropriate to provide for this process because of the significance

of these documents.").

　　　　There is no evidence the Secretary or Florida's Governor concurred with this draft guidance

memorandum, because the Corps successfully resisted Plaintiff Okeelanta's discovery requests

seeking copies of such documents, ECF No. 23, and the Corps chose not to put any of those

documents in the administrative record.  Plaintiffs believe there is a reason why the Corps is not

disclosing these documents, because they likely reveal the memorandum was not finalized because

it was highly controversial.  The Corps cannot credibly claim Plaintiffs are elevating form over

substance, ECF No. 56, at 17, when the agency has gone to such great lengths to avoid disclosure

of these documents.

　　　　The Corps' efforts to bolster its assertions of deference by relying on its own guidance

memorandum is also overreaching.  WRDA 2000 makes no mention of guidance memoranda, it

only references preparation of the Programmatic Regulations.  WRDA 2000 § 601(h)(3).  The

Corps also is required to review the Programmatic Regulations every five years for potential

revision.  *Id.* § 601(h)(3)(E).  If the Corps believed the interpretation of the Savings Clause found

in the 2007 draft guidance memorandum is correct, then it had ample opportunity to revise the

Programmatic Regulations to reflect that interpretation.  *See* 68 Fed. Reg. 64200, at 64203 (2003)

(noting possibility of including guidance memorandum into future updates to Programmatic

Regulations).  However, the Corps has never updated the Programmatic Regulations.  The decision to leave the guidance memorandum in draft and not to incorporate it into the Programmatic Regulation further discredits it.

Should their arguments for relying directly on the guidance memorandum fail, the Corps includes a back-up argument.  Citing 33 C.F.R. § 385.26(b)(1), the Corps notes that before development of the guidance memoranda, the Corps may use whatever method, consistent with "applicable" law and policy, seems "appropriate" in their "discretion."  ECF No. 56, at 17.  The defect in this assertion is that the Programmatic Regulations state that the guidance memoranda will be completed by December 31, 2004, thirteen months from the date of the Programmatic Regulations.  33 C.F.R. § 385.5(b)(4).   The Corps is now, nearly twenty years later, still using interim authority it granted itself to justify reliance on the guidance memoranda the Corps never finalized.  *Chevron* is neither logically nor fairly applicable to such circular, open-ended grants of discretion by an agency to itself.   *See Gonzalez v. Oregon*, 546 U.S. 243, 245 (2006) (rejecting *Chevron* deference where agency claimed broad authority to deregister under Controlled Substances Act all physicians, where Congress had "painstakingly described [the Agency's] limited authority to deregister a single physician….").

Finally, the Corps' inconsistent argument undermines its plea for deference.  *See In re: MDL-1824 Tri-State Water Rights Litigation*, 644 F.3d at 1193–94 ("A significant fact undermining any deference to the Corps on this issue is the fact that the Corps has also been inconsistent in its statements about whether water supply was an authorized purpose.").   In addition to their attempt to rely on both the guidance memorandum and the regulations that apply in advance of the guidance memorandum's development, the Corps has historically relied on both authorities.  *Compare* 2015_ROD_060958 (treating LORS 2008 as intervening non-CERP event

based on the guidance memorandum) *with* 2015_ROD_060952 ("[S]ince the guidance memoranda exist in draft form only, the PIRs completed prior to their approval can use appropriate methods deemed reasonable at the time.").

II.     **The Corps Violated NEPA**

    A.    **The Corps' Failure to Analyze Any Alternative that Would Provide Water Supply Available in 2000 Violated NEPA**

The Corps' violated NEPA by failing to analyze an alternative in which the Plaintiffs would receive the equivalent water supply available in December 2000 when Congress approved the CERP. By not comparing the water supply available with the proposed EAA Project to the water supply available in 2000, the FEIS obscures the fact that the project will actually provide less water than was available to agricultural and urban users when CERP was approved. ECF No. 50, at 14–15.

