UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| OKEELANTA CORPORATION, </br></br> Plaintiff, </br></br> v. </br></br> UNITED STATES ARMY CORPS OF ENGINEERS, </br></br> Defendant. | Case No. 9:21-cv-81505-DMM |
| UNITED STATES SUGAR CORPORATION, </br></br> Plaintiff, </br></br> v. </br></br> UNITED STATES ARMY CORPS OF ENGINEERS, CHRISTINE E. WORMUTH, in her official capacity as Secretary of the Army, MICHAEL L. CONNOR, in his official capacity as Assistant Secretary of the Army (Civil Works)[1], LIEUTENANT GENERAL SCOTT A. SPELLMON, in his official capacity as Commanding General and Chief of Engineers for the United States Army Corps of Engineers, COLONEL JAMES L. BOOTH[2], in his official Capacity as Commanding District Engineer for the United States Army Corps of Engineers, Jacksonville District, </br></br> Defendants. | Case No. 9:21-cv-81506-DMM |

---

[1] Automatically substituted for Jaime A. Pinkham pursuant to Fed. R. Civ. P. 25(d).

[2] Automatically substituted for Andrew D. Kelly pursuant to Fed. R. Civ. P. 25(d).

i

| | |
|---|---|
| SUGAR CANE GROWERS COOPERATIVE OF FLORIDA,       )<br>)<br>Plaintiff,                                                            )<br>)<br>v.                                                                         )<br>)<br>UNITED STATES ARMY CORPS OF ENGINEERS,                                                         )<br>)<br>Defendant.                                                         ) | Case No. 9:21-cv-81508-DMM |

# DEFENDANTS' REPLY IN SUPPORT OF
# CROSS MOTION FOR SUMMARY JUDGMENT

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division

*/s/Peter Kryn Dykema*
Peter Kryn Dykema
Sally J. Sullivan
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington DC 20044-7611
peter.dykema@usdoj.gov
sally.sullivan@usdoj.gov
Phone: (202) 305 0436
Fax: (202) 305 0274

ii

## INTRODUCTION

Plaintiffs' Opposition Brief (DE 67 (Opp.)) does not meet their burden to show unreasonable or unlawful implementation of the 2000 Water Resources Development Act (Pub. L. No. 106-541, 114 Stat. 2572 (Dec. 11, 2000) (WRDA 2000)), or noncompliance with the National Environmental Policy Act (NEPA). Judgment for Defendants is thus appropriate.

## ARGUMENT

**A.    Relevant Facts**

It is true (Opp. at 3-4) that the Corps' Savings Clause and NEPA analyses employ a baseline and no-action alternative that consider the effects of intervening non-CERP activities. It is not true (*id*. at 4) that the Corps has not evaluated the effect of the STA during its grow-in period. *See* DE 56 at 8 & n.9, 19. Nor is it true that the Corps has equivocated regarding the performance of additional NEPA and Savings Clause analyses should more substantial STA operations be proposed (*infra*, Section C).

**B.    The Corps' Reading of the Savings Clause is the Only Reasonable Interpretation**

The Savings Clause applies only to "implementation[s]" of CERP. Plaintiffs' only effort to give effect to the implementation requirement reads that language as excluding "natural disasters." Opp. at 7. This reading would make the Savings Clause apply to all government actions of any kind, which is not what the statute says. In their very next sentence, however, Plaintiffs acknowledge that the Savings Clause protects existing water users from the impacts "[of] Everglades restoration." *Id*. That is much closer to the truth. And LORS 2008 – Plaintiffs' chief villain – has nothing to do with Everglades restoration.

