# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| OKEELANTA CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 9:21-cv-81505-DMM |
| | ) | |
| UNITED STATES ARMY CORPS OF | ) | |
| ENGINEERS, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | / | |

| | | |
|---|---|---|
| UNITED STATES SUGAR CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 9:21-cv-81506-DMM |
| | ) | |
| UNITED STATES ARMY CORPS OF | ) | |
| ENGINEERS, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | / | |

| | | |
|---|---|---|
| SUGAR CANE GROWERS COOPERATIVE OF | ) | |
| FLORIDA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 9:21-cv-81508-DMM |
| | ) | |
| UNITED STATES ARMY CORPS OF | ) | |
| ENGINEERS, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | / | |

## <u>ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT</u>

THIS CAUSE comes before the Court upon the Parties' Cross-Motions for Summary Judgment ("the Motions").[1]  (DE 50; DE 59).  The Motions are fully briefed.  (DE 67; DE 70).  The Court also accepted three *amicus* briefs.[2]  On February 10, 2023, the Court held oral argument.  (DE 75).  For the following reasons, Defendants' Cross-Motion for Summary Judgment is granted, and Plaintiff's Motion for Summary Judgment is denied.

## I.    SUMMARY

The facts of this case can be difficult to get through.  There are countless acronyms; obscure statutes and regulations; and thousands of pages of administrative record with technical language, written mostly by scientists and engineers.  At the risk of sounding repetitive, I will first outline the issues in this case without the jargon that comes with much of administrative/environmental law.

Here's the 30,000-foot view:  In an Act passed in December of 2000, Congress adopted a "Plan" for the United States Corps of Engineers to restore the Everglades.  The crux of this case is a provision of that Act known as the "Savings Clause."  The Savings Clause, in essence, tells the Corps that implementation of the Plan cannot lower the quantity of water as of that available in December of 2000.

---

[1] This is a consolidated action of nearly identical lawsuits filed by Okeelanta Corporation (DE 31), United States Sugar Corporation (DE 1 in SD Fla. Case No. 21-CV-81506) and Sugar Cane Growers Cooperative of Florida (DE 1 in SD Fla. Case No. 21-CV-81508).  For brevity, where all three complaints contain the same allegation, I will cite only to Okeelanta's complaint preceded with "*e.g.*".  One technical difference between the lawsuits is that U.S. Sugar Corporation sued individuals of the U.S. Army Corps of Engineers in their official capacities.  That distinction makes no difference in the outcome of this case.  Plaintiffs jointly briefed summary judgment.

[2] *See* (DE 55) ("Farmers *Amici*," supporting Plaintiffs); (DE 64) ("Everglades *Amici*," supporting Defendants); and (DE 65) ("SFWMD *Amici*," supporting Defendants).

The Plan is embedded in an over 4000-page document written by the Corps and other stakeholders in Florida. The way that Congress adopted the Plan—by basically incorporating it by reference into the Act—is the source of much of the confusion in this case. The centerpiece of the Plan was over 60 construction projects. Two of those projects are at issue in this case: a reservoir and water treatment facility.

The Plan also discussed various operational changes that would take place to accommodate the construction projects. That included changes to the Lake Okeechobee Regulation Schedule. Simply put, the regulation schedule is a manual that tells people how to operate various structures (*e.g.*, pumps) connected to the Lake to keep its water at a set baseline. As that might reveal, Lake Okeechobee is highly engineered. The Lake is surrounded by a dike (the Herbert Hoover Dike) and a series of canals, pumps, gates, and so forth that allow for near-precise regulation. This is important because Lake Okeechobee is the largest freshwater lake in the region and is as an integral part of the Everglades ecosystem, as well as a key component of Florida's water supply and flood control efforts. In the 1930s, Congress designated the Corps as the federal agency in charge of building and operating this complex system following a devasting flood that killed approximately 3,000 people.

Now, here comes the first problem. In 2008, the Corps implemented a regulation schedule that lowered the Lake's baseline because of issues with the structural integrity of the Dike. Returning to the Savings Clause, the question arises whether the 2008 action was an "implementation of the Plan." In the Corps' view, this was a non-Plan activity that changed the baseline. And thus, in implementing the reservoir and water treatment facility, the Corps used that new baseline to comply with the Savings Clause. Various sugar companies that rely on the Lake as a source of water for their crops disagree with that view. Since the 2008 regulation schedule

lowered the Lake's water level, the sugar companies face a higher likelihood of experiencing water shortages in future droughts.

The second problem:  The sugar companies take issue with the Corps' environmental impact analysis as required under federal law.  The environmental impact analysis includes studying effects to water supply.  In particular, the sugar companies want the Corps to study the impact of standalone operation of the water treatment facility.  The Corps' analysis is currently limited to in tandem operation of the water treatment facility and reservoir.  This is important because the water treatment facility does not store water for the sugar companies—the reservoir does.  The Corps responds that it has not approved standalone operation, but if it does, it will perform a new analysis.  The sugar companies believe that the Corps is going to pull the rug out from under them.

## II.    BACKGROUND[3]

This consolidated action pertains to the United States Army Corps of Engineers' ("the Corps") implementation of two components of an ecosystem restoration project called the Comprehensive Everglades Restoration Plan ("CERP").  Those components are a reservoir and a water treatment facility, which will store and treat water from Lake Okeechobee.  Lake Okeechobee is considered the heart of the water resources system in south Florida.  2015_ROD_068498.  CERP is a part of the Central and Southern Florida Project for Flood Control

---

[3] This background section is largely adapted from this Court's previous Order Denying Defendants' Motion to Dismiss (DE 37 at 1-7), which relied on Plaintiffs' complaints.  In lieu of a statement of material facts under SD Fla. Local Rule 56.1(a), the Parties agreed to have their Motions adjudicated on evidence in the administrative record.  (DE 20 at 2-3).  The Corps conventionally filed four administrative records.  (*See* DE 38-44; DE 48-49).  In my review of the record and the Motions, I do not see any dispute as to the facts herein (unless stated otherwise).  Where appropriate, I supplement this section with citations to the administrative record and/or the Parties' summary of facts in the summary judgment briefing.

and Other Purposes ("C&SF Project"), the regional water management project that provides for the water-related needs of South Florida. (*e.g.*, Okeelanta Compl. ¶¶ 1, 12). The Corps is the federal agency tasked with operation of the C&SF Project, in conjunction with the South Florida Water Management District ("SFWMD"), its local sponsor. (*e.g.*, *id.* ¶¶ 6, 8). Plaintiffs are, or represent, farmers (mainly of sugar cane but also other crops) who rely on water from Lake Okeechobee for irrigation.

Plaintiffs bring this Administrative Procedure Act action challenging the Corps' compliance with the Water Resources Development Act of 2000 ("WRDA 2000"), a federal statute governing CERP, and the National Environmental Policy Act ("NEPA"). Section A provides background on WRDA, Section B on NEPA, and Section C on Plaintiffs' allegations.

**A. WRDA 2000**

Congress granted the Corps authority to operate the C&SF Project in the Flood Control Act of 1948. Pub. L No. 80-858, 62 Stat. 1171, 1176. Over fifty years later, Congress approved CERP in WRDA 2000 as the "**framework** for **modifications** and **operational changes** to the [C&SF Project] that are needed to restore, preserve and protect the South Florida ecosystem while providing for other water-related needs of the region, including water supply and flood protection." Pub. L. No. 106-541, 104 Stat. 2680, § 601(b)(1)(A), (Dec. 11, 2000) (emphasis added) (hereinafter cited as "WRDA 2000"). In doing so, Congress specified that in implementing the Plan, the Corps "shall integrate the [Plan] with ongoing Federal and State projects and activities in accordance with section 528(c) of the Water Resources Development Act of 1996 (110 Stat. 3769)." *Id.* § 601(b)(1)(B).

As will later become relevant, the Plan involved an operational change to the then-current Lake Okeechobee Regulation Schedule ("Run 25"). 2015_ROD_003684.

## 1.  THE SAVINGS CLAUSE

Central to this action is the WRDA 2000 provision known as the "Savings Clause," which provides in pertinent part:

> NO ELIMINATION OR TRANSFER—Until a new source of water supply of comparable quantity and quality **as that available on the date of enactment of this Act** is available to replace the water to be lost **as a result of implementation of the Plan**, the Secretary and non-Federal sponsor shall not eliminate or transfer existing legal sources of water, including those for—
> (i) an agricultural or urban water supply.

WRDA 2000 § 601(h)(5)(A)(i) (emphasis added).  The level/quality of water available "as that available on the date of enactment of this Act" is referred to herein as the "pre-CERP baseline." Plaintiffs are existing legal water users within the meaning of WRDA 2000 and thus claim protection of the Savings Clause.