The Corps first asserts that current operational rules are the proper baseline for its NEPA analysis. ECF No. 56, at 21. The Corps apparently assumes – without citation to any authority – that an alternative based on water supply available in 2000 could only be evaluated if it were the "no action" alternative. Even if it is appropriate to compare the effects of the proposed action to the status quo (the typical "no action" alternative), nothing prohibits an agency from also comparing the effects of its proposal to water supply available in 2000 to comply with legal requirements and to allow the public to understand the true effects of the agency's proposals. The Corps also seems to assume there can only be a single "no action" alternative. However, Federal agencies commonly prepare NEPA documents in which there are more than one "no action" alternative so that readers can compare the effects of an agency's proposal to different baseline scenarios. *See, e.g., Montana Wilderness Ass'n v. McAllister,* 460 Fed.Appx. 667, 670–71 (9th

Cir. 2011) (rejecting argument that agency could only analyze a single "no action" alternative); *Cape Hatteras Access Preservation Alliance v. Jewell,* 28 F.Supp.3d 537, 547 (E.D.N.C. 2014) (upholding agency's identification of two "no action" alternatives); *Wyoming Lodging & Restaurant Ass'n v. U.S. Dept. of Interior,* 398 F.Supp.2d 1197, 1216–17 (D. Wyo. 2005) (identification of two "no action" alternatives complied with NEPA).

The Corps' refusal to compare the water supply available with the EAA Project to water supply available in 2000 obscures the fact that the Corps is proposing to implement CERP projects that transfer water from users and cause the C&SF Project to have less water supply than was available when Congress approved CERP.  This defeats the purpose of NEPA, which is to ensure that agencies and the public are fully aware of the effects of proposed actions, and not avoid discussion of prior violations by including them in the baseline.  In *Center for Biological Diversity v. U.S. Bureau of Land Mgmt.,* 746 F.Supp.2d 1055 (N.D. Cal. 2008), the court considered an EIS for a proposed designation of off-highway vehicle ("OHV") routes.  The agency used a "no action" alternative based on current OHV routes, but failed to explain that the current routes included some routes installed in violation of a management plan.  The court found that the agency violated NEPA by not also comparing the proposed action to OHV routes legally installed, because "[o]nly with all of this information could the public accurately assess the true nature of the status quo, as well as the proposed alternatives against which it is compared."  *Id.* at 1090–91.  In *League to Save Lake Tahoe v. Tahoe Regional Planning Agency,* 739 F.Supp.2d 1260 (E.D. Cal. 2010), *affirmed in relevant part,* 469 Fed.Appx. 621 (9th Cir. 2012), the court considered an EIS for proposed management of mooring buoys, in which the agency included mooring buoys in the baseline that were in existence but not legally installed.  The court found that this violated NEPA because "an agency may not escape its duty [to remove unauthorized buoys] by ignoring that duty and then

presenting the result as a *fait accompli* incorporated into an environmental baseline." *Id.* at 1272–76.

The Corps next asserts it would have been "unrealistic" and "[un]reasonable" to include an alternative in which the EAA Project would provide the water supply available in 2000. ECF No. 56, at 20–21. Hardly. The original plan for CERP was designed to provide environmental benefits from the EAA Project while also maintaining the same levels of water supply, and the Programmatic Regulations require the Corps to include as an alternative "the project as described in" the original CERP plan (the Restudy). 33 C.F.R. § 385.26(b)(2). The existence of a reasonable but unexamined alternative renders the FEIS inadequate. *DuBois v. U.S. Dept. of Agric.,* 102 F.3d 1273, 1289 (1st Cir. 1996).