**a.    WRDA 2000 does not tacitly restrict all Corps activities in Florida**

Plaintiffs do not meaningfully respond to the fact that their reading of WRDA 2000 would hamstring the Corps' performance of its many non-CERP-related responsibilities by silently amending a host of statutes. Plaintiffs (Opp. at 5) simply dismiss as a "parade of horribles" the United States' entire argument on this point (DE 56 at 12-13) as well as the Conservation Amici's useful discussion. DE 64 at 7-10.  Plaintiffs also try to obscure the fact that WRDA 2000 specifically rejects Plaintiffs' reading by requiring that its plan be "integrate[d] . . . with ongoing Federal and State projects and activities." WRDA 2000 § 601(b)(1)(B). Plaintiffs assert that this requires that all "pre-existing parts of the C&SF Project" must "comply with WRDA 2000," Opp. at 13, as though "integrating" CERP with existing programs and

1

activities means *over-riding those programs and activities* – the opposite of the usual meaning of integrate. And the fact that Section 601 of WRDA 2000 describes a "comprehensive" Everglades restoration plan (Opp. at 13) does not suggest that its requirements apply to the entire Central and Southern Florida (C&SF) Project or to other non-CERP operations in the region.

Plaintiffs (Opp. at 14) accuse Defendants of ignoring their "structure" argument, but the cases they cite show that Plaintiffs have things backwards. In *King v. Burwell*, 576 U.S. 473 (2015) the Court denied *Chevron* deference to an IRS ruling regarding health care exchanges under the Affordable Care Act (ACA), noting that Congress could not have intended to delegate to the IRS broad rulemaking authority on health insurance policy on which the IRS "has no expertise." *Id.* at 486. Here, Congress did delegate broad authority. *See* DE 56 at 16. And the Court's point on the structure of the ACA was that the IRS ruling would upset the very market the ACA was designed to settle. *King*, 576 U.S. at 492. Here the key structural consideration is Congress' directive that CERP be "integrate[d]" into existing programs, WRDA 2000 § 601(b)(1)(B), which is precisely what the Corps' reading of the Savings Clause accomplishes.[3]

      b.      **Lake Okeechobee Regulation Schedule (LORS) 2008**

Plaintiffs' main (and new) argument is that the Corps' releases to the Northern estuaries under LORS 2008 will be "redirected" to the Everglades *via* the EAA Phase of CEPP. In fact, the overarching goal of CEPP is to reduce the amount of water that would otherwise be sent "to tide," by utilizing new CEPP project infrastructure to increase water delivered to the Everglades. *See*, *e.g.*, 2020 ROD 37008:

> The strategy involves the formulation of canal conveyance, above-ground storage, and treatment wetlands that serve to reduce LORS-compliant water releases to the Northern Estuaries and restore the central portions of the Everglades by utilizing the CEPP North and South project features to improve flow to Water Conservation Area 3A (WCA 3A), WCA 3B, Everglades National Park (ENP) and Florida Bay consistent with both CEPP and CERP.

---

[3] *New York State Department of Social Services v. Dublino*, 413 U.S. 405 (1973) likewise gives Plaintiffs no comfort. The case held that State work requirements for welfare recipients were not preempted by comparable federal requirements, because both served the same goals and were compatible. 413 U.S. at 419-20. The case sheds no light on WRDA 2000.

This redirection is at the heart of CEPP (2015 ROD 3664) and CERP. PPA 8335, 8408; 2020 ROD 37006, 37051. But Plaintiffs have failed to demonstrate that this redirection will violate the Savings Clause or any other aspect of WRDA 2000.

Currently, small amounts of water – enough to promote plant grow-in – are planned and permitted for the STA. The Corps has assessed that the water necessary for this purpose will have zero impact on existing legal uses of water.[4] Plaintiffs don't disagree.