The "Plan" is defined as, "the Comprehensive Everglades Restoration Plan contained in the 'Final Integrated Feasibility Report and Programmatic Environmental Impact Statement', dated April 1, 1999, as modified by this section." *Id.* § 601(a)(4).  The 1999 Report is an over 4000-page document.  *See* 2015_ROD_003341.  The proposed plan is contained in Section 9 of the 1999 Report and is titled, "The Recommended Comprehensive Plan."  2015_ROD_003656. The centerpiece of CERP is over 60 construction projects.  WRDA 2000 requires that the Corps and SFWMD prepare Project Implementation Reports ("PIR") that describe CERP projects and document compliance with WRDA 2000 requirements.  WRDA 2000 § 601(h)(4)(A).

## 2.  PROGRAMMATIC REGULATIONS

The Programmatic Regulations implementing WRDA 2000 are important in several respects.  They require that PIRs include analyses "to determine if existing legal sources of water

are to be eliminated or transferred **as a result of project implementation**." 33 C.F.R. § 385.36(a) (emphasis added).  Specifically, the Corps must determine:

> **if implementation of the project will cause** an elimination or transfer of existing legal sources of water **by comparing the availability of water with the recommended project with the pre–CERP baseline** developed in accordance with § 385.35(a), by using the water quality and other analyses developed in § 385.35(a)(1)(iii), and by using other appropriate information.

*Id*. (emphasis added).  If so, the PIR "shall include an implementation plan that ensures that such elimination or transfer shall not occur until a new source of water of comparable quantity and quality is available to replace the water to be lost."  *Id.*  The Corps must make this determination in part by comparing water supply under its recommended project "with the pre-CERP baseline." *Id*.  The "pre-CERP" baseline is defined as: "the hydrological conditions . . . on the date of enactment of WRDA 2000."  *Id*.  § 385.3.

### 3.  GUIDANCE MEMORANDUM

The Programmatic Regulations direct the Corps to develop a guidance memorandum that establishes a pre-CERP baseline to be used in Savings Clause analyses.  *Id*.  § 385.36(b).  In 2007, the Corps developed a draft guidance memorandum titled, "Guidance Memorandum #3, Savings Clause Requirement" ("Guidance Memorandum").  2020_ROD_004262.  Although the Corps went through notice and comment to develop the Guidance Memorandum, pursuant to its own regulations, it is still in draft form because several federal (including the Secretary of the Army) and state officials have not signed off on it.  (*See* DE 50 at 13; DE 59 at 12).  Until that happens, "issues involving existing legal sources of water should be resolved on a case-by-case basis considering all factors that can be identified as relevant to decisions under the savings clause."  *Id*. § 385.36(c).  Defendants' counsel represents that this delay is due to the nature of the bureaucratic process.  (Hearing Transcript, 70-71).

The Guidance Memorandum is the first time that the Corps took the position that the Savings Clause does not apply to "intervening non-CERP activities" and that new operational changes to LORS is such an activity.   2020_ROD_004269.   When intervening non-CERP activities *lower* the pre-CERP baseline, the Corps reasons that it would not be required to make up for that loss.  The Corps would, however, be restricted from lowering the baseline any further.   In cases in which the intervening non-CERP activities *increase* the pre-CERP baseline, the Corps would not be restricted (at least under the Savings Clause) from reducing those gains.  Of course, in those cases, the Corps could not lower the pre-CERP baseline.

### 4.   LAKE OKEECHOBEE REGULATION SCHEDULES

The Lake Okeechobee Regulation Schedule ("LORS") is a manual that tells people (*i.e.*, the Corps or SFWMD) how to operate various structures (*e.g.*, pumps) connected to Lake Okeechobee to achieve certain objectives.   2015_ROD_068523.   Those objectives include maintaining Lake Okeechobee's water level at a predetermined height and releasing water to certain areas.   *Id*.  Congress granted the Corps the authority to operate these structures under the umbrella of the C&SF Project in the Flood Control Act of 1948.

The Plan adopted by Congress in WRDA 2000 contained an operational change to the then-current LORS, known as "Run 25."   2015_ROD_003684.   The nature of that change will be explored in the discussion.  Run 25 set the maximum elevation of Lake Okeechobee's water level at 16.75 feet.   2015_ROD_006143.   The regulation schedule that followed Run 25, and thus provided the baseline for the Savings Clause, is referred to as the "Water Supply and Environment" ("WSE").   2015_ROD_068498.  WSE provided a maximum elevation of 18.53 ft.  *Id*. at 068525.

In November 2007, the Corps lowered the Lake's maximum elevation to 17.25 ft in a new regulation schedule ("LORS 2008") due primarily to concerns with the structural integrity of the

Herbert Hoover Dike ("the Dike").[4]  *Id*. at 068498.  The main cause of the Dike's weakening was the Lake's unusually high-water levels in the preceding years.  *Id*.  It is worth noting that lowering Lake Okeechobee's elevation is not necessarily equivalent to lowering the pre-CERP baseline. What matters is what the Corps does with the water afterwards.

The Corps expected LORS 2008 to remain in place, "until the earlier of (1) implementation of a new [LORS] as a component of the system-wide operating plan to accommodate the Comprehensive Everglades Restoration Plan (CERP Band 1 projects) and the State of Florida's fast track Acceler8 projects, or (2) completion of [the Dike repairs] . . . . "  *Id*. at 068501.  At oral argument, Defendants' counsel represented that the Corps is undergoing the final stages of a safety-permitting process before the Dike can be considered complete.  (Hearing Transcript, 94:4-10).  Once the Dike is permitted, the Corps estimates that it will implement a new regulation schedule, called Lake Okeechobee System Operating Manual, by June of this year.  (*Id*. at 94:8-10).

## B.  NEPA

The second pertinent statute is NEPA, which requires all federal agencies to analyze the environmental impacts of certain proposed agency actions.  *See* 42 U.S.C. § 4332(c).  Specifically, agencies must prepare an environmental impact statement ("EIS") for proposed agency actions that will significantly affect the environment.  *Id*.; 40 C.F.R. §§ 1500, *et seq*.

---

[4] Congress directed the Corps to build the Dike in the Rivers and Harbors Act of 1930 following a devasting flood that killed over 3,000 people.  *See Fla. Wildlife Fed'n Inc. v. United States Army Corps of Engineers*, 859 F.3d 1306, 1311 (11th Cir. 2017).

### C. PLAINTIFFS' CLAIMS

I will first describe the projects at issue in more detail before outlining Plaintiffs' claims. In January 2020, the Corps issued a Final Environmental Impact Statement for CEPP A-2.[5] (DE 50 at 7). CEPP A-2 has two key components: (1) the construction and operation of a 240,000-acre-foot capacity reservoir in the Everglades Agricultural Area ("EAA"), which is referred to as the "EAA Reservoir" or the "A-2 Reservoir" ("Reservoir"), and (2) the construction and operation of a 6,500-acre Stormwater Treatment Area, generally referred to as the A-2 STA ("STA") (collectively, the "EAA Project"). (Okeelanta Compl. ¶ 2; U.S. Sugar Compl. ¶ 50; SCGC Compl. ¶¶ 30–31). The STA will treat the lake water via plants to remove phosphorus and other nutrients from the water before it flows south. (*e.g.,* Okeelanta Compl. ¶ 28). The Reservoir will store water from where it can be distributed to EAA water users, like Plaintiffs, or to Water Conservation Areas and the Everglades. (*e.g.*, *id.* ¶ 27).

The STA is currently in the "grow-in period"—*i.e.*, a period of time that allows the plants to grow—and is scheduled to begin water treatment operations in 2025. (DE 50 at 17). The Parties dispute whether the Corps already approved the STA to be fully operational past the grow-in period. Construction on the Reservoir is just beginning. Given that these are ongoing projects, their status has changed since the inception of these cases. During oral argument, Defendants' counsel represented that the contract for the Reservoir has been awarded and that the contractor would be on site in a matter of days. (Hearing Transcript, 75:2-4). The Reservoir is expected to be complete in 2029. (DE 50 at 17).

---

[5] This project is a feature of the Central Everglades Planning Project ("CEPP"). CEPP is an Everglades restoration project that is itself comprised of a number of CERP projects. (Okeelanta Compl. ¶ 30; U.S. Sugar Compl. ¶¶ 1, 31).

Plaintiffs allege (under the APA) that the Corps violated WRDA 2000, its own Programmatic Regulations, and NEPA in approving the EAA Project.[6] U.S. Sugar also seeks relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, with respect to the baseline. (U.S. Sugar Compl. ¶¶ 108–18). Plaintiffs *do not* seek vacatur of the projects. (DE 67 at 29). In the main, they support the projects. (Plaintiffs' counsel, Hearing Transcript, 92:14-17).[7] Plaintiffs only take issue with *how* the projects are going to operate. Thus, Plaintiffs seek for this Court to remand the project approvals for further consideration by the Corps in accordance with a ruling in their favor. (DE 67 at 29). I will address each set of claims in turn.