Next, the Corps dismisses the Plaintiffs' NEPA claim as just a "repackaging of their Savings Clause argument." ECF No. 56, at 21. Just because the Corps violated the Savings Clause does not mean that the agency did not also violate NEPA. The NEPA regulations require agencies to "integrate the requirements of NEPA with other planning and environmental review procedures required by law." 40 C.F.R. § 1500.2(c) (2020); *see also* §§ 1500.4(k), (o); 1500.5(g), (i); 1502.25(a) (requiring EIS's to be "integrated with environmental impact analyses and related surveys and studies … required by other environmental review laws"); 1506.4. That is because NEPA documents are the place where agencies explain the environmental consequences of their choices in plain language, so the document needs to include information necessary for the agency to make decisions based on other laws. The FEIS in this case does not allow the public to determine whether the agency is complying with the WRDA 2000 Savings Clause because it never shows how water supply with the EAA Project compares to water supply available when Congress approved the CERP.

While the Corps denies that this omission keeps the public in the dark about the true water supply effects of its proposal, ECF No. 56, at 21, that clearly is the effect.  This is demonstrated by the NGO amicus brief, ECF No. 64, which asserts that preserving water supply as required by CERP would lead to "extreme" harm to CERP's environmental goals and eliminate any environmental benefits to the EAA Project.  ECF No. 64, at 7.  Putting aside the NGOs' hyperbole, the reality is that the NGOs are simply guessing about those supposed impacts because the Corps has never studied the effect of operating the EAA Project while also providing levels of water supply available when CERP was approved.  Without consideration of an alternative that would provide levels of water supply available in 2000, one simply does not know what environmental effects, if any, would result from complying with the Savings Clause.

It is apparent that compliance with the Savings Clause can be entirely consistent with protecting the South Florida environment.  With proper regulation schedule synchronization, the Reservoir could be used to store water that otherwise would be released to tide from Lake Okeechobee, and not compromise water that is needed for urban and agricultural water supply. 2015_ROD_003533.  The Reservoir also could allow for some of the water stored in it to be used for agricultural water supply in dry periods, which was the original plan for the Reservoir in the CERP Restudy.  2015_ROD_003664–65.  There are likely are other options as well.  But if the agencies never look, then they never will show how it can be done, and third parties like the NGO amici simply assume the worst.  This omission by the Corps demonstrates the practical effect of the Corps' failure to comply with NEPA in this case.

**B.     The Corps Violated NEPA by Failing to Analyze the Standalone Operations of the STA**

Plaintiffs' second NEPA argument is that the Corps never studied the standalone operation of the STA, and in particular, the water supply effects of operating the STA without the Reservoir. Both the Corps and SFWMD focus on the period *before* the grow-in phase is complete (less than two years), but Plaintiffs' argument is that NEPA analysis of the period *after* the completion of the grow-in phase is required but omitted.

Neither the Corps nor SFWMD deny that the Reservoir and STA are on significantly different timelines. The Reservoir is scheduled to be completed in 2029, and that assumes there are no funding, permitting, or construction delays for the multi-billion-dollar project. ECF No. 50, at 16. Construction of the STA is scheduled to be complete by early 2023 and will be ready to operate by 2025 after completion of the grow-in period. *Id.*; *see* PERMIT_011592–93 (2020 ROD, stating that the grow-in period "is expected to last approximately 2 years"). SFWMD acknowledges it is quickly building the STA, and notably does not deny that construction is scheduled to be finished next year. ECF No. 65, at 6. Both the Corps and SFWMD discuss the grow-in period, *see id.* at 8–9; ECF No. 56, at 8, 23, but are silent about the time *after* the grow-in period ends and before the Reservoir is built. That is a gap of at least four years, in which the STA could send approximately 162,000 acre-feet of water per year from Lake Okeechobee to the Water Conservation Areas. ECF No. 50, at 12; ECF No. 65, at 5 (SFWMD brief: "Operation of the A-2 STA has the potential to accelerate the delivery of these anticipated benefits by diverting water south – sooner rather than later."). And this is the best-case timing scenario for the Corps, who elsewhere state the Reservoir may not be built at all. PERMIT_011595 ("In addition, *if the Corps constructs the proposed A-2 Reservoir*, the overall project purpose would include improvement of the quantity, quality, timing and distribution of water flows….") (emphasis added).