Plaintiffs' new argument suggests that LORS will be modified to redirect ocean-bound water to the Everglades, thus, in effect, transforming LORS into a CERP project. The suggestion is curious because it tacitly agrees that only CERP projects implicate the Savings Clause. More importantly, the Corps has fully anticipated that full operation of the EAA Phase of CEPP may require modifications to the LORS and that those modifications will implicate the Savings Clause and thus require new hydrologic modeling and analyses to assure Savings Clause compliance.[5]

In other words, the Corps' Savings Clause analysis properly treats LORS 2008 as an intervening non-CERP activity, while acknowledging that, to the extent implementation of CEPP generally (and the EAA Phase specifically) requires modifications to the LORS as described in CERP, then Savings Clause analyses may also need to be updated. As explained in Annex B to the 2020 ROD:

> Benefits gained from sending new water south from Lake Okeechobee are derived in part from operational refinements that can take place within the existing, inherent flexibility of the 2008 LORS, and in part with refinements that are beyond the schedule's current flexibility. Modifications to 2008 LORS will be required to optimally utilize the added storage capacity of the A-2 Reservoir to send approximately 370,000 ac-ft/yr of new water . . . south to the Everglades, while maintaining compliance with Savings Clause requirements for water supply and flood control performance levels.

---

[4] The Corps determined that the water required for grow-in would not exceed the amount previously used for irrigating the EAA STA and reservoir footprint. 2020 ROD 37047-48. SFWMD has gone further, determining that water needed for the full-scale STA operation can be similarly satisfied, so that this too will have no impact on existing water users. DE 65 at 8-9.

[5] *See* 2014 CEPP PIR (PPA 427-34, PPA 438, PPA 478-80, PPA 490-96, PPA 506); 2014 Chief's Report (2020 ROD 12749-50). Language to the same effect appears in the 2020 EAA FEIS, including the accompanying Section 203 report. *See*, *e.g.*, 2020 ROD 37020, 37037-39, 37086, 37242-319, 37337-39, 37357-62, 37386, 37406, 40734-39, 41097-102.

2020 ROD 37287.

Plaintiffs assert that if intervening non-CERP activities are excluded from analysis "the agency would never do the comparison with the pre-CERP baseline." Opp. at 15. This is incorrect, because the 2000 pre-CERP conditions will govern the analysis where there are no intervening non-CERP activities that alter the hydrology and/or water management. As the Guidance Memoranda explain, it is only where (as here) the baseline conditions have been altered by non-CERP activities that "a different analysis is required." 2020 ROD 4269. The pre-CERP conditions also become germane where a non-CERP-related activity has *increased* existing legal sources of water. If a non-CERP activity has increased legal sources, the discontinuation of that activity, and resulting decrease in Plaintiffs' allotments, will not implicate the Savings Clause unless it reduces Plaintiffs' allotments beyond the 2000 pre-CERP baseline.

> The Savings Clause does not prohibit CERP from reducing quantity and quality of existing legal sources of water or levels of service for flood protection that were increased by intervening non-CERP activities, but it does prohibit CERP projects from reducing those increases below those in place on the date of enactment of WRDA 2000.

2020 ROD 4269; *see also* 2015 ROD 69406 (same).

### c. The Corps' Savings Clause interpretation conforms to the regulations

The Corps' interpretation of the Savings Clause – in its Guidance Memoranda and in its many EAA project documents – is also consistent with the Corps' Programmatic Regulations for CERP (33 C.F.R. Part 385). Plaintiffs' arguments (Opp. at 14) regarding the language of 33 C.F.R. § 385.36(a) conveniently ignore that the regulation, by its terms (like the Savings Clause that it elaborates), only has effect where "implementation of the project [shall] cause an elimination or transfer of existing legal sources of water." *Id.*

In challenging the Corps' interpretation of WRDA 2000 as conflicting with the Corps' regulations, Plaintiffs (Opp. at 15) tout the decision in *Rafferty v. Denny's, Inc.*, 13 F.4th 1166 (11th Cir. 2021). *Rafferty* involved letter rulings interpreting regulations that defined when restaurant wait staff could be paid less than minimum wage for non-tip-generating work. The regulation at issue required that such work be no more than occasional or infrequent. 13 F.4th at 1185. The challenged letter ruling completely revoked this time limitation -- "remov[ing]," as the court put it, "any limit on the time a tipped employee may perform non-tipped duties," and thus "flatly contradict[ing] the . . . regulation's ceiling on related duties." *Id*. Here, by contrast,