First, as to WRDA 2000, Plaintiffs allege that the Corps violated the Savings Clause by using the wrong pre-CERP baseline in approving the EAA Project. (*e.g.*, Okeelanta Compl. ¶¶ 44–45). The Corps used LORS 2008 as the baseline, which provides a meaningfully lower water supply than the WSE. That reduction translates to approximately 500,000 acre-feet of lost storage capacity for existing legal water users. (U.S. Sugar Compl. ¶ 70; SCGC Compl. ¶ 28). However,

---

[6] Defendants argue that Plaintiffs abandoned claims against the "the 2015 ROD," "issuance of the permit for the STA grow-in period" and the "Project Partnership Agreement." (DE 59 at 16). I do not read Plaintiffs' summary judgment as abandoning any claim regarding the use of the LORS 2008 baseline in connection with the EAA Project. Plaintiffs concede that they are not challenging the Corps' operation of the STA during the grow-in period. (Plaintiffs' Reply Brief, DE 67 at 24) ("Plaintiffs' argument is that NEPA analysis of the period *after* the completion of the grow-in phase is required but omitted.").

[7] At oral argument, counsel for Okeelanta Corporation, Mr. McAliley, led argument for Plaintiffs. However, counsel for U.S. Sugar Corporation, Mr. Munson, also argued on behalf of his client. Counsel for Sugar Cane Growers Cooperative of Florida, Mr. Perko, was present but did not present argument. The Plaintiffs, having filed a joint motion for summary judgment, agree as to the outcome of all issues. To the extent the lawyers raised a nuance specific to their client, I note that by citing to the corporate entity (*e.g.*, U.S. Sugar Corporation's counsel). Otherwise, I generically refer to "Plaintiffs' counsel."

operation of the EAA Project would decrease that amount by about half.  *See* 2020_ROD_031336; (Everglades *Amici*, DE 64 at 12).

Plaintiffs allege that a reduction in available water caused by both standalone STA operations and use of LORS 2008 increases the risk of permanent damage to their land and crops. (*e.g.*, Okeelanta Compl. ¶¶ 2, 39).  During low-rainfall periods such as the annual dry season and droughts, Plaintiffs allege that they will not have sufficient and predicable amounts of water to grow their crops.  (*e.g.*, *id.* ¶¶ 6, 55).  Low water conditions also increase the risk of wildfires and lead to oxidization of soil, which results in soil subsidence.  (U.S. Sugar Compl. ¶ 74).

Plaintiffs also allege that the Corps has not performed a Savings Clause analysis of the STA as a standalone component.  (*e.g.*, Okeelanta Compl. ¶ 48–51).  The Corps' Savings Clause analyses assumed in tandem operation of the Reservoir and STA, with the Reservoir providing key storage benefits.  (*e.g.*, *id.* ¶¶ 49–50).  Plaintiffs allege that the standalone operation of the STA increases risk of permanent damage to Plaintiffs' farms because they rely on the Lake Okeechobee water that will be sent to the STA, and without the storage component of the project, water will be treated and sent south thereby lowering overall Lake levels and diminishing Plaintiffs' supply during dry periods.  (*e.g.*, *id.* ¶¶ 37–38, 51, 55).

Second, Plaintiffs claim that the Corps violated its own Programmatic Regulations in much the same way that it violated WRDA 2000.  They argue that the Corps' own definition of the pre-CERP baseline in the Programmatic Regulations is inconsistent with the view taken in approving the EAA Projects.  (DE 50 at 10).  Moreover, Plaintiffs take issue with the Corps' failure to establish a pre-CERP baseline by June 14, 2004.  *Id.* (citing 33 C.F.R. § 385.35(a)(1)).

As to NEPA, Plaintiffs allege that the Corps prepared an inadequate EIS because the erroneous Savings Clause analyses demonstrates the failure to take the requisite "hard look" at the

impacts on the human environment and the failure to assess reasonably foreseeable adverse impacts associated with the EAA Project. (*e.g.*, Okeelanta Compl. ¶¶ 64–68). Moreover, Plaintiffs allege that the Corps violated NEPA by failing to analyze the standalone operation of the STA. (*Id.*; DE 50 at 17).

Plaintiffs allege that the Corps' actions were "arbitrary, capricious, an abuse of discretion, contrary to law, and without observance of procedures required by law within the meaning of 5 U.S.C. § 706(2)." (*Id.* ¶¶ 61, 68).

## III.   LEGAL STANDARD

Summary judgment is appropriate only when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). However, "when a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal" and the "'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (citation omitted). In such cases, summary judgment is the vehicle for deciding "whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Brinklys v. Johnson*, 175 F. Supp. 3d 1338, 1350 (M.D. Fla. 2016) (citation omitted), *aff'd sub nom. Brinklys v. Sec., Dept. of Homeland Sec.*, 702 Fed. Appx. 856 (11th Cir. 2017); *see also Preserve Endangered Areas of Cobb's History, Inc. v. United States Army Corps of Engineers*, 87 F.3d 1242, 1246-47 (11th Cir. 1996) (explaining that on summary judgment district court applies APA standard of review to the administrative record).

Section 706 of the APA governs the scope of review of this case. *See Preserve Endangered Areas of Cobb's History*, 87 F.3d at 1246. Under Section 706, the reviewing court must determine whether agency decisions are "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2)(A); *Defs. of Wildlife v. Bureau of Ocean Energy Mgmt.*, 684 F.3d 1242, 1248 (11th Cir. 2012). "The arbitrary and capricious standard is 'exceedingly deferential.'" *Defs. of Wildlife v. United States Dept. of Navy*, 733 F.3d 1106, 1115 (11th Cir. 2013) (citation omitted).

The court may not substitute its "judgment for the agency's as long as its conclusions are rational." *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009). Notwithstanding, the court may find that an agency action is arbitrary and capricious where:

> [T]he agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id*.

Under NEPA, a reviewing court "may only ask whether the agency took a 'hard look' at environmental consequences." *Citizens for Smart Growth v. Sec. of Dept. of Transp.*, 669 F.3d 1203, 1211 (11th Cir. 2012). "A challenging party has the burden of showing by a preponderance of the evidence that the agency did not comply with NEPA's procedures." *Id*.

## IV.   DISCUSSION

In Section A, I address Plaintiffs' Savings Clause claims. Section B covers Plaintiffs' claims related to Defendants alleged violations of the Corps' Programmatic Regulations. And Section C covers Plaintiffs' NEPA claims.

### A.   SAVINGS CLAUSE CLAIMS

Whether the Corps violated the Savings Clause boils down to two questions. First, is there such a thing as an "intervening non-CERP activity"? The answer to that is obviously yes. Second, was LORS 2008 an intervening non-CERP activity? That is a close call. Ultimately, I find that it

was.  I will explain the reasoning behind each answer in Sections two and three below.  In Sction one, I address agency deference.  But before doing so, I want to emphasize how narrow this holding is.

I am only answering the very narrow question posed:  was LORS 2008 an intervening non-CERP activity?[8]  After using all of the Court's tools of statutory construction, I find that it was (*i.e.*, that it was not an "implementation of the Plan.").  However, I make no judgment about how the Savings Clause applies to other aspects of the C&SF Project.   In the Corps' Guidance Memorandum, for instance, it asserts that the following are intervening non-CERP activities: Interim Operational Plan, Modified Water Deliveries Project, 1994 C-111 General Reevaluation Report modifications, and Combined Structural and Operational Plan.  2020_ROD_004262.  None of those are at issue in this case.

Even with regard to future changes to the Lake Okeechobee Regulation Schedule, this holding provides only limited guidance:  the Corps may treat the water elevation set by LORS 2008 as a permissible baseline.  With one exception, and only because it is inextricably linked with the reasoning behind this holding, I withhold opining on what scenarios may give the Corps authority to go lower than that.  The exception:  in scenarios in which Lake Okeechobee's water level threatens the structural integrity of the Herbert Hoover Dike, the Corps is not prohibited—at least by WRDA 2000's Savings Clause—to take appropriate remedial actions.  The Corps, as the Congressionally selected steward of the Dike, is in the best position to know what those actions may be.

---

[8] This question contains the preliminary question of whether non-CERP activity even exists.  For purposes of organization/clarity, I analyze it as such.

The Court appreciates that this leaves a great deal of uncertainty.  Notwithstanding, principles of judicial restraint counsel against providing a broader holding.  Lake Okeechobee and the Everglades more generally are highly regulated.  Numerous federal and state laws might be implicated by any given action.  Moreover, federal and state government jurisdiction is oftentimes overlapping.  Under these circumstances, it is especially prudent to avoid moving beyond the narrow grounds on which this case can be decided.