The two agencies claim that operation of the STA during this multi-year gap is "speculative" and "purely hypothetical" because the Corps has not fully authorized operations. ECF No. 56, at 2, 8, 24; ECF No. 65, at 10–11. This ignores the fact that the Corps has already issued its Record of Decision approving the overall civil works project (that includes STA operations), 2020_ROD_037003, and that the two agencies have already signed their Project Partnership Agreement to implement the project. PPA_019710. The only restriction the Corps identifies is language in the Corps' Clean Water Act Section 404 permit stating that SFWMD cannot operate the STA until it receives additional approval from the Corps. PERMIT_011623, PERMIT_011769. It is questionable whether such a condition is even enforceable because Section 404 authorizes the Corps only to "issue permits … for the discharge of dredged or fill material," 33 U.S.C. § 1344(a), *i.e.*, construction-related activities, and does not authorize the Corps to issue permits that control operations of a completed project. In Florida, operating permits issued pursuant to Clean Water Act Section 402 (the so-called "NPDES" program), *id.* § 1342(a), are issued by the Florida Department of Environmental Protection ("FDEP"). *See* PERMIT_011612 (stating that FDEP will issue the NPDES permit).

Even assuming the Corps does have the authority to control operation of the STA through its Clean Water Act Section 404 permit, it is clear the agencies will approve its operations. The administrative record is full of documents indicating the agencies intend to operate the STA before completion of the Reservoir. *See* ECF No. 50, at 16 (citing 2020 FEIS and ROD); *see also* PERMIT_17401 (Corps supplement to permit ROD, discussing preparation of a plan to "address interim [STA] operations prior to completion of the A-2 Reservoir"); PERMIT_19300–02 (revised draft STA operational plan, describing operations "prior to completion of A-2 Reservoir"); 2020_ROD_36341 (USFWS biological opinion for the project, stating "The STA is expected to

be constructed and operated prior to completion of the Reservoir.").  In their briefs, the Corps and SFWMD act as if those documents do not exist.

Moreover, SFWMD makes clear the agencies are under enormous political pressure to operate the STA as soon as possible.  *See* ECF No. 65, at 2, 4–5 (stating that "Governor DeSantis directed the District to take decisive actions to expedite restoration" and that the Legislature "declared that an emergency exists . . . and directed the District to take specific actions to facilitate the prompt construction of  . . . the A-2 Stormwater Treatment Area").  SFWMD's brief reveals it is spending at least $261 million on the STA, ECF No. 65, at 6.  Under these circumstances it strains credulity to believe the agencies are going to let the quarter billion-dollar STA sit idle for years while the Reservoir is being built.  *Cf. Department of Commerce v. New York,* 139 S.Ct. 2551, 2575–76 (2019) ("Our review is deferential, but we are 'not required to exhibit a naiveté from which ordinary citizens are free'") (citing *United States v. Stanchich,* 550 F.2d 1294, 1300 (2d Cir. 1977)).

The Corps suggests it may conduct additional analysis pursuant to NEPA and the Savings Clause before it approves standalone STA operations.  ECF No. 56, at 8, 24.  But nowhere has the Corps committed to doing this additional analysis.  The Record of Decision is clear that the 2020 FEIS was intended to "consider the impacts of the construction *and operation* of the A-2 STA." PERMIT_011591 (emphasis added).  The Corps' suggestion also ignores the statements in the Record of Decision that the agency would decide "*prior to construction* of the STA" whether to conduct supplemental NEPA analysis, a date that long since has passed without any additional study.  *See* ECF No. 50, at 17 (citing to PERMIT_011626).  The Record of Decision also indicates that the Corps' approval of STA operations will be a ministerial act once SFWMD submits copies of plans, a water quality certification, a state-issued NPDES permit, and other documents.