4

the Corps' regulations repeatedly emphasize the statute's stipulation that Savings Clause analysis is only required for water source diversions that are caused by implementation of CERP, and that is precisely the same concept that is embodied in the idea of not applying the Savings Clause requirements to "intervening non-CERP activities." Indeed, even though the factual context could not be more alien to that here, the *Rafferty* court's disapproval of an agency interpretation that "essentially rewrites the [agency's] regulation" (13 F.4th at 1185) would squarely apply had the Corps here accepted Plaintiffs' invitation to rewrite the regulation (and the statute) to make it applicable to projects or operations that are unrelated to CERP's implementation. The same is true of Plaintiffs' reliance on *Kisor v. Wilkie*, 139 S.Ct. 2400 (2019) and *Simmons v. Block*, 782 F.2d 1545 (11th Cir. 1986)). Opp. at 15-16. It is Plaintiffs' proffered interpretation that, by flouting the repeated injunction that the Savings Clause only applies to activities that implement CERP, "flies in the face of the plain language of the [agency's] regulation." Opp. at 15.

  d.  **The Corps' interpretation deserves deference**

  Plaintiffs do not meaningfully answer our *Chevron* argument. We make two points in reply. First, the courts owe deference to an agency's duly promulgated *regulations*, as we have noted. DE 56 at 15-17. Thus, if there is any statutory ambiguity to be resolved, *Chevron* deference applies to the Corps' resolution of that ambiguity in its programmatic regulations. Plaintiffs appear to agree with this.[6]

  Second, the parties' main quarrel seems to focus on the respect due the draft Guidance Memoranda. We have emphasized the effort and formalities that went into the drafting and issuance of the Guidance Memoranda, and the wide scope of the authority WRDA 2000 gives the Corps to implement the statute. The breadth of that delegation distinguishes *Gonzalez v. Oregon*, 546 U.S. 243 (2006) (cited at Opp. at 19), where Congress tightly restricted the agency's delegated authority. *Gonzalez*, 546 U.S. at 245. Plaintiffs, for their part, emphasize the

---

[6] A separate question arises with respect to the Corps' *interpretation of its regulations*. As the Supreme Court has recently noted, it has "often deferred to agencies' reasonable readings of genuinely ambiguous regulations," based on Congress's presumed intent. *Kisor*, 139 S. Ct. at 2408, 2412. Here the regulations, by repeatedly stressing the statute's implementation requirement, are unambiguous. If there is ambiguity, however, *Kisor* – and the long line of cases it follows (and cabins) – establishes that the Corps' interpretation is controlling if reasonable. As the D.C. Circuit puts it, "[t]he court is bound to accept an agency's interpretation of its own regulations unless it is plainly wrong." *Env't Def. Fund v. EPA*, 210 F.3d 396, 400 (D.C. Cir. 2000) (citations and internal edits and quotation marks omitted).

Memoranda's want of finalization.[7] But the quarrel makes little difference. The relevant Corps' Guidance Memorandum serves as one articulation of the agency's interpretation of the Savings Clause. The Corps' technical Savings Clause analysis in the EAA project documents, including its discussion in the Memorandum, is owed deference as an interpretation of WRDA and of the Corps' regulations to the extent the Court finds genuine ambiguity in either. *Autauga Cnty. Emergency Mgmt. Commc'n Dist. v. Fed. Commc'ns Comm'n*, 17 F.4th 88, 98–99 (11th Cir. 2021) (applying *Chevron* to statutory interpretation in FCC declaratory ruling); *Arevalo v. U.S. Att'y Gen.*, 872 F.3d 1184, 1187-88 (11th Cir. 2017) (applying *Chevron* to statutory construction by Board of Immigration Appeals in an adjudicatory determination).

Contrary to Plaintiffs' suggestion (Opp. at 19) the Corps' interpretation of WRDA 2000 has been perfectly consistent. *See*, *e.g.*, 2015 ROD 69406. Summary judgment should be granted in favor of Defendants on the Savings Clause claims.

## C.   The Corps Complied With its NEPA Obligations

The Court should also grant Defendants summary judgment on the NEPA claims.