### 1.   AGENCY DEFERENCE

The issue of agency deference in this case is simple—there is none.   First, I do not find that the statute is ambiguous.  *Chevron, U.S.A., Inc. v. Nat. Resources Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").  In other words, there is no need to reach step two of *Chevron*.  Second, I also ultimately agree with the Corps' interpretation.  *See Edelman v. Lynchburg College*, 535 U.S. 106, 114 (2002) ("Because we so clearly agree with the EEOC [*i.e.*, the agency], there is no occasion to defer and no point in asking what kind of deference, or how much."); *The Pittsburg & Midway Coal Mining Co. v. Dir., Off. of Workers' Compen. Programs, U.S. Dept. of Lab.*, 508 F.3d 975, 983 n.6 (11th Cir. 2007) (quoting same).  So, rather than engage in a long discussion about agency deference only to not defer and then come to the same conclusion anyways, I will cut to the chase.

### 2.   "INTERVENING NON-CERP ACTIVITY"[9]

The text of the Savings Clause states that it only applies "as a result of implementation of the Plan."  WRDA 2000 § 601(h)(5)(A)(i).  Again, the "Plan" is defined as, "the Comprehensive

---

[9] The Corps first used the term "intervening non-CERP activities" in its Guidance Memorandum.  2020_ROD_004269.  Throughout the summary judgment briefing, the Parties and *Amici* have also used the term "intervening non-CERP event" interchangeably.

Everglades Restoration Plan contained in the 'Final Integrated Feasibility Report and Programmatic Environmental Impact Statement', dated April 1, 1999, as modified by this section." *Id*. § 601(a)(4).  Everything else is not the "Plan."  At minimum, this must mean—and Plaintiffs *do not* dispute—that non-Plan actions/events (or as the Corps calls it, "intervening non-CERP activities") are excluded.  Examples that the Parties agree on are acts of nature and/or actions by third parties.  (Plaintiffs' Brief, DE 67 at 13) ("What is left out [of CERP] are events like natural disasters (such as droughts or saltwater intrusion), or actions by parties other than the Corps and its local sponsor, SFWMD."); (Plaintiffs' Counsel, Hearing Transcript, 19-20) (stating same and adding that "if the dam [*i.e.*, the Herbert Hoover Dike] just broke, I would say that is not an action of the Corps that would be subject to the Savings Clause.").

The following hypothetical is illustrative.  For simplicity, imagine that the pre-CERP baseline (*i.e.*, the quantity of water available on the date of enactment of WRDA 2000) was 100x. In subsequent years, a relentless drought affects the south Florida area, reducing the quantity of water available to 50x.   The Corps now wants to implement a CERP Project ("Project A").  To do so, it must comply with the Savings Clause.  Project A will neither reduce nor increase the current quantity of water available, 50x.  Does Project A violate the Savings Clause?  No.  The water lost (*i.e.*, the reduction in the pre-CERP baseline by 50%) was not "as a result of implementation of the Plan."  In fact, Project A does not change the quantity of water at all.

This hypothetical scenario represents a straightforward application of the Savings Clause that Plaintiffs seem to agree with.  Nevertheless, Plaintiffs fight hard against endorsing the term, "intervening non-CERP activities."  They argue that there is no such thing as an intervening non-CERP activity.  (*See e.g.*, DE 50 at 13) (stating that "[t]he term is a fiction").  What else would Plaintiffs have the Corps call a drought?  Perhaps an intervening non-Plan event, or maybe an

17

intervening act of nature.  But this cannot matter.  The exact term used to conveniently (and accurately) describe what the text of the statute unambiguously commands is of no consequence.

Notably, Plaintiffs do not challenge the Corps' method of dealing with intervening non-CERP activities—only that LORS 2008 is not one of them.  That is, as the Corps stated in its Guidance Memorandum, the Savings Clause "does not require CERP to make up for reductions" in water "caused by intervening non-CERP events, but it does prohibit CERP projects from further reductions."  2020_ROD_004269.  Or in cases when intervening non-CERP activities increase the quantity of water, that CERP is not prohibited from reducing the quantity of water up to (but not below) the pre-CERP baseline.  *Id.*  Nowhere in the summary judgment briefing do Plaintiffs argue that, assuming LORS 2008 is an intervening non-CERP activity, that the Corps is required to do something other than what its Guidance Memorandum says.

Plaintiffs cannot have it both ways.  In their reply brief, Plaintiffs say "WRDA 2000 did not make the government a guarantor of water supply against natural disasters like droughts or saltwater intrusion, but instead, requires the Corps to look at each CERP project and analyze whether at least the same amount of water will be available as compared to the 2000 baseline." (DE 67 at 7).  This does not make sense.  Plaintiffs agree that the Savings Clause only applies to losses in water due to "implementation of the Plan."  Yet in the same breath, they want to prevent the Corps from implementing CERP if the baseline is not the same as it was in the year 2000, regardless of intervening non-CERP activities.

The Corps' Programmatic Regulations lead to the same conclusion.  In its Regulations, the Corps states that it is "to determine if existing legal sources of water are to be eliminated or transferred *as a result of project implementation*."  33 C.F.R. § 385.36(a) (emphasis added).  And "*if implementation of the project will cause* an elimination or transfer of existing legal sources of

water by comparing the availability of water with the recommended project with the pre-CERP baseline." *Id*. (emphasis added).   Neither of these directives expand the scope of the Savings Clause to non-CERP activities for the same reason:  the Corps' Regulations limit the application of the Savings Clause to losses in water due to project implementation.[10]   In fact, if it did expand the scope, that would be an impermissible interpretation of the statute given that it unambiguously *does not* apply to non-CERP activities.  *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1320 (11th Cir. 2011) (citing *Carcieri v. Salazar*, 555 U.S. 379, 386-87 (2009)) ("Where the statutory language is clear, agency regulations have no effect.")

This only provides half the answer to the question at the heart of this case; that is, whether LORS 2008 is an intervening non-CERP activity.

### 3.  WAS LORS 2008 AN INTERVENING NON-CERP ACTIVITY?

Plaintiffs provide shifting and at times contradictory answers to this question.  Most times their answer is "no, but it is now."  Other times, it is simply yes.  I will spend the initial portion of this Section outlining what exactly it is that Plaintiffs argue before directly interpreting the statute as to this question.  I do so because Plaintiffs' position reveals a key gap in their reasoning that helps elucidate why their reading of the statute is wrong.  That is, at no point do Plaintiffs answer (though they assume it) how the Corps lawfully lowered Lake Okeechobee's water elevation to ensure the structural integrity of the Dike.

---

[10] Plaintiffs see the definition of "pre-CERP baseline" in the Regulations as a sort of smoking gun.  (*See* DE 50 at 10).  It is not.  The Regulations define the pre-CERP baseline as the "hydrological conditions in the South Florida ecosystem on the date of enactment of WRDA 2000 . . . ."  33 C.F.R. § 385.3.  Again, this does not change the fact that what matters is a loss in water due to "project implementation."

In their reply brief, Plaintiffs state that the "Savings Clause violation did not occur with the adoption of LORS 2008."[11] (DE 67 at 12). In fact, Plaintiffs have not and do not now challenge LORS 2008 directly.[12] This is a curious position to hold. If the Corps' implementation of LORS 2008 *did not* trigger the Savings Clause, as Plaintiffs seemingly agree, then it must have not been an "implementation of the Plan."

So, what then, in Plaintiffs' view, violated the Savings Clause? Well, Plaintiffs state that "[t]he Savings Clause violation occurred when the Corps' [sic] changed LORS 2008 from a temporary schedule **necessary for dike repairs** to permanently us[ing] it for environmental restoration in the challenged CERP project." (*Id*.) (emphasis added). Said another way, "CERP applies to all C&SF Project modifications and operational changes the Corps makes for environmental and other water-related purposes." (*Id*. at 13). This line of reasoning continues to implicitly concede that when the Corps implemented LORS 2008 for "necessary . . . dike repairs" it *did not* trigger the Savings Clause. Plaintiffs instead argue that the Corps essentially transformed LORS 2008 into a CERP Project when it used it as the baseline for the EAA Project because it was ostensibly for an "environmental purpose."

That argument completely disregards the text of the Savings Clause and contradicts Plaintiffs' own position as it relates to "acts of nature" or "third parties." Plaintiffs have never argued that the Corps would be responsible for "making up" for lost water due to such an

---

[11] To be clear, Plaintiffs do not argue that LORS 2008 complies with the Savings Clause; *i.e.*, that it provides a "comparable" quantity of water. (*See, e.g.,* Plaintiffs' counsel, Hearing Transcript, 7:19-22) (responding to whether LORS 2008 provides comparable water with: "[w]e think the answer is clearly no."). Indeed, this whole case is largely about how it does not.