PERMIT_011593.  In its May 2021 supplement to the Record of Decision, the Corps indicated the only reason it did not approve operations at that time was because it had not yet received a water quality certification from FDEP, and there is no indication the Corps was even considering any additional NEPA analysis.  PERMIT_019731.  The Corps did state in the permit that it may "evaluate" whether to conduct additional NEPA analysis, PERMIT_011613, but an agency always has the discretion to prepare additional NEPA documents, 40 C.F.R. § 1502.9(d)(2) (2022), so such statements offer nothing not already provided by law.

The Corps also has never even acknowledged there are problems with the 2020 FEIS.  The Corps did not respond in the Record of Decision to Plaintiffs' point that standalone STA operations were not studied, ECF No. 50, at 17, and the Corps has refused to conduct water supply analyses in every NEPA document it has prepared for this project since 2014.  *See* ECF No.  50, at 7 (recounting project history and requests for additional water supply analysis).   After refusing to look at these water supply issues for years, there is no reason to believe the Corps is going to do anything different now.

Finally, the Corps asserts it need only analyze the operation of the STA and Reservoir together, because analyzing standalone STA operations in a separate NEPA document would be improper segmentation of analysis.  ECF No. 56, at 22–23.  Here, the Corps misunderstands Plaintiffs' argument.  The Corps violated NEPA by failing to analyze the independent, standalone operations of the STA in the 2020 FEIS because those operations will clearly occur and directly result from the Corps' decision to approve the STA.  As the Corps acknowledges, NEPA requires agencies to analyze the impacts of connected actions in the same NEPA document, ECF No. 56 at 22 (citing 40 C.F.R. § 1508.25), which in this case includes both the construction and operation of the STA.  *Accord Defenders of Wildlife v. U.S. Dep't of Navy,* 895 F.Supp.2d 1285, 1301 (S.D.

Ga. 2012) ("there is no dispute that the installation and operation components of the USWTR are to be discussed in the same EIS").   Plaintiffs are not asking for separate NEPA documents (which would be segmentation), they are asking that the Corps properly analyze all the effects of the project in the single EIS that the agency relies upon.

Ironically, it is now the Corps arguing it may improperly segment its NEPA analysis.  The 2020 FEIS studies some STA operations (those occurring after the Reservoir is built), but not other operations (those occurring after the grow-in period and before the Reservoir is built).  To the extent the Corps' position is that it always intended to study the standalone STA operations in a later NEPA document, rather than in the main FEIS, the agency is guilty of the very sin of segmentation of which it falsely accuses the Plaintiffs.

## III.    The Corps Incorrectly Asserts Plaintiffs Have Taken or Abandoned Certain Positions

The Corps' Cross Motion is rife with unfounded assertions that the Plaintiffs have abandoned or do not dispute certain positions.  Plaintiffs disagree with all those assertions.

The Corps incorrectly asserts the Plaintiffs' have "abandoned" claims related to the 2015 CEPP Record of Decision, the 2020 STA permit, and the 2021 Project Partnership Agreement.  ECF No. 56, at 8 & n.10.   It could not be clearer that Plaintiffs challenge the Corps' approval of the EAA Project without complying with the Savings Clause and NEPA.  The Corps approved the EAA Project through a series of actions identified in the complaints, including the 2015 CEPP ROD, the 2020 ROD, the 2020 Permit ROD, and the 2021 PPA.  *See* ECF No. 31, at ¶¶ 36, 57, and 63 (Okeelanta); ECF No. 5-1, at 2–3 (Case No. Case 9:21-cv-81506-DMM) (U.S. Sugar); ECF No. 1, at ¶¶ 12, 32 (Case No. 9:21-cv-81508-DMM) (SCGC).  The later actions all refer back to and incorporate the previous actions and the Savings Clause and NEPA analysis supporting the earlier actions.  PPA_008393; PPA_008509; 2020_ROD_037008.  The Administrative Procedure

Act allows for parties to challenge agency decisions contained in final agency actions, and Plaintiffs' claims are directed at the project approvals.