Plaintiffs argue that the Corps violated NEPA because it did not analyze an alternative that would provide the water supply available in 2000. Opp. at 20.[8] But an agency need only consider "reasonable" alternatives. *N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1541 (11th Cir. 1990). And the selection of such alternatives "is a matter within an agency's discretion." *Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 342 (6th Cir. 2006). Plaintiffs' proffered no-action alternative (Opp. at 21) – one reflecting Lake operations under the 2000 Water Supply and Environment regulation schedule (WSE) – is not reasonable. The WSE, which governed Lake Okeechobee water management releases until 2008, is no longer in effect. *See* 2015 ROD 59546 at pdf 66 (of 392). Several intervening non-CERP events, including LORS 2008, altered the hydrologic conditions from those that existed in 2000. *See* 2015 ROD 69406; PPA 8761-62; 2020 ROD 31415. This type of no-action alternative is not reasonable under

---

[7] Plaintiffs' idle insinuation (Opp. at 18) that the Corps was trying to hide something relevant to the Guidance Memoranda when it resisted Plaintiffs' improper discovery demands overlooks the Court's granting of a Protective Order against those demands. DE 23. And, as we have noted, the Corps' regulations address the situation where Project Implementation Reports need to be prepared "before the development of the guidance memorandum." 33 C.F.R. § 385.26(b)(1).

[8] Plaintiffs do not propose any particular action alternative In fact, Plaintiffs emphasize that they do not seek vacatur of the permit that allows SFWMD to construct a feature of the approved project. Opp. at 29.

NEPA because it would not reflect relevant hydrologic conditions, and would not provide useful information to the public regarding potential environmental impacts of the EAA project. Plaintiffs protest that "nothing prohibits" the Corps from comparing an alternative based on the 2000 hydrologic conditions and that agencies "commonly" analyze more than one no-action alternative. Opp. at 20-21. Both may be true. But NEPA does not require that the Corps do either—and Plaintiffs cite nothing to the contrary that supports their position.

Plaintiffs (Opp. at 22) cite *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1289 (1st Cir. 1996) for the idea that the failure to study a reasonable alternative may render an EIS inadequate. But, as *Dubois* itself explains, an agency cannot be faulted under NEPA for not considering alternatives that "were not appropriate for study" because they would not fulfill a project's purpose and need. *See Dubois*, 102 F.3d at 1290 n.18. The EAA project purpose was to provide additional storage, treatment, and conveyance in the Everglades Agricultural Area, not consider alternatives to LORS 2008.

The two California district court cases Plaintiffs cite likewise do not support their position. In *Center for Biological Diversity v. U.S. Bureau of Land Management*, plaintiffs argued that BLM should have used a 1980 vehicle route network as the baseline/no-action alternative because it was the only network that was permitted by the terms of a separately-enacted land management plan. 746 F. Supp. 2d 1055, 1086-87 (N.D. Cal. 2009). The court disagreed and explained that "for NEPA purposes, the '1980 OHV network' cannot be the 'no action' alternative against which the proposed action would be compared because the 1980 network has not been the status quo since 1980, decades before the proposed action." *Id.* at 1090. Likewise, here, the water supply Plaintiffs would have the Corps use for comparison has not been the status quo since at least 2008. And in *League to Save Lake Tahoe v. Tahoe Regional Planning Agency*, the court recognized "that a [NEPA] baseline may reflect damage that has already occurred as a result of illegal activity . . . ." 739 F. Supp. 2d 1260, 1276 (E.D. Cal. 2010), *aff'd in part, vacated in part, remanded*, 469 F. App'x 621 (9th Cir. 2012). Thus, even if Plaintiffs were correct that considering water supply conditions resulting from non-CERP activities somehow violates the Savings Clause, since those are the currently existing conditions, they may properly be reflected in the Corps' NEPA analysis. In any event, here, unlike in Plaintiffs' two cases, the Corps' NEPA analysis does not incorporate any prior violations of law.