[12] Defendants and Everglades *Amici* point out that the statute of limitations to directly challenge LORS 2008 has since run. (Defendants' Brief, DE 59 at 22) (stating that statute of limitations is six years); (Everglades *Amici* Brief, DE 64 at 12 n.6) (same). Plaintiffs do not rebut this.

event/activity.  In fact, they have said the opposite.  Plaintiffs' reply brief states: "the Corps is not a guarantor of water supply affected by every factor affecting water supply." (DE 67 at 13).  Under Plaintiffs' logic, however, the Corps would be just that.

Another hypothetical helps show why.  Like before, assume the pre-CERP baseline is 100x. In subsequent years, a third party lowers the quantity of water available to 80x.  The Corps now wants to implement a CERP Project ("Project B").  To do so, it must comply with the Savings Clause.  Project B will neither increase nor decrease the current quantity of water available, 80x. In implementing Project B, the Corps says, "this 80x baseline advances Everglades restoration more so than we could have ever done on our own."  Following Plaintiffs' logic, the Corps transformed the third party's actions into a CERP activity because the Corps adopted the lower baseline for an "environmental purpose."  This line of thinking deletes the words "as a result of implementation of the Plan" from the Savings Clause.  Plaintiffs do not cite a single case or even secondary source to support this quite surprising conclusion.

Much of Plaintiffs' position also hinges on the temporary nature of LORS 2008, but that is a red herring.  First, if Plaintiffs wanted to challenge LORS 2008, they had plenty of time to do so. *See supra* note 12, at 20.  Any sense of "unfairness" raised by the Corps' continued implementation of LORS 2008 is too little, too late.  Second, under the Savings Clause, it ultimately does not matter whether the Corps intended for LORS 2008 to be temporary or not.  The question is whether LORS 2008 was an implementation of the Plan. The temporary nature of the action provides no guidance on that front.  If the Corps did not violate the Savings Clause in 2007 by implementing LORS 2008, then it does not now.  It cannot be that there is an exception to the Savings Clause that says:  temporary violations are okay, but not permanent ones.

Perhaps realizing the holes in their reasoning, Plaintiffs at oral argument seemed to shift their position by arguing that LORS 2008 was always part of CERP, and even if it was not, it is now.  (*See* Okeelanta Corporation's counsel, Hearing Transcript, 10:5-7) ("Much of what LORS [2008] was trying to do was achieve environmental goals of the CERP itself, it wasn't just about the dike."); (*see also* U.S. Sugar Corporation's counsel, *id.*, 39:16-18) (agreeing but adding "[w]e think the Corps' actions are illegal whether or not LORS '08 was a CERP or non CERP event.").

I will now turn directly to the statute itself, explain my interpretation of it, and address its application to LORS 2008.  In doing so, I use traditional tools of statutory construction.  *Chevron*, 467 U.S. at 843 n.9 ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."); *see also Autauga County Emerg. Mgt. Commun. Dist. v. Fed. Commun. Commn.*, 17 F.4th 88, 99 (11th Cir. 2021) (listing traditional tools of statutory construction as "the text of the statute, its structure, its history, and its stated purpose . . . . "); *cf. Kisor v. Wilkie*, 139 S.Ct. 2400, 2415 (2019) (listing same to interpret regulations).

***The Text and Structure.***  For ease of reference, the Savings Clause states:

> NO ELIMINATION OR TRANSFER—Until a new source of water supply of comparable quantity and quality **as that available on the date of enactment of this Act** is available to replace the water to be lost **as a result of implementation of the Plan**, the Secretary and non-Federal sponsor shall not eliminate or transfer existing legal sources of water, including those for—
> (i) an agricultural or urban water supply.

WRDA 2000 § 601(h)(5)(A)(i) (emphasis added).  The date of enactment was December 11, 2000.  (DE 67 at 6).  The Parties do not dispute that LORS 2008 eliminated an "existing legal source[] of water" for which Plaintiffs use for agriculture.  The statue does not define "comparable quantity" and its context does not suggest a special meaning.  As such, the term is given its plain and ordinary

meaning at the time that Congress enacted the statute.  *See United States v. Garcon*, 54 F.4th 1274, 1277-78 (11th Cir. 2022).  Whatever quantity comes close to that which might constitute a "comparable quantity," LORS 2008 is not it.  LORS 2008 lowered Lake Okeechobee's water elevation by about 1.5 ft, or 500,000 acre-feet of water.  Even with the improvements of the EAA Project, the Corps will only cut that in about half.  *See* 2020_ROD_031336; (Everglades *Amici*, DE 64 at 12).

The "Plan" is defined as "the Comprehensive Everglades Restoration Plan contained in the 'Final Integrated Feasibility Report and Programmatic Environmental Impact Statement', dated April 1, 1999, as modified by this section."  *Id*. § 601(a)(4).  As I explained in previous Section, the phrase "as a result of implementation of the Plan" means that the Savings Clause does not apply to intervening non-CERP activates.  Nothing in the Savings Clause indicates that the Corps cannot itself produce intervening non-CERP activities.

In the Plan, under the heading of "Operational Features," is a change to the Lake Okeechobee Regulation Schedule in place at the time, "Run 25."  2015_ROD_003684.  That operational change is reproduced in full here:

> The Lake Okeechobee Regulation Schedule **will be modified in order to take advantage of the additional storage facilities identified in the construction features. Two additional zones will be added to the schedule**. The first zone will trigger discharges to the north of Lake Okeechobee reservoir and the Everglades Agricultural Area reservoir. The second higher zone will trigger the Lake Okeechobee aquifer storage and recovery facilities to begin injecting water from the Lake. **Climate based forecasting will be used to guide management decisions regarding releases to the storage facilities.**

> It is anticipated that all flood control releases through the C-43 and C-44 Canals will be eliminated with the exception of emergency zone A. Zone A levels are expected to be similar to the levels that occur in the current regulation schedule Run 25, however, the number of times that the Lake is above zone A is expected to be dramatically reduced.

*Id.* (emphasis added).

Turning back to the statute, it further states that:

> "Except as modified by this section,[13] the Plan is approved as a **framework** for **modifications** and **operational changes** to the Central and Southern Florida Project ["C&SF Project"] that are needed to restore, preserve, and protect the South Florida ecosystem while providing for other water-related needs of the region, including water supply and flood protection. The Plan shall be implemented to ensure the protection of water quality in, the reduction of the loss of fresh water from, and the improvement of the environment of the South Florida ecosystem and to achieve and maintain the benefits to the natural system and human environment described in the Plan, and required pursuant to this section, for as long as the project is authorized.

*Id.* § 601(b)(1)(A) (emphasis added). The C&SF Project is defined as "the project for Central and Southern Florida authorized under the heading "CENTRAL AND SOUTHERN FLORIDA" in section 203 of the Flood Control Act of 1948 (62 Stat. 1176)." *Id.* § 601(a)(1)(A). Including any "modification to the project authorized by [§ 601] or any other provision of law." *Id.* § 601(a)(1)(B).

With that in mind, this is what I interpret the statute to say: the Plan includes an *operational change* to the Lake Okeechobee Regulation Schedule, which was part of the existing C&SF Project. The operational change is to allow for discharges to new storage facilities. The new storage facilities are part of the *modifications* to the C&SF Project.[14] The Plan is the "framework"

---

[13] "Section" refers to Section 601 of WRDA 2000, which covers CERP. Section 601 is under "Title VI—Comprehensive Everglades Restoration." Title VI contains one other section, Section 602. Section 602 basically required the U.S. Airforce to carefully consider how development at the Homestead Air Base, near the Everglades, may impact the surrounding environment. Congress emphasized that "the Everglades is an American treasure and includes uniquely-important and diverse wildlife resources and recreational opportunities." WRDA 2000 § 602(a)(1). The rest of the statute covers other environmental projects.

[14] This reading, as it should, gives independent meaning to "modifications" and "operational change." *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts § 26, at 174 (2012) (explaining canon against surplusage).

in that it provides broad directives (indeed, two paragraphs) on what operational change the regulation schedule must undergo.  The broad nature of the framework means the Corps would have to determine the details through rule making; hence, the Programmatic Regulations.

Crucial to the Plan's "operational change" is what it leaves out: changes to the Corps' authority to ensure the structural integrity of the Dike (more on this in the history).   And it was not for lack of consideration.  In formulating the Plan, the Corps considered the Florida Governor's (then Gov. Lawton Chiles) recommendations in a document titled, *A Conceptual Plan for the C&SF Project Restudy*.   2015_ROD_003420.[15]   The 1999 Report's summary of those recommendations notes that "[r]ecent high lake levels and the resulting dike seepage problems indicate levee repairs and improvements may be required even if the current regulation schedule is not raised."  *Id*. at 003533.  Notwithstanding the Governor's recommendations, the Corps did not include any such provision in the "Operational Features" section of the Plan.  Congress, in turn, did not override this decision in adopting the Plan as the "framework."  Moreover, the Plan's mention that "climate based forecasting will be used to guide management decisions regarding releases to the storage facilities" indicates a great deal of discretion for the Corps. 2015_ROD_003684.