The Corps inexplicably states that "Plaintiffs Do Not Challenge the Corps Application of the Savings Clause, as the Corps Interpreted the Clause."  ECF No. 56, at 19 (also stating "Plaintiffs do not challenge the Corps' conclusion under the Corps' interpretation of the [Savings] Clause…").  The Corps is fully articulating this (invalid) interpretation for the first time in their Cross Motion so until now, Plaintiffs had no need to challenge it.  Having seen their interpretation, Plaintiffs challenge and reject it, as explained above.

The Corps also states "the fully operational STA without the Reservoir  . . . is not proposed as part of the Federal project," ECF No. 56, at 2, suggesting that the STA is not a CERP project. That is inconsistent with numerous documents in the record, in which the Corps states that the STA is part of the EAA Project which is part of CERP.  2020_ROD_036998; 2020_ROD_037006– 07.  This statement appears to be another invention in the Corps' Cross Motion.

**IV.    SFWMD's Amicus Brief Misunderstands the Relief Plaintiffs Are Requesting**

In their amicus brief, ECF No. 65, SFWMD misunderstands the relief requested by Plaintiffs.  Plaintiffs do not seek vacatur of the Clean Water Act Section 404 permit.  Instead, the Plaintiffs' relief is focused on ensuring the operations of the EAA Project (including the standalone operations of the STA) are analyzed and are consistent with the mandates of the WRDA 2000 Savings Clause.  If Plaintiffs prevail, the Corps would be required to re-analyze the project approvals (including the Clean Water Act Section 404 Permit) in accordance with the Court's ruling.  Nothing prevents the Corps from completing this re-analysis before the STA grow-in period is complete in 2025.

SFWMD's woes in contracting and change orders should not be laid at the feet of the Plaintiffs when Plaintiffs have raised the need to comply with the Savings Clause mandate and to do a complete NEPA analysis at every step of the way in the EAA Project and the related agency actions. These agencies have ignored Plaintiffs' requests and should look in the mirror before blaming Plaintiffs for the purported additional burdens they face when required to follow the law.

SFWMD complains of the potential effects of not being able to proceed with STA construction, such as impacted wetlands remaining unmitigated and the unfinished project attracting listed species.  Such effects may occur as a result of not being authorized to operate the STA as a standalone feature and likewise should have been analyzed, if as the Corps contends, the standalone operation post-grow-in is only speculative.  SFWMD and the Corps present conflicting positions in their briefs and appear to be at a stalemate on this minimum four-year period before the Reservoir is operational, and have therefore put off the effects analysis for operating or not operating the STA for water quality treatment post-grow in.

SFWMD accuses the Florida Fruit and Vegetable Association ("FFVA") and the Florida Farm Bureau Federation ("FFB") amici briefs of making a hyperbolic claim that if the STA takes "surface water from a source other than the Reservoir, either water will be diverted away from LOSA consumptive use permittees like FFVA and FFB growers and farmers or Lake Okeechobee's minimum level will be violated." ECF No. 55, at 7.  Clearly, the FFVA and FFB amici are making the point about the minimum of four years between grow-in and the Reservoir being operational, during which SFWMD intends to divert water from the Lake to the Everglades without providing additional storage in the C&SF Project.  During treatment operations, the STA will operate as a new demand on the Lake.  SFWMD, the very agency that issues the consumptive use permits to Plaintiffs and FFVA and FFB amici, fails to explain how the source of water is not

diminished beyond the identified allocation of 64,766.06 acre-feet of water per year compared to the capacity of the STA to send approximately 162,000 acre-feet of water per year from Lake Okeechobee to the Water Conservation Areas.  ECF No. 50, at 12; ECF No. 65, at 5.  The STA has the unanalyzed capability of sending almost 100,000 acre-feet of water per year more water away from the water supply source for SFWMD's permittees and direct it to Everglades restoration.  Instead of explaining these capabilities, SFWMD - the permitting agency itself - relies on newspaper articles to support its position.