Rather, it reflects water supply conditions as they presently exist in accordance with the legally-authorized LORS 2008 regime. ROD 59546 at pdf 66 (of 392).

Finally, Plaintiffs suggest that the Corps' NEPA analysis is somehow deficient because it "does not allow the public to determine whether the [Corps] is complying with the WRDA 2000 Savings Clause." Opp. at 22. But using a 2000 water supply would not comply with the Savings Clause. And, in any event, the Corps' NEPA documents address potential project impacts to water supply and the Savings Clause in detail and provide more than sufficient information for NEPA purposes. *See* PPA 499-506, 1597-1793; 2020 ROD 37242-37319, 40734-40739, 41097-41102.

Plaintiffs next protest that the Corps should have analyzed "standalone operations" of the A-2 STA. Opp. at 23-28. What NEPA provision Plaintiffs allege that the Corps has violated here remains a mystery: Plaintiffs again cite no statute, regulation, case law, or secondary source that suggests that NEPA requires an agency to analyze, independently, project components that will not be completed at the same time. *Id*. The only NEPA regulations Plaintiffs cite are 40 C.F.R. § 1508.25, defining connected actions, and 40 C.F.R. § 1502.9(d)(2), providing for supplemental NEPA analysis. Opp. at 27. Connected actions are actions that are "closely related" and "should be discussed in the same impact statement." 40 C.F.R. § 1508.25(a)(1). Supplemental NEPA analysis is required when an agency "makes substantial changes [to] the proposed action" or "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action . . . ." *Id*. § 1502.9(c)(1). Neither supports Plaintiffs' position here.

Plaintiffs' argument also fails on the facts. The Corps' NEPA analysis considered standalone operations of the STA insofar as such operations have been proposed by the SFWMD in its permit application and approved by the Corps. DE 59 at 23-24. Those operations are limited to a restricted grow-in process. 2020 ROD 31351; PERMIT 11614. No other operations are currently approved. *Id*. Nor will they be approved until an operations plan is developed by SFWMD and accepted by the Corps. *See* PERMIT 11614.

Contrary to Plaintiffs' speculation, Opp. at 25, the remaining requirements regarding permitting and approvals are both real and enforceable. Because the STA is part of a federal project, the SFWMD must develop operations for the STA in conjunction with the Corps to achieve project purposes in compliance with all applicable federal laws, permitting requirements,

8

and Corps' regulations and policy. *See, e.g.*, PERMIT11591-92. The SFWMD will build and operate the STA, but the SFWMD must first obtain all required permits, including a 404 permit. *Id*. Plaintiffs wrongly conflate the NPDES permit, which the state of Florida must issue, *see* PERMIT 11612, with other permitting requirements and Corps review and approvals. Opp. at 25. Moreover, the Corps retains ultimate control over operations. *See, e.g.*, PPA 79; PPA 95. The Corps' authority to control operations is not simply by virtue of its permitting authority, as Plaintiffs suggest. Opp. at 25. That authority arises from the Corps' responsibility to manage and oversee federal civil works projects, like the EAA project, as delegated by Congress. *See* WRDA 2020 § 324, Pub. L. No. 116-260, 134 Stat. 1182 (Dec. 27, 2020);WRDA 2018 § 1308(a), Pub. L. No. 115-270, 132 Stat. 3765 (Oct. 23, 2018); WRDA 2016 § 1401(4), Pub. L. No. 114-322, 130 Stat. 1632 (Dec. 16, 2016); WRDA 2000 § 601. The requirement that the Corps approve any plan for STA operations beyond the grow-in period is real. PERMIT 11777. Plaintiffs' statement that "it is clear the agencies will approve its operations," is speculation, and also misses the relevant point – namely, that the Corps will not approve such operations without ensuring compliance with NEPA, the Savings Clause, and other applicable requirements.