Plaintiffs point to the following clause of WRDA 2000 to argue otherwise:

> INTEGRATION.—In carrying out the Plan, the Secretary **shall integrate the activities described in subparagraph (A)[16] with ongoing Federal and State projects and activities** in accordance with section 528(c) of the Water Resources Development Act of 1996 (110 Stat. 3769). Unless

---

[15]  "The Water Resources Development Act of 1996 directs that the conceptual framework provided in the *Conceptual Plan for the Restudy* (GCSSF, 1996b) be considered in the development of the Comprehensive Plan."  2015_ROD_003420.

[16] Referring to the preceding block quote of WRDA 2000.

specifically provided herein, nothing in this section shall be construed to modify any existing cost share or responsibility for projects as listed in subsection (c) or (e) of section 528 of the Water Resources Development Act of 1996 (110 Stat. 3769).

*Id*. § 601(b)(1)(B) ("Integration Clause").   Section 528(c) of WRDA 1996 provides a non-exhaustive list of four Everglades-related projects.[17]   In their view, the Integration Clause means that the Savings Clause applies to *any* management action the Corps takes in relation to the C&SF Project.  (DE 50 at 12).  If not, Plaintiffs argue, then the Integration Clause is superfluous.  (DE 67 at 13).

Plaintiffs' conclusion is not right for three reasons.  First, the plain and ordinary meaning of "integrate [CERP] activities . . . with ongoing Federal and State projects and activities" is not to *override* those activities.  Integrate means to "to form, coordinate, or blend into a functioning or unified whole: unite."  *Integrate*, Merriam-Webster's Collegiate Dictionary (10th ed. 1996).[18] To coordinate or blend into a functioning whole connotes some level of give and take.  The Corps'

---

[17]  They are as follows:

(A) the project for the ecosystem restoration of the Kissimmee River, Florida, authorized by section 101 of the Water Resources Development Act of 1992 (106 Stat. 4802);

(B) the project for modifications to improve water deliveries into Everglades National Park authorized by section 104 of the Everglades National Park Protection and Expansion Act of 1989 ( 16 U.S.C. 410r-8);

(C) activities under the Florida Keys National Marine Sanctuary and Protection Act (16 U.S.C. 1433 note; 104 Stat. 3089); and

(D) the Everglades Construction Project of the State of Florida.

WRDA 1996 § 528(c).

[18]  *Integrate*, Merriam-Webster's Online Dictionary 2023, https://www.merriam-webster.com/dictionary/integrate (same),

proposed method of dealing with intervening non-CERP activities (again, not challenged) does just that by maintaining the pre-CERP baseline as an important limiting point.   *See* Part II.A.3. Second, Plaintiffs' broad reading of the Integration Clause is conveniently selective.   Under Plaintiffs' view, nothing stops the Savings Clause from also applying to all projects by the State of Florida.   They have of course never argued that because it is simply not the case.   The Savings Clause explicitly only applies to the "Secretary [of the Army] and the non-Federal sponsor [SFWMD]."   WRDA 2000 § 601(h)(5)(A)(i).

Third, returning to a reoccurring inconsistency in Plaintiffs' position, if Plaintiffs are right that the Integration Clause is that broad, then the Corps' implementation of LORS 2008 would have violated the Savings Clause from the start.   Perhaps Plaintiffs are reluctant to take a strong position on this point because to do so would necessarily mean that when the Corps lowered Lake Okeechobee's water level (because it was concerned that the Dike might break and put in harm's way nearby residents), it violated the Savings Clause.   That cannot possibly be right.   Such a result rises to the level of absurdity and statutes must not be read to produce absurd results.   *See Durr v. Shinseki*, 638 F.3d 1342, 1349 (11th Cir. 2011) (citation omitted) (explaining rationale of absurdity doctrine as: "[b]ecause the legislature is presumed to act with sensible and reasonable purpose, a statute should, if at all possible, be read so as to avoid an unjust or absurd conclusion.")

In adopting LORS 2008, the Corps stated that "[t]he issue of public health and safety, related to concerns regarding the integrity of the Herbert Hoover Dike (HHD) surrounding the lake, is the dominant factor in the decision making process to select a preferred alternative regulation schedule."   2020_ROD_042274.   The Corps further stated that "the heightened concern with [the Dike] was emphasized after several hurricanes passed through south Florida during 2004 and 2005, as well as the levee damage around New Orleans caused by Hurricane Katrina in 2005."

*Id*. at 042303.  The Corps determined that under the then-current regulation schedule, WSE, the likelihood of the Dike breaking in a high-water event was 55%.  *Id*.  The Corps issued LORS 2008 through notice and comment rulemaking.  2020_ROD_042277.

Comparing LORS 2008 to the "operational changes" in the Plan, it becomes clear that they are two separate things.  LORS 2008 was not an "implementation of the Plan."  The Plan did not dictate how the Corps might ensure the structural integrity of the Dike in the future.  Neither did WRDA 2000 abrogate the Corps' ability to do so.   Accordingly, I find that the Savings Clause is unambiguous as to its exclusion of LORS 2008.

***The History and Purpose.***   "Courts look to a statute's contemporary history and historical background as aids to interpretation.   These aids illuminate the circumstances under which an act was passed, the mischief at which it was aimed, and the statute's 'object' or 'purpose.'" Preenactment history, 2A Sutherland Statutory Construction § 48:3 (7th ed.); *see also Mellouli v. Lynch*, 575 U.S. 798, 812 (2015) (Ginsburg, J.) (using "historical background" of statute as a tool of construction); *Pereira v. Sessions*, 138 S.Ct. 2105, 2124 (2018) (Alito, J., dissenting) (relying, in part, on "statutory history" to interpret statute).  And while not necessary given that the statute's text is unambiguous, the Eleven Circuit has explained that "[s]o long as legislative history is not used to contradict the plain meaning of the statutory language, we see no inconsistency in pointing out that both the statutory language and legislative history lead to the same interpretative result." *Harris v. Garner*, 216 F.3d 970, 977 n.4 (11th Cir. 2000) (en banc) (Carnes, J.).

Prior to any human intervention, Lake Okeechobee had no defined southern border. Alanna L. Lecher, Ph.D., *A Brief History of Lake Okeechobee: A Narrative of Conflict*, J. FLA. STUD., 2021, at 1, 3.  During the wet seasons, Lake Okeechobee would spill over its southern edge and flow into the Everglades.  *Id*. at 4.

In 1850, Congress passed the "Swamp and Overflowed Lands Act of 1850, which conveyed the Everglades and surrounding overflowed areas to the State of Florida for development." *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 537 (11th Cir. 2013) (citing 9 Stat. 519, 520).  Soon after, businessmen and then the State of Florida began to dredge canals to re-route the Lake's seasonal flooding into the Gulf of Mexico and the Atlantic Ocean.  Lecher, *supra*, at 7-9.  By the 1920's, real estate investors trusted the effectiveness of the canals enough to develop housing alongside Lake Okeechobee.  Lecher, *supra*, at 9.  The canals turned out not to be enough.  In 1924, following a series of floods, the State of Florida constructed a dike (5-9 ft) made of muck and rocks along the southern portion of the Lake.  *Id.*

Congress, in the form of the Rivers and Harbors Act of 1930, stepped in following a pair of hurricanes in 1926 and 1928 that caused massive flooding of Lake Okeechobee, killing approximately 3,000 people.  *Mildenberger v. United States*, 91 Fed. Cl. 217, 226 n.3 (Fed. Cl. 2010).  The small dike of muck and rocks was swept away along with various communities. Lecher, *supra*, at 10.  In the 1930 Act, Congress directed the Secretary of War (now the Secretary of the Army) to build levees (31 ft above sea level) along Lake Okeechobee.  Rivers and Harbors Act of 1930, Pub. L. No. 71-520, 46 Stat. 918, 925.  Congress would later name this system of levees the Herbert Hoover Dike.  2020_ROD_043924 (citing Flood Control Act of 1960).  Thus began the U.S. Army Corps of Engineers' management of Lake Okeechobee.  *See Fla. Wildlife Fedn. Inc. v. U.S. Army Corps of Engineers*, 859 F.3d 1306, 1311 (11th Cir. 2017).

 In the Rivers and Harbors Act of 1935, Congress solidified the Corps' sole responsibility over the Dike by modifying the construction project "to provide that the **United States shall maintain all project works when completed** and shall bear the cost of all drainage structures heretofore or hereafter constructed in connection with said project . . . . "  Rivers and Harbors Act

of 1935, Pub L. No. 74-409, 49 Stat. 1028, 1032 (emphasis added).  Pursuant to the 1935 Act, the Corps operated and maintained the culverts, over 83 miles of levee, hurricane gates, St. Lucie Canal, Caloosahatchee River Canal, and the Okeechobee Waterway.   2020_ROD_043925. Despite this massive investment, it still was not enough to adequately protect against flooding. Lecher, *supra*, at 11.