SFWMD's hollow assertions that water is not lost by this project, but instead that water is gained, are not persuasive because those assertions are based on the LORS 2008 baseline.  Until the Reservoir is built in 2029 (or later), the STA provides no storage and no water supply to urban and agricultural users.  Even operating together, the Corps' flawed Savings Clause analysis and undisputed redirection of water that was available in December 2000 to the CERP EAA Project, undermines the relevant water supply, even if it shows improvements over a severely diminished baseline.  SFWMD never states how Plaintiffs' water supply will fare in the EAA Project when compared to the water available in the year 2000.

## CONCLUSION

The Corps has plainly violated the Savings Clause, the Programmatic Regulations, and NEPA in its flawed "analysis" of the water supply effects of the EAA Project.  This Court should grant summary judgment to the Plaintiffs and remand the Corps' approvals back to the agency so that it can conduct a proper analysis and ensure that, as Congress has mandated in the Savings Clause, the project is operated in a way that protects agricultural and urban water supply available when WRDA 2000 was enacted.

## **REQUEST FOR HEARING**

Plaintiffs request a hearing in this matter because this dispute involves complex and technical facts, a lengthy administrative record, and four parties.  Plaintiffs estimate a hearing of two hours is appropriate.

Dated: September 28, 2022

Respectfully submitted,

/s/ Gregory M. Munson

**GREGORY M. MUNSON**
Florida Bar No.: 188344
GUNSTER, YOAKLEY & STEWART, P.A.
215 South Monroe Street, Suite 601
Tallahassee, Florida 32301
Primary email: gmunson@gunster.com
Secondary email: mmcleod@gunster.com and
rfrazier@gunster.com
Telephone: 850-521-1980
Facsimile: 850-576-0902

**DEBORAH K. MADDEN**
Florida Bar No.: 0098816
GUNSTER, YOAKLEY & STEWART, P.A.
Las Olas Centre
450 East Las Olas Boulevard, Suite 1400
Fort Lauderdale, Florida 33301
Primary email: dmadden@gunster.com
Secondary email: mmcleod@gunster.com
Telephone: 954-462-2000
Facsimile: 954-523-1722

**LUNA E. PHILLIPS**
Florida Bar No.: 0063673
GUNSTER, YOAKLEY & STEWART, P.A.
Las Olas Centre
450 East Las Olas Boulevard, Suite 1400
Fort Lauderdale, Florida 33301
Primary email: lphillips@gunster.com
Secondary email: mmcleod@gunster.com
Telephone: 954-462-2000
Facsimile: 954-523-1722
*Attorneys for Plaintiff, United States Sugar*
*Corporation*

 /s/ Neal McAliley

**T. NEAL MCALILEY**
Florida Bar No.: 172091
Email: nmcaliley@carltonfields.com
**CHARLES THROCKMORTON**
Florida Bar No.: 101203
Email: cthrockmorton@carltonfields.com
CARLTON FIELDS, P.A.
2 Miami Central
700 NW 1st Avenue, Suite 1200
Miami, Florida 33136
Telephone: 305-530-0050
Facsimile: 305-530-0055
*Attorneys for Plaintiff, Okeelanta Corporation*

/s/ Matthew Patrick Coglianese

**MATTHEW PATRICK COGLIANESE**
Florida Bar No.: 471585
Email: matthew.coglianese@floridacrystals.com
FLORIDA CRYSTALS CORPORATION
One North Clematis Street, Suite 200
West Palm Beach, Florida 33401
Telephone: 561-532-1528
*Attorneys for Plaintiff, Okeelanta Corporation*

/s/ Gary V. Perko

**GARY V. PERKO**
Florida Bar No.:  855898
Email: gperko@holtzmanvogel.com
**GARY K. HUNTER**
Florida Bar No.: 949779
Email: ghunter@holtzmanvogel.com
**MOHAMMAD O. JAZIL**
Florida Bar No.: 72556
Email: mjazil@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
19 South Monroe Street, Suite 500
Tallahassee, Florida 32301
Telephone: 850-270-5938
*Attorneys for Plaintiff, Sugar Cane Growers
Cooperative of Florida*

34

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on 28th day of September 2022, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF. Copies of the foregoing document will be served upon counsel of record by transmission of Notices of Electronic Filing generated by the Court's CM/ECF system.