   And, contrary to Plaintiffs' mischaracterization, the Corps has not merely "suggest[ed] it may conduct additional analysis pursuant to NEPA" prior to approving standalone STA operations, Opp. at 26. The Corps has committed to do so. Special condition 14 of the ROD requires that an operations plan must be submitted six months before operations commence, and plainly states that "National Environmental Policy Act analysis for the project **will be updated** to reflect the operations plan and coordinated for public and agency review as appropriate." PERMIT 11614 (emphasis added). The permit that the Corps issued to the SFWMD contains a nearly identical provision. PERMIT 11777; *see also* PERMIT 11780-81.

   While Plaintiffs are correct that the "FEIS was intended to consider the impacts of the construction and operation of the A-2 STA," Opp. at 26 (citing PERMIT 11591), their selective quotation ignores a critical detail describing what *operations* the FEIS studied. The Corps' NEPA analysis appropriately considered the potential impacts from construction of the full project (Reservoir and STA), while recognizing that modifications to the LORS would be required to optimally utilize the additional storage capacity for realization of project benefits, while maintaining Savings Clause compliance. *E.g.*, 2020 ROD 37038. The "interim" operations of the STA that were considered and authorized so far, are limited to the grow-in period. *See,*

9

*e.g.*, 2020 ROD 31351; PERMIT 11614. The Corps is not "silent about the time after the grow-in period ends and before the Reservoir is built," Opp. at 24; rather, additional analyses, permitting, and approvals are required before post grow-in operations. *See* PERMIT 11614; PERMIT 11777. The Corps' NEPA analysis contemplates phased implementation and expressly acknowledges that the Corps will conduct further analyses to ensure compliance with NEPA and the Savings Clause. *See id*. It provides the public with a clear picture of what has been studied and what remains to be studied, thus, fulfilling NEPA's procedural objectives.[9]

Finally, Plaintiffs' response to our segmentation argument is unavailing. Opp. at 27-28. Plaintiffs now suggest that the Corps' NEPA analysis is deficient because it did not study *all* potential STA operations prior to completion of the Reservoir. *Id*. But this would have been impossible given that an operations plan for the post grow-in period (without a functioning reservoir) has not yet been developed or submitted to the Corps. The FEIS studied *both* the construction and (limited) operations of the STA, as currently contemplated. *See, e.g.*, 2020 ROD 31351. That the Corps has committed to supplementing its analysis for operations that extend beyond what was already studied and approved, does not render its NEPA analysis inadequate and does not evidence improper segmentation. *See, e.g.*, *Mayo v. Reynolds*, 875 F.3d 11, 22–23 (D.C. Cir. 2017) (explaining that "if a program 'involves . . . separate sub-projects and will take many years,' NEPA's implementing regulations allow the agency to 'evaluate[ ] each sub-project as it becomes ready' and tailor its subsequent analyses to particularized considerations not already addressed in a prior 'programmatic EIS.'" (citation omitted)).

NEPA's purpose is twofold: to inform agency decision makers as they consider federal projects and to inform the public of the potential environmental impacts of such projects. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Here, the Corps' NEPA analysis fulfills both objectives, and nothing about its analysis was arbitrary or capricious.

## CONCLUSION

Defendants respectfully submit the summary judgment should be entered on their behalf.

---

[9] Plaintiffs' accusation that the Corps "has refused to conduct water supply analyses in every NEPA document it has prepared for this project since 2014," Opp. at 27, is belied by the record. *See, e.g.,* 2020 ROD 40734-39; 2020 ROD 39741-47; 2020 ROD 41097-102.

Dated this 28th day of October, 2022.

        Respectfully submitted,

        TODD KIM
        Assistant Attorney General
        Environment and Natural Resources Division

        */s/Peter Kryn Dykema*
        Peter Kryn Dykema
        Sally J. Sullivan
        U.S. Department of Justice
        Environment and Natural Resources Division
        Natural Resources Section
        P.O. Box 7611
        Washington DC 20044-7611
        peter.dykema@usdoj.gov
        sally.sullivan@usdoj.gov
        Phone: (202) 305 0436
        Fax: (202) 305 0274

        *Attorneys for Defendants*

Electronically filed.