In the Flood Control Act of 1948, Congress initiated the C&SF Project.  The 1948 Act stated in pertinent part:

> The project for Caloosahatchee River and Lake Okeechobee drainage areas, Florida, **authorized by the Rivers and Harbors Act of July 3, 1930**, as amended [*i.e.*, the 1935 amendment], is hereby **modified and expanded** to **include** the first phase of the comprehensive plan for flood control and other purposes in central and southern Florida [*i.e*, C&SF Project] as recommended by the Chief of Engineers.

80 Pub. L No. 80-858, 62 Stat. 1171, 1176 (emphasis added); *see also* 62 Stat. 1175 (authorizing Corps to preside over C&SF Project "for the benefit of navigation and the control of destructive floodwaters and other purposes . . . . ").

Notably, for purposes of this case, the 1948 Act *modified and expanded* the Rivers and Harbors Act of 1930, and its 1935 amendment, to *include* the C&SF Project.  The plain and ordinary meaning of "modified and expanded" is not to repeal.  The C&SF Project included the construction and modification of several structures aimed at giving the Corps more control over Lake Okeechobee.  2020_ROD_043936.  The C&SF Project is also what allowed the Corps to implement regulation schedules, but it did not direct a specific schedule.  *Id*. at 043943.  None of this indicates that Congress intended to curtail the Corps' ability to maintain the integrity of the Dike.

Jumping ahead,[19] Congress explained its motivation for modifying the C&SF Project in WRDA 1996 by directing the Corps to:

> [D]evelop . . . a proposed comprehensive plan for the purpose of restoring, preserving, and protecting the South Florida ecosystem. The comprehensive plan shall provide for the protection of water quality in, and the reduction of the loss of fresh water from, the Everglades. The comprehensive plan shall include such features as are necessary to provide for the water-related needs of the region, including flood control, the enhancement of water supplies, and other objectives served by the Central and Southern Florida Project.

WRDA 1996, Pub. L 104-303, 110 Stat 3658, § 528(b)(1)(A)(i).   At no time has Congress indicated that it intended for the Plan to override the Corps' pre-existing authority to maintain the structural integrity of the Dike.

The legislative history on the Savings Clause is sparse, but it does support what the text already says: it only applies because of "implementation of the Plan."  *See* S. REP. 106-362, at 53. Thus, the Savings Clause serves as an important limiting point for the Corps.  In cases in which there are no intervening non-CERP activities, it would apply in exactly the manner that Plaintiffs argue (*i.e.*, the pre-CERP baseline is the baseline).   In cases in which there are such activities/events, the Corps' proposed application of the Savings Clause provides a meaningful limitation on the Corps' actions. *See* Part II.A.3.  I once more emphasize that Plaintiffs have not challenged that.

Plaintiffs argue that the Savings Clause fails to serve any purpose if the Corps can simply use a temporary drawdown to permanently alter the pre-CERP baseline.  That is not exactly right. First, the Corps remains constrained by the APA's arbitrary and capricious review.  It could not, for example, act under pretext.  *See Dept. of Com. v. New York*, 139 S.Ct. 2551, 2576 (2019)

---

[19] Congress authorized remaining features of the C&SF Project in a series of Flood Control Acts.  *Mildenberger v. United States*, 91 Fed. Cl. 217, 225 (Fed. Cl. 2010) (collecting statutes).

(citation omitted) (finding pretext and stating "[o]ur review is deferential, but we are 'not required to exhibit a naiveté from which ordinary citizens are free.'").  Second, the risk posed is inherent in the text of the Savings Clause, which only applies to implementation of the Plan.  That is a choice made by Congress that I cannot second guess.  Third, the Corps must still comply with numerous other state and federal laws in maintaining the Lake's water level.  2020_ROD_042486-89 (citing compliance with *twenty-five* environmental laws in implementing LORS 2008); *see also Miccosukee Tribe of Indians of Fla.*, 566 F.3d at 1275 (finding violation of Endangered Species Act); *Ctr. for Biological Diversity v. U.S. Army Corps of Engineers*, No. 19-CV-14199, 2020 WL 9073339 (S.D. Fla. Aug. 28, 2020) (Middlebrooks, J.) (same).  And fourth, I reiterate that my holding in this case is limited to LORS 2008.

Subsequent legislation also provides helpful clues as to the application of the Savings Clause to LORS 2008.[20]  In WRDA 2018, Congress directed the Corps to "expedite completion of the Lake Okeechobee regulation schedule to coincide with the completion of the Herbert Hoover Dike project,[21] and **may** consider all relevant aspects of the Comprehensive Everglades Restoration Plan described in section 601 of the [WRDA 2000]."  Pub. L. No. 115-270, 132 Stat. 3773, § 1106 (emphasis added and citation omitted).  Congress' use of the word "may" indicates discretion, which is contrary to Plaintiffs' position that *any* operational change to regulation schedules, and in particular LORS 2008, is subject to the Savings Clause.

---

[20] "It is settled that 'subsequent legislation may be considered to assist in the interpretation of prior legislation upon the same subject.'"  *Great N. R. Co. v. United States*, 315 U.S. 262, 277 (1942).  Notwithstanding, courts nowadays generally regard subsequent legislation as having little-to-no value in interpreting a statute.  *See, e.g., Pitch v. United States*, 953 F.3d 1226, 1241 n.14 (11th Cir. 2020).  In any event, I do not rely on it here.  I simply point to it, and only at the very end, to reinforce what the text already commands.

[21] This refers to the new regulation schedule the Corps is set to implement by June of this year.  *See* Part II.A.4.

Two years later, Congress directed the Corps to, pursuant to the 2018 Act, "evaluate the implications of prohibiting releases from Lake Okeechobee through [specific structures]" and coordinate with "ongoing efforts of Federal and State agencies responsible for monitoring . . . cyanobacteria levels in Lake Okeechobee."  WRDA 2020, Pub. L. No. 116-200, 134 Stat. 1182, § 210 (titled, "Lake Okeechobee Regulation Schedule, Florida").  And finally, about three months ago,[22] Congress directed the Corps to submit a report, within 180 days, providing an "update" on:

> (1) [CERP] projects, as authorized by or pursuant to section 601 of [WRDA 2000];
>
> (2) **the review of the Lake Okeechobee Regulation Schedule pursuant to section 1106 of [WRDA 2018] and section 210 of [WRDA 2020]**; and
>
> (3) any additional water resources development projects and studies included in the South Florida Ecosystem Restoration Plan Integrated Delivery Schedule[23] prepared in accordance with [the Corps' Programmatic Regulations].

James M. Inhofe National Defense Authorization Act for Fiscal Year 2023, Pub. L. No. 117-263, § 8217 (emphasis added).

---

[22] It is worth noting that this Bill was signed into law on December 23, 2022, over a year *after* Plaintiffs initiated these lawsuits.

[23] The Corps' website describes this as follows:

> The Integrated Delivery Schedule (IDS) is a forward-looking snapshot of upcoming design and construction schedules and programmatic costs at a "top" line level for the South Florida Ecosystem Restoration (SFER) Program. It includes Modified Water Deliveries to Everglades National Park, Critical Projects, Kissimmee River Restoration, non-Comprehensive Everglades Restoration Plan (CERP) Central and Southern Flood (C&SF), and CERP projects.

Integrated Delivery Schedule, U.S. Army Corps of Engineers, https://www.saj.usace.army.mil/Missions/Environmental/Ecosystem-Restoration/Integrated-Delivery-Schedule/ (last visited 3/20/2023).

Congress is clearly hyper focused on LORS 2008 and Lake Okeechobee more generally. It has passed not one, but *three* laws directly related to it since 2018.  And yet, in none of those instances, has Congress directed the Corps to "comply" (*i.e.*, in the way that Plaintiffs request) with the Savings Clause.

Having considered the text, structure, history, and purpose of WRDA 2000, I reach a similar conclusion as Plaintiffs implicitly have:  the Corps' adoption of LORS 2008 was not an "implementation of the Plan."  However, unlike Plaintiffs, I do not see how the statute gives any credence to the temporary nature of the action.  The action either is or is not part of the Plan; it cannot shapeshift.  Thus, the Corps does not now violate the Savings Clause by using LORS 2008 as the baseline for the EAA Project.

### B.    PROGRAMMATIC REGULATIONS CLAIMS

As outlined in Part II.C, Plaintiffs claim that the Corps violated its own regulations in two respects.  (DE 50 at 10-11).  First, by not using the "the hydrological conditions in the South Florida ecosystem on the date of enactment of WRDA 2000" as the pre-CERP baseline.  (*Id*. at 10) (citing 33 C.F.R. § 385.3).   Second, by not issuing a pre-CERP baseline by June 14, 2004. (*Id*.) (citing 33 C.F.R. § 385.35(a)(1)).  I will briefly address both in turn.