*/s/ Gregory M. Munson*

## SERVICE LIST

*Served via Notice of Electronic Filing Generated by CM/ECF*
Okeelanta Corporation, et al. vs. United States Army Corps of Engineers, et al.
CASE NO.: 21-81505-CIV-MIDDLEBROOKS
United States District Court Southern District of Florida

**MATTHEW J. FEELEY, ESQ.**
Assistant United States Attorney
Florida Bar No. 0012908
Office of the United States Attorney, Juan
Antonio Gonzalez
Southern District of Florida
99 N.E. 4th Street, Suite 300
Miami, Florida 33132-2111
Telephone: 305-961-9235
Facsimile: 305-530-7139
Email: Matthew.Feeley@usdoj.gov
*Attorneys for Defendants, United States*
*Army Corps of Engineers, et al.*

**SALLY J. SULLIVAN, ESQ.**
U.S. Department of Justice
Environment and Natural Resources Division
150 M Street NE Suite 3.142
Washington, DC 20002
Telephone: 202-514-9269
Facsimile: 202-305-0506
Primary email: sally.sullivan@usdoj.gov
Secondary email: efile_nrs.enrd@usdoj.gov
*Attorneys for Defendants, United States Army*
*Corps of Engineers, et al.*

**PETER KRYN DYKEMA, ESQ.**
U. S. Department of Justice
Environment and Natural Resources Division
4 Constitution Square
150 M Street, N.E., Suite 3.206
Washington, DC 20002
Telephone: 202-305-0436
Facsimile: 202-305-0274
Primary email: peter.dykema@usdoj.gov
Secondary email: efile_nrs.enrd@usdoj.gov
*Attorneys for Defendants, United States Army*
*Corps of Engineers, et al.*

**LAURA E. SCALA-OLYMPIO, ESQ.**
Manson Bolves Donaldson Varn, P.A.
515 N Flagler Drive, Suite 301
West Palm Beach, Florida 33401
Primary email: lolympio@mansonbolves.com
Primary email:
BAccardo@MansonBolves.com
Secondary email:
cdonaldson@mansbolves.com
Secondary email: vdavis@mansonbolves.com
*Attorney for Joint Amicus, the Florida Fruit &*
*Vegetable Association and Florida Farm*
*Bureau Federation*

35

**S. ANSLEY SAMSON, ESQ.**
**LISA INTERLANDI, ESQ.**
**ELIZABETH FATA CARPENTER, ESQ.**
Everglades Law Center, Inc.
378 Northlake Blvd. #105
North Palm Beach, Florida 33408
Primary: ansley@evergladeslaw.org
Primary: lisa@evergladeslaw.org
Primary: elizabeth@evergladeslaw.org
Telephone: 786-496-3309
*Attorneys for Joint Amicus, Everglades Law*
*Center, Inc.*

**JULIA LOMONICO, ESQ.**
**ROBERT C. GLASS, ESQ.**
South Florida Water Management District
Office of Counsel
3301 Gun Club Road, MSC 1410
West Palm Beach, Florida 33444
Primary email: jlomonic@sfwmd.gov
Primary email: roglass@sfwmd.gov
Secondary email: litigation@sfwmd.gov
Secondary email: pguzman@sfwmd.gov
Telephone: 561-682-2157
*Attorneys for Amicus, South Florida Water*
*Management District*