As to the first, this Court's interpretation of the Savings Clause as applied to LORS 2008 resolves Plaintiffs' claim in favor of the Corps.  The regulations do not, and indeed could not, run counter to the Court's interpretation of an unambiguous statute.  Second, what the regulations actually say is that "[n]ot later than June 14, 2004 the Corps . . . shall . . . *develop for approval* by the Secretary of the Army, the pre-CERP baseline . . . and memorialize the pre-CERP baseline in

an appropriate document."[24]  33 C.F.R. § 385.35(a)(1) (emphasis added).  That document is meant

to be used in the Corps' Savings Clause analysis pursuant to 33 C.F.R. § 385.36(a).

Plaintiffs read § 385.35 to mean that the Secretary of the Army had to *approve* the pre-

CERP baseline *by* June 14, 2004.  (DE 50 at 5).  That is simply not what the regulation says—it

says, "develop for approval."  *Id*. § 385.35(a)(1).  Moreover, 33 C.F.R. § 385.36(c), provides that

"[u]ntil guidance is *issued*, issues involving existing legal sources of water should be resolved on

a case-by-case basis considering all the factors that can be identified as relevant to decisions under

the savings clause."  "Issued" means that the guidance has been approved, not just developed.

Plaintiffs *do not* challenge the Corps' method of resolving intervening non-CERP events (only that

such a thing exists).  As such, the "pre-CERP baseline," as defined by the Corps' regulations is

not relevant in this case because LORS 2008 is a lower baseline than the pre-CERP baseline.

Under the Corps', currently unchallenged reasoning, the "pre-CERP baseline" would only be

relevant when there are no intervening non-CERP activities or when those activities *increase* the

quantity of water.

Accordingly, I do not find that the Corps violated its own Programmatic Regulations.

## C.    NEPA CLAIMS

Plaintiffs' NEPA claims are premised on (1) their reading of the Savings Clause and (2)

the Corps' failure to analyze the operation of the STA independently of the Reservoir.  Plaintiffs'

first challenge is rejected for all the reasons stated above.  As to the second, Plaintiffs' claims are

also rejected.  The reasoning behind the latter is the subject of the following paragraphs.

---

[24] It appears the Corps missed this deadline because it developed this document in April 2005.  (Defendants' Answer, DE 45 ¶ 43).  However, I do not find that significant.  For starters, to the extent this delay gave rise to any injury (which I find questionable), the statute of limitations has since run by over a decade.  Second, Plaintiffs do not directly take issue with this.  They instead rely on, what I find to be, an erroneous reading of the regulations.

To briefly reiterate the issue: Plaintiffs complain of the Corps' failure to perform a separate NEPA analysis for the standalone operation of the STA post grow-in period.[25] The Corps' NEPA analysis for the EAA Project assumed that the STA (post grown-in) would operate in tandem with the Reservoir. (DE 59 at 9, 22). The grow-in period is a period of time, estimated to conclude in 2025, that will allow grass to grow in the STA. (Plaintiffs' Reply Brief, DE 67 at 24); (Defendants' counsel, Hearing Transcript, 75:1-4) (stating expected completion date is September 2025). After the grow-in period, water will be able to flow into the STA, get "cleaned" up, and then flow down to the Everglades. The Reservoir would store water to make up for losses from the STA. However, construction on the Reservoir just began, and it is not expected to be operational until 2029.

The Corps responds that it requires its local sponsor, South Florida Water Management District ("SFWMD"), to apply for additional permits to operate the STA post grow-in. At that time, the Corps says, a new NEPA and Savings Clause analysis would occur. (DE 59 at 32-34). In its brief, the Corps further says that "[a] fully operational stand-alone STA is purely hypothetical." (*Id.*).

Plaintiffs reply to these assertions with incredulity—how is a $261 million project going to be held up, they say. (Plaintiffs' counsel, Hearing Transcript 31:2-6). Crucially, Plaintiffs argue that "[n]owhere has the Corps committed to conducting additional NEPA analysis on standalone STA operations." (DE 50 at 19). I initially shared a similar view as Plaintiffs.[26]

---

[25] Plaintiffs *do not* challenge the Corps' operation of the STA during the grow-in period, only after.

[26] In this Court's Order on Defendants' Motion to Dismiss, I held that Plaintiffs' threat of injury is not speculative because the "regulatory wheels [are] in motion for construction and operation of the STA." (DE 36).

At oral argument, however, the Corps materially changed its position.  The following key exchanges are excerpted from the hearing transcript:

> THE COURT:  One of the Plaintiffs contended that what you want to do is take that 500,000 square cubic acres, or whatever it is, and divert it to other uses, I think is what he said. What is the truth of that?
>
> MR. DYKEMA:[27]  The truth of that is that the Corps of Engineers is not nearly so underhanded, your Honor, and the bigger truth to that is that if in fact the much greater amounts of water that Mr. Munson [U.S. Sugar's counsel] referred to are, in fact, going to be diverted into the STA, **additional NEPA analysis and additional permitting will be required, and it is not a matter of prevarication, it will be required.**

(Hearing Transcript, 55:15-25) (emphasis added).

> THE COURT: I guess they are arguing two things; one, that if there is $250 million spent on it, nobody would be willing to let it sit there for seven years, or whenever the remainder of the system is completed, and then they are arguing, I guess this pump -- the 650 cubic feet per second will flow through that temporary structure without the necessity of any further study.
>
> MR. DYKEMA: It simply can't happen, your Honor, it simply cannot happen. The Corps has said in no uncertain terms -- and **there is no equivocation about this.** What the Corps has said in its permitting, for the 404 permitting to the South Florida folks [*i.e.*, SFWMD] it has said you are authorized to take this amount of water to grow the plants. Beyond that you have to get additional approvals, and **we have to do additional NEPA analysis and we have to make sure that there is Savings Clause compliance.**
>
> THE COURT: **You couldn't approve that without the additional NEPA analysis?**
>
> MR. DYKEMA: **Absolutely not.** That is exactly what the Corps has said to the South Florida folks . . . The Corps has committed that the State of Florida can't go any further with its construction or operation, and that it, the Corps, cannot go further with any additional construction or operation of the STA, the storm water treatment facility, without the additional **NEPA and Savings Clause analysis.**

(Hearing Transcript, 57, 5-24) (emphasis added).

---

[27] Defendants' Counsel.

I take these concessions seriously.  This was not a mere "convenient litigation position"[28]—it had real legal effect.  Akin to a party conceding, withdrawing, or abandoning a claim, Defendants' counsel bound the Corps.  This gave Plaintiffs largely what they had been asking for: assurances.  The Court appreciates that Plaintiffs do not find the Corps' representations comforting or credible.  Two responses.  First, as I said, I find the Corps' concessions to be legally binding. As a matter of equity, the Corps cannot later go back on its representation.  Second, given the broad discretion that agencies are given as to *when* they perform a NEPA analysis, I am not persuaded to order one now.  *See Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976); *City of Oxford, Ga. v. F.A.A.*, 428 F.3d 1346, 1354 (11th Cir. 2005).  The Corps has plenty of time (at least two years) to perform a NEPA analysis before the end of the grow-in period.  Should the Corps decide to operate the STA before the Reservoir, it must abide by its representations in this case.[29]

## V.    CONCLUSION

For the foregoing reasons, it is hereby **ORDERED and ADJUDGED** that:

(1) Plaintiffs' Motion for Summary Judgment (DE 50) is **DENIED.**

(2) Defendants' Cross Motion for Summary Judgment (DE 59) is **GRANTED.**

---

[28] *Bowen v. Georgetown U. Hosp.*, 488 U.S. 204, 212-13 (1988) (giving no deference to agency's *post hoc* rationalization or "convenient litigation position").  This is also not a position that establishes an agency "rule."  *See Heckler v. Chaney*, 470 U.S. 821, 836 n.5 (1985) (refusing to find statement of agency lawyer in litigation as establishing agency "rule").  Instead, Defendants' counsel assured that a certain *course of action* would take place as it relates to the EAA Project.

[29] I note that Plaintiffs also take issue with the Corps' lack of Savings Clause analysis for standalone operation of the STA post grow in.  (*e.g.*, Okeelanta Compl. ¶ 48-51); Part II.C. Throughout the summary judgment briefing, however, the Parties treated this issue as consonant with the resolution of the NEPA claims.  (*See, e.g.*, DE 67 at 24, 26).  Given the Corps' representations at oral argument that further NEPA *and* Savings Clause analysis must be done before standalone operation of the STA could move forward, I decline to order that such analysis be done now.

(3) Final Judgment will be entered by separate order.

**SIGNED**, in Chambers, at West Palm Beach, Florida, this 21 day of March, 2023.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

cc:     Counsel of Record